**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| In re UPSTART HOLDINGS, INC. SECURITIES LITIGATION | No. 2:22-cv-02935-ALM-EPD<br><br>CLASS ACTION<br><br>Judge Algenon L. Marbley<br>Magistrate Judge Elizabeth Preston Deavers<br><br>DEMAND FOR JURY TRIAL |

**CONSOLIDATED COMPLAINT FOR**
**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

I. SUMMARY OF THE ACTION ....1
II. JURISDICTION AND VENUE ....6
III. THE PARTIES....7
A. Plaintiffs....7
B. Defendants ....8
1. The Upstart Defendants ....8
2. The Third Point Defendants....10
IV. SUBSTANTIVE ALLEGATIONS ....14
A. Background on Upstart's Business Model....14
1. Upstart Claims It Is a Lending Platform, Not a Lender or Investor in Loans....15
2. The Relationship Between Upstart and the Third Point Defendants ....17
B. The COVID-19 Pandemic....20
C. Defendants' Scheme and Fraudulent Conduct....23
1. Upstart Completes its IPO ....23
2. The Upstart Defendants Tout Upstart's Sophisticated AI Platform and Growth Prospects ....24
D. Insider Selling Commences as Upstart's Business Model Begins to Deteriorate....29
E. The Truth Regarding Upstart's Platform and Prospects Emerges ....32
V. THE UPSTART DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ....36
A. December 9, 2020 – IPO Registration Statement ....37
B. Q4 & Full-Year 2020 Financial Results ....39
C. 2020 Form 10-K....41
D. April 6, 2021 – SPO Registration Statement ....43
E. Gu's Leaders in Lending Podcast Interview ....44
F. Q1 2021 Financial Results ....46
G. Q1 2021 Form 10-Q....48
H. May 19, 2021 – Barclays Emerging and Fintech Forum ....49
I. June 9, 2021 – Bank of America Securities Global Technology Conference ....51
J. June 30, 2021 – Investing in AI, Episode #10 ....52

K. Q2 2021 Financial Results ....................53

L. Q2 2021 Form 10-Q ....................55

M. September 9, 2021 – Deutsche Bank Technology Conference ....................57

N. Upstart's Class Period MD&As Were False and Misleading ....................59

O. Upstart's Class Period Sarbanes-Oxley Certifications Were False and Misleading ....................64

VI. DEFENDANTS CONTINUE THEIR FRAUDULENT SCHEME, BUT FACTS REVEALING THE FRAUD BEGIN TO LEAK ....................67

A. Q3 2021 Financial Results – The Upstart Defendants Reveal A Dramatic Increase in Loans on Upstart's Balance Sheet but Conceal the Reasons for It ....................67

B. Q3 2021 Form 10-Q ....................70

C. Q4 & Full-Year 2021 Financial Results ....................72

D. 2021 Form 10-K ....................76

E. March 8, 2022 – JMP Securities Conference ....................78

F. March 9, 2022 – Morgan Stanley Technology, Media, and Telecom Conference ....................81

G. Girouard's March 21, 2022 Leaders in Lending Interview ....................83

H. Q1 2022 Financial Results: Upstart Defendants Further Reveal the Truth About Upstart's AI System, but Continue to Conceal the Full Extent of the Company's Funding Deficiencies ....................84

I. Q2 2022 Preliminary Financial Results ....................88

J. November 8, 2022 Q3 2022 Financial Results ....................88

VII. ADDITIONAL SCIENTER ALLEGATIONS ....................90

A. The Core Operations Doctrine Enhances the Inference of Scienter ....................93

B. Individual Defendant Gu Had Particularly Detailed Knowledge of How Upstart's AI System Worked During the Class Period ....................95

C. Defendants Were Motivated to Artificially Inflate Upstart's Stock Price to Enable Themselves to Profit from Their Sales of Upstart Stock ....................95

D. Defendants Girouard and Datta's False SOX Certifications Add to the Inference of Scienter ....................98

VIII. THE STATUTORY SAFE HARBOR DOES NOT APPLY TO THE UPSTART DEFENDANTS' FALSE AND MISLEADING STATEMENTS ....................99

IX. APPLICABILITY OF THE PRESUMPTION OF RELIANCE ....................101

X. LOSS CAUSATION ....................103

XI. CONTROL PERSONS ....................107

XII. CLASS ACTION ALLEGATIONS ....................109

COUNT I For Violation of § 10(b) of the 1934 Act and Rule 10b-5 and Rule l0b-5 Promulgated Thereunder Against All Defendants ....................111

COUNT II For Violation of Section 20(a) of the 1934 Act Against the Individual Defendants and the Third Point Defendants ....................112

COUNT III For Violation of Section 20(A) of the 1934 Act Against the Founder Defendants, Third Point, Third Point Ventures, and Loeb ....................113

PRAYER FOR RELIEF ....................116

JURY DEMAND ....................117

Universal-Investment-Gesellschaft mbH ("Universal" or "Lead Plaintiff"), Emmanuel Sebag ("Sebag"), and Kathy Brooks ("Brooks," and together with Universal and Sebag, "Plaintiffs"), individually and on behalf of all other persons and entities similarly situated, allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on an investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Upstart Holdings, Inc. ("Upstart" or the "Company"), transcripts of Upstart's public conference calls, press releases issued by, and media and analyst reports about, the Company. Plaintiffs' investigation of the facts underlying this action continues, and Plaintiffs believe that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. SUMMARY OF THE ACTION

1. This is a securities fraud class action on behalf of all persons who purchased or otherwise acquired Upstart securities between December 16, 2020, and November 8, 2022 (the "Class Period"), against Upstart, certain of its officers and/or directors, and the Third Point Defendants (defined below) for violations of §§ 10, 20(a), and 20(A) of the Securities Exchange Act of 1934 ("1934 Act"), as well as SEC Rule 10b-5 promulgated thereunder.[1]

2. Upstart is a consumer lending company that connects lenders with borrowers seeking unsecured personal loans. For decades, traditional loan brokers and lenders have relied

---

[1] Excluded from the Class are Defendants; members of the immediate families of the Individual Defendants (defined below); subsidiaries and affiliates and Upstart and Third Point (defined below); any person who is or was an officer or director of Upstart or Third Point during the Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

almost exclusively on Fair Isaac Corporation ("FICO") scores to underwrite loan default risk. Upstart promised investors something better and sought to disrupt this traditional model.

3. Upstart claims that its platform's underwriting process, which uses a proprietary artificial intelligence ("AI") modeling, allows its banking partners to originate loans with higher approval rates, lower loss rates, and a higher degree of automation than traditional lending models. Upstart's business model is predicated on moving large volumes of loans through its underwriting platform and then placing those loans with banks or institutional credit investors, thereby keeping loans off its own balance sheet and insulating itself from credit risk.

4. During the Class Period, Upstart, certain of its officers and/or directors, and Third Point (the Company's most influential investor and a major funder of Upstart loans) engaged in a scheme to defraud investors in order to conceal the truth about the Company's platform and business operations, allowing various Defendants to conduct massive insider selling to the tune of over ***$2.7 billion*** before the truth was revealed. Defendants intentionally concealed that: (i) Upstart's AI system was not properly accounting for changing macroeconomic factors and was not automated, but rather required manual intervention, including "a bunch of conversations and phone calls;" (ii) Upstart's business was increasingly becoming funding constrained, as demand from funders of Upstart loans materially decreased; (iii) the increasing number of loans Upstart was putting on its own balance sheet were not for research and development ("R&D") purposes, but rather due to the dwindling demand from funders; (iv) the increasing number of loans Upstart was putting on its own balance sheet were not marketable and had a materially negative impact on Upstart's revenue; and (v) "contraction in lending volume" during times of "rising rates and elevated consumer risk" was an undisclosed intentional "feature" of Upstart's AI platform.

5. Upstart completed its initial public offering ("IPO") on December 16, 2020, in the midst of the COVID-19 pandemic. In the months leading up to the IPO, the U.S. government had bolstered the economy with numerous stimulus programs. The lending industry thrived in this environment, and Defendants took advantage of the timing, deciding to IPO Upstart common stock in the middle of the pandemic while the stimulus was still creating strong tailwinds.

6. The Third Point Defendants (defined below) played a pivotal role in bringing the young start-up to market and wielded unique influence over Upstart as a self-proclaimed "incubator" of the Company. Years before the IPO, Third Point had invested heavily in Upstart and provided a significant amount of funding to Upstart for its loans. As Upstart's most significant investor, Third Point held a board seat and wielded considerable influence over the Company, which, given its position as an insider, provided Third Point with knowledge of the quality of the loans, the impact of the stimulus on default rates, and Upstart's AI platform's deficiencies.

7. During the Class Period, Upstart's promises of a low credit risk business model piloted by its AI platform (purportedly well-suited to turbulent times) were critically important to investors. The Upstart Defendants (defined below) repeatedly boasted of Upstart not taking on credit risk itself and told investors that the AI platform was uniquely positioned to handle macroeconomic changes in real time, including changes in employment and interest rates. They emphasized the AI platform's ability to evaluate a borrower's creditworthiness and likelihood of default better than other forms of underwriting, convincing both investors and analysts of Upstart's platform's superiority.

8. Not surprisingly, investors found these propositions attractive, and soaring loan originations and increased fee revenue caused Upstart's stock valuation to increase at a staggering

pace. Between the December 2020 IPO and November 2021, Upstart's stock increased to a high of $401.49 – more than 2,000% from its initial $20.00 IPO price.

9. Unfortunately, investors later learned that Upstart and its officers misrepresented the true state of affairs at the Company. Upstart's AI system was not accurately or efficiently accounting for changing macroeconomic factors. It also was not as automated and "nimble" as promised. Instead, it required manual interventions, including "a bunch of conversations and phone calls." As stimulus money ran out and interest rates increased, lender demand for Upstart loans also shrunk, which forced Upstart to hold an increasingly material inventory of loans it underwrote on its own balance sheet.

10. On November 9, 2021, Upstart announced its financial results for third quarter of 2021, revealing that the loans held on the Company's balance sheet had increased by more than 57%. In response, Upstart's stock price fell from a closing price of $313.71 on November 9, 2021, to a closing price of $256.59 on November 10, 2021. Defendants claimed the increased loans were related to expanded R&D and that the Company was receiving growing interest from funders. The Upstart Defendants continued to misrepresent the AI platform's ability to timely respond to changing macroeconomic circumstances and identify credit worthy borrowers.

11. On May 9, 2022, Upstart announced its financial results for the first quarter of 2022. During the corresponding conference call, the Upstart Defendants admitted that the growing loans on the Company's balance sheet (which had once again ballooned, this time more than doubling in the span of a single quarter, to over $600 million) were not merely for R&D purposes and that there were deficiencies in Upstart's AI platform. Defendants Datta and Girouard revealed that the platform was "not as nimble as we would like," was "somewhat manual," and "requires a bunch of conversations and phone calls." In response to these revelations, the price of Upstart common

stock plummeted by more than 56%. The Upstart Defendants nevertheless continued to claim that the loans on the balance sheet were merely "a temporary thing."

12. On July 7, 2022, the Company announced that it was forced to take a hit in revenue because Upstart-originated loan purchases by funders were declining, and because it had to liquidate low quality loans from its balance sheet. Girouard stated, "[o]ur revenue was negatively impacted by two factors approximately equally. First, our marketplace is funding constrained, largely driven by concerns about the macroeconomy among lenders and capital market participants. Second, in Q2, we took action to convert loans on our balance sheet into cash, which, given the quickly increasing rate environment, negatively impacted our revenue." In response, Upstart's stock price dropped nearly 20%.

13. The truth was fully revealed on November 8, 2022, when the Company announced its Q3 2022 results, stating that revenue had decreased 31% and originations were down 48% from the same quarter the prior year. Contrary to their prior representations stating that the Company's AI platform was not sensitive to interest rates and that macroeconomic turbulence was good for Upstart's business, the Upstart Defendants now stated for the first time that they had planned all along for the Company's business to shrink when there were "rising rates and elevated consumer risk." Now the Upstart Defendants claimed that "contraction in lending volume" during such times was a "feature" of Upstart's AI platform; it was intentional. Datta also stated that Upstart-originated loans were experiencing 25% more losses than modeled, essentially admitting that the Company's AI model was not performing well in the very same macroeconomic environment where the Upstart Defendants previously assured investors it was designed to "shine."

14. While these revelations caused Class Members to lose billions of dollars, Defendants, on the other hand, profited greatly. Taking advantage of Upstart's inflated stock price

and their insider knowledge, they sold heavily before investors learned the truth. By December 2021, Third Point (Upstart's chief investor and loan underwriter with insider knowledge) had completely exited its investment in Upstart, and dumped its entire position, reaping over $2.2 billion of proceeds from the sales of its holdings at artificially inflated prices. By December 2021, Defendants Girouard, Gu, and Counselman had sold over $410 million of Upstart stock. Girouard sold another $58 million in Upstart stock by May 2022. Thus, as the below chart shows, within only one year of the IPO, these insiders had sold approximately $2.7 billion in Upstart stock.




15. Defendants' conduct, as more fully alleged below, reaped them billions in insider gains but cost public investors billions in losses.

## II. JURISDICTION AND VENUE

16. The claims asserted herein arise under and pursuant to §§ 10(b), 20(a), and 20(A) of the 1934 Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the

SEC (17 C.F.R. § 240.10b-5). This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the 1934 Act (15 U.S.C. § 78aa).

17. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the 1934 Act (15 U.S.C. § 78aa) because Upstart is co-headquartered in Columbus, Ohio (within this judicial district), where it conducts substantial operations, and many of the acts and omissions charged herein, including the preparation and/or dissemination of materially false and misleading information to the investing public, occurred in part in this judicial district. Moreover, several of Upstart's lending partners, through which the Company facilitates loans, are based in Ohio, including some financial institutions that are headquartered in this judicial district.

18. In connection with the acts, transactions, and conduct alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone and internet communications, and the facilities of the National Association of Securities Dealers Automated Quotations ("NASDAQ") stock exchange.

## III. THE PARTIES

### A. Plaintiffs

19. **Universal-Investment-Gesellschaft mbH** is an investment company based in Frankfurt am Main, Germany, which manages assets of approximately 763 billion Euros. During the Class Period, Universal's funds purchased Upstart securities at artificially inflated prices and were damaged thereby.

20. Plaintiff **Emmanuel Sebag** purchased Upstart securities at artificially inflated prices during the Class Period and was damaged thereby.

21. Plaintiff **Kathy Brooks** purchased Upstart securities at artificially inflated prices during the Class Period and was damaged thereby.

**B. Defendants**

**1. The Upstart Defendants**

22. **Upstart**: Founded in 2012, Defendant Upstart operates a cloud-based AI lending platform that matches borrowers seeking unsecured personal and (later) secured auto loans with funding provided by the Company's banking and investment partners.

23. Upstart is incorporated under the laws of Delaware, with co-corporate headquarters located in San Mateo, California and Columbus, Ohio.

24. Upstart's common stock has traded on the NASDAQ under the ticker symbol "UPST" since its IPO on December 16, 2020.

25. **Girouard**: Defendant David J. Girouard ("Girouard") is a co-founder of the Company. During the Class Period and at all relevant times, Girouard served as Upstart's President, Chief Executive Officer ("CEO"), and chairperson of the Company's board of directors.

26. Girouard signed Upstart's IPO Form S-1 filed on December 9, 2020, and issued the Founders' Letter contained therein. Girouard also signed Upstart's April 6, 2021 secondary public offering ("SPO") Form S-1, its Forms 10-K for 2020 and 2021, and its Forms 10-Q for the first, second, and third quarters of 2021.

27. Girouard made or had authority over the content and dissemination of the false statements and omissions identified in Parts V and VI below, and is liable for those false statements and omissions.[2] Girouard also was a control person of Upstart within the meaning of § 20(a) of the 1934 Act.

---

[2] Girouard made false statements and omissions during the following events: the March 17, 2021 earnings call for Q4 and full year 2020, the May 11, 2021 earnings call for 1Q21, the August 10, 2021 earnings call for 2Q21, the November 9, 2021 earnings call for 3Q21, the February 15, 2022 earnings call for Q4 and full year 2021, the May 9, 2022 earnings call for 1Q22,

28. During the Class Period, Girouard sold over 1 million shares of Upstart stock at inflated prices, receiving over $203 million in proceeds.

29. **Datta**: Defendant Sanjay Datta ("Datta") joined Upstart as CFO in December 2016 and served as Upstart's Chief Financial Officer ("CFO") during the Class Period and at all relevant times.

30. Datta signed Upstart's IPO Form S-1 filed on December 9, 2020, as well as Upstart's April 6, 2021 SPO Form S-1, its Forms 10-K for 2020 and 2021, and its Forms 10-Q for the first, second, and third quarters of 2021.

31. Datta made numerous false statements and omissions in calls and interviews during the Class Period, as identified in Parts V and VI below, and is liable for those false statements and omissions. Datta also was a control person of Upstart within the meaning of § 20(a) of the 1934 Act.[3]

32. **Gu**: Defendant Paul Gu ("Gu") is a co-founder of the Company. During the Class Period, Gu served as Upstart's Senior Vice President of Product and Data Science and as a member of the Company's Board of Directors. Gu pioneered the statistical models used by Upstart's AI to predict "financial potential rather than financial history" at the heart of its underwriting technology.

---

the May 19, 2021 Barclays Emerging and Fintech Forum, the June 9, 2021 Bank of America Securities Global Technology Conference, a June 30, 2021 "Investing in AI" podcast, the September 9, 2021 Deutsche Bank Technology Conference, a November 10, 2021 appearance on CNBC's Closing Bell, a March 8, 2022 JMP Securities Conference, a March 9, 2022 Morgan Stanley Technology, Media, and Telecom Conference, and a March 21, 2022 interview on the Leaders in Lending podcast.

[3] Datta made false statements and omissions during the following events: the March 17, 2021 earnings call for Q4 and full year 2020, the August 10, 2021 earnings call for 2Q21, the November 9, 2021 earnings call for 3Q21, the February 15, 2022 earnings call for Q4 and full year 2021, and the May 9, 2022 earnings call for 1Q22.

33. Gu signed Upstart's IPO Form S-1 filed on December 9, 2020, and issued the Founders' Letter therein through Defendant Girouard. Gu also signed Upstart's SPO Form S-1 filed on April 6, 2021.

34. Gu made or had authority over the content and dissemination of the false statements and omissions identified in Parts V and VI below, including in a May 4, 2021 Leaders in Lending podcast interview, and is liable for those false statements and omissions. Gu also was a control person of Upstart within the meaning of § 20(a) of the 1934 Act.

35. During the Class Period, Gu sold 506,000 shares of Upstart stock at inflated prices, receiving over $140 million in proceeds.

36. **Counselman**: Defendant Anna Counselman ("Counselman") is a co-founder of the Company. During the Class Period, Counselman served as Senior Vice President of People and Operations at Upstart.

37. Counselman issued the Founders' Letter in Upstart's Registration Statement (through Defendant Girouard).

38. Counselman made or had authority over the content and dissemination of the false statements and omissions identified in Part V below, including the Founders' Letter in Upstart's Registration Statement, and is liable for those false statements and omissions. Counselman also was a control person of Upstart within the meaning of § 20(a) of the 1934 Act.

39. During the Class Period, Counselman sold over 608,000 shares of Upstart stock at inflated prices, receiving over $122 million in proceeds.

**2. The Third Point Defendants**

40. **Third Point**: Defendant Third Point LLC ("Third Point") is a New York-based investment manager and adviser to a variety of hedge funds and managed accounts.

41. Third Point was a significant early investor in Upstart and was heavily involved in overseeing the Company's operations and development from a start-up to a publicly traded company.

42. Third Point was named as a reporting person on the Form 3 and Forms 4 filed with the SEC, disclosing the sales and holdings of Upstart common stock by Third Point Ventures LLC ("Third Point Ventures"). According to the SEC Forms, Third Point may be deemed to be the beneficial owner of the securities beneficially owned by Third Point Ventures.

43. **Third Point Ventures**: Defendant Third Point Ventures LLC is the Menlo Park, California-based venture capital arm of Third Point and serves as nominee for funds managed and/or advised by Third Point.

44. At the time of Upstart's IPO, entities affiliated with Third Point Ventures owned 19.3% of Upstart common stock.

45. During the Class Period, Third Point Ventures was a direct beneficial owner of Upstart common stock, holding over 13.3 million shares following Upstart's IPO. Between August and December 2021, Third Point Ventures liquidated substantially all its stake in Upstart, garnering proceeds of over $2 billion.

46. **Loeb**: Defendant Daniel S. Loeb ("Loeb") is the CEO of Third Point.

47. Loeb was named as a reporting person on the Form 3 and Forms 4 filed with the SEC, disclosing the sales and holdings of Upstart common stock by Third Point Ventures. According to the SEC Forms, Loeb may be deemed to be the beneficial owner of the securities beneficially owned by Third Point Ventures.

48. As described further herein, Loeb also issued and signed quarterly letters to Third Point's clients which made clear that the investments in Upstart were Third Point's own (though conducted through Third Point Ventures).[4]

49. **Schwartz**: Defendant Robert Schwartz ("Schwartz") is a Managing Partner of Third Point Ventures and served as a member of Upstart's Board of Directors from approximately June 2015 until his abrupt resignation on November 15, 2021.

50. Schwartz signed Upstart's IPO Form S-1 filed on December 9, 2020, and the Company's April 6, 2021 SPO Form S-1. Schwartz also signed Upstart's 2020 Form 10-K, filed on March 18, 2021.

51. Defendants Girouard, Gu, and Counselman are referred to herein, collectively, as the "Founder Defendants."

52. Defendants Girouard, Datta, Gu, Counselman, and Schwartz are referred to herein, collectively, as the "Individual Defendants."

53. Upstart, Girouard, Datta, Gu, Counselman, and Schwartz are referred to herein, collectively, as the "Upstart Defendants."

54. Defendants Third Point, Third Point Ventures, Loeb, and Schwartz are referred to herein, collectively, as the "Third Point Defendants."

55. Defendants Upstart, the Third Point Defendants, and the Individual Defendants are sometimes referred to collectively as "Defendants."

---

[4] Loeb acknowledged in a December 15, 2020 Form 3 filed with the SEC that he and Third Point "may be deemed to be the beneficial owners of the securities beneficially owned by Third Point Ventures" pursuant to Rule 13d-3 and under the Securities Exchange Act of 1934. In addition, Forms 144 filed by Third Point identified "Third Point LLC" as the seller of Upstart stock.

56. During the Class Period, the Individual Defendants and Third Point Defendants had extensive knowledge about core aspects of Upstart's financial and business operations. They were also intimately involved in deciding which disclosures Upstart would make to investors. Each Defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Upstart securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme:

a. deceived the investing public regarding Upstart's business, operations, market trends and present and future business prospects;

b. facilitated the Company's IPO on or about December 16, 2020;

c. facilitated the Company's SPO on or about April 12, 2021;

d. created artificial demand for the Upstart common shares sold in the IPO and SPO;

e. enabled Upstart to sell its common shares in the IPO and SPO at artificially inflated prices;

f. enabled the Individual Defendants to collectively reap proceeds of more than $470 million from the sale of Upstart common stock at artificially inflated prices during the Class Period;

g. enabled funds managed and/or advised by the Third Point Defendants to collectively reap proceeds of more than $2 billion from the sale of Upstart common stock at artificially inflated prices during the Class Period; and

h. caused Plaintiffs and the Class to purchase Upstart publicly traded securities at artificially inflated prices.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background on Upstart's Business Model

57. For decades, a prospective borrower's "FICO score" has been the principal factor utilized by lenders to determine whether such an individual is eligible for credit (and the rate of interest to be charged on any resulting loan). The FICO score was developed by the Fair Isaac Corporation in 1989 and utilizes a methodology that calculates and assigns credit scores to prospective borrowers based upon data submitted by creditors and others to third-party credit data brokers such as Experian, Equifax, or TransUnion.

58. In 2012, Girouard, Gu, and Counselman formed Upstart with the purported goal of disrupting the unsecured personal loan market (which remained largely driven by FICO score-based lending) with the Company's AI-driven underwriting approach. According to Upstart, the AI-powered lending platform it developed had superior abilities to evaluate a potential borrower's creditworthiness and likelihood of repayment or default. Upstart's AI underwriting could be used as a supplement to FICO scores, or even in lieu of them. According to Upstart, rules-based systems like a FICO score considered only a limited number of variables – typically no more than a couple of dozen – and therefore were limited in their predictive powers. As a result, Upstart contends, lending approaches based on these legacy credit models could fail to identify and quantify a prospective borrower's true credit risk, thus artificially constraining the pool of otherwise eligible and credit-worthy potential borrowers.

59. Upstart contends that its platform's use of sophisticated AI underwriting models addresses these gaps and shortcomings. According to Upstart, its AI models incorporate more than 1,600 variables, with reference to tens of millions of actual repayment events, which serve to "improve [the AI models] in real time" by creating a "flywheel effect" of incremental improvement that is characteristic of machine learning systems. Upstart claims that the accumulation of, and

training on, additional repayment data leads to steadily improving AI modeling for both its risk assessment and fraud prevention functions. Indeed, Defendant Gu characterized the statistical models used by Upstart's AI as predictive of a borrower's "financial potential" rather than merely his or her "financial history." Those purported improvements, in turn, can result in higher borrower approval rates, lower interest rates, or both.

### 1. Upstart Claims It Is a Lending Platform, Not a Lender or Investor in Loans

60. Despite its intense focus on lending, Upstart has consistently represented that it is itself ***not*** a lender or bank and is instead engaged in the business of providing technology and related services to financial institutions and credit investors. For example, during his opening remarks at the Company's first earnings call following its IPO, Girouard assured investors: "***Upstart is a fee-based business***. ***We don't make loans and we aren't exposed to material balance sheet risk***." It was critically important to investors that, as a technology company that made substantially all its revenues from fees charged to lenders, Upstart would not be exposed to credit risk.

61. Accordingly, loans generated by Upstart's AI platform are supposed to be either (i) retained by the Company's bank partners that originated the loans, or (ii) packaged and marketed to credit investors. These latter types of loans (particularly those bearing higher risk) may be included in asset-backed securitization ("ABS") transactions through Upstart's Securitization Trust program, where they are pooled with other such loans and sold to credit investors. Upstart also sells whole loans to institutional buyers and utilizes a pass-through trust sponsored by a third-party bank under which pass-through certificates are sold to institutional investors.

62. Upstart charges its banking and investment partners fees in exchange for their use of its AI lending platform and technology, which provides (among other things) loan application data, underwriting of credit risk, verification and fraud detection, and the delivery of electronic loan offers and associated documentation. Upstart also collects fees by servicing the loans generated by its platform. While these Upstart-provided services generate fees for the Company, critically, the underlying funding itself for the loans themselves is supposed to come from external sources: Upstart's banking and credit investor partners. That was the fundamental business model that Upstart represented to investors throughout most of the Class Period.

63. For example, as Third Point noted in October 2020, shortly before Upstart's IPO: "Upstart partners with traditional banks and, ***critically, does not use its own balance sheet***." This sentiment was echoed by Girouard, shortly after the IPO, in comments made to CNBC's Jim Cramer on January 15, 2021: "we help banks originate consumer credit with the power of AI," and "our future [is] not to become a bank like other fintechs are doing."[5] Cramer accordingly noted that "Upstart uses data and its AI technology to facilitate [loans]. . . . ***They don't lend money themselves***. They're a marketplace that matches borrowers and lenders. They take a referral fee."

64. Leading up to the Class Period, almost all the Company's revenue was generated from platform, referral, and servicing fees derived from its banking technology services, with Upstart funding and holding only a "small percentage" of its platform-generated loans on its own books, for the stated purpose of R&D testing and experimenting with potential new loan products before marketing them more broadly to its banking and investment partners. Immediately prior to

---

[5] Indeed, Defendant Girouard repeatedly made these points in interviews throughout the Class Period. *See, e.g.*, https://anchor.fm/william-brewster1/episodes/Dave-Girouard----Disrupting-Credit-Underwriting-e1gci62; https://www.joincolossus.com/episodes/91470262/girouard-making-better-loans?tab=transcript; https://podcasts.apple.com/us/podcast/mad-money-w-jim-cramer-01-15-21/id147247199?i=1000507616596.

the Class Period, the overwhelming majority of Upstart-generated loans were funded by the Company's banking partners (approximately 22%) and credit investors (approximately 76%). Thus, approximately only 2% of Upstart loans were funded by Upstart and remained on its own balance sheet. These on-balance-sheet loans have historically represented only a minimal dollar value of loans originated by the Company's platform, and were not held as a source of revenue for Upstart.

65. Cross River Bank ("CRB") originated a substantial majority of Upstart's loans. During Upstart's pre-IPO period in 2019 and 2020, for example, CRB originated approximately 89% and 72%, respectively, of the loans facilitated on Upstart's platform. Notably, CRB was not required to retain any of the loans it originated. Instead, CRB could retain loans that fit its own business and risk objectives and put back to Upstart any other loans, thus reducing CRB's risk if Upstart-powered loans proved deficient. And Upstart guaranteed its originator banks that it would repurchase any Upstart-powered loans.

66. To keep non-R&D loans off the Company's own balance sheet, Upstart established a loan funding program, which included whole loan sales to institutional investors, ABS transactions, and the utilization of loan warehouse credit facilities. None of the institutions involved were required to purchase a minimum amount of loans or securitizations, but Upstart was able to sell off enough loans based on promises of the AI platform's superiority – at least at first. And Third Point was complicit in purchasing Upstart originated loans, at least until it dumped its position in Upstart by late 2021 for well over $2 billion in proceeds.

### 2. The Relationship Between Upstart and the Third Point Defendants

67. In June 2015, Third Point led Upstart's Series C funding round (at a $145 million valuation) as a self-described "major early investor[]," and obtained a seat on Upstart's board of

directors, occupied by Schwartz. Following its initial 2015 investment and subsequent investments in the Company totaling $66 million, Third Point bought an additional $24 million worth of Upstart stock (approximately 1.2 million shares) in the IPO. But Third Point was not merely a passive investor in Upstart, as it thereafter became heavily involved in Upstart's business and began serving as a self-described "incubat[or]" to the Company.

68. The longstanding relationship between the Third Point Defendants and Upstart was unique in both its depth and scope. As Loeb has periodically acknowledged, Third Point has had heavy involvement in myriad aspects of the Company's business, including Upstart's "organizational development," its "tech focus," staffing, "talent acquisition," "go-to-market strategies," and "capital markets strategy." Moreover, Third Point Credit helped Upstart "refine its Capital Markets approach" and Third Point's structured credit team was "instrumental in evaluating Upstart's loan and securitization products." As Girouard explained, "Rob [Schwartz] and Third Point Ventures have been critical partners, helping Upstart to connect the dots from an early-stage startup to a market leader prepared for success at the next level."

69. Loeb and Third Point closely monitored Upstart and described guiding the Company through its "lifecycle." Only a few months after Upstart's IPO, in a February 10, 2021 letter, Loeb referred to Upstart as "[o]ur biggest winner" and went on to describe Third Point's investment and involvement in the Company as follows:

> We initially invested in the Series C round in 2015 at a pre-money valuation of $145 million and added to our investment on the IPO with the purchase of an additional 1.2 million shares, bringing our total ownership to approximately 13.4 million shares, or roughly an 18% stake.
>
> * * *
>
> **Upstart exemplifies Third Point's approach to lifecycle investing**. Following a lead from our Structured Credit group, which had looked at funding Upstart's loan pools, we led Upstart's Series C in June of 2015 and **Rob Schwartz joined their Board**. **Third Point delivered value on capital markets strategy, staffing, and**

> **organizational development, and eventually became a loan buyer on the platform**. As Upstart grew, we maintained our ownership through further investments and placed a 10% order of the IPO in December 2020.

70. Third Point was motivated to be hyper-focused on nearly every aspect of Upstart's business, as Upstart was Third Point's largest position – worth around $1.2 billion as of May 6, 2021. As Loeb and Third Point admitted in a May 6, 2021 letter, they had "intimate knowledge" of Upstart's management teams, strategy, and outlook:

> We own approximately 15% of Upstart . . . . We initially invested in Upstart at a $145 million valuation (currently a $7 billion market cap). . . . **We sat on their boards** throughout their journey from start-ups to mature businesses, **adding value in a variety of areas from talent acquisition to go-to-market strategies to navigating capital markets**. Unlike a traditional VC firm, we see an IPO as just another stage in the company's lifecycle and can continue both **our board involvement and financial investment** in these world-class companies following their public listings.
>
> Given that these companies are still at the hyper-growth stage, they also command high valuations commensurate with their expansion and future potential, something we are comfortable with given **our intimate knowledge of their management teams, strategy, and promise**. . . . For example, **Upstart, in which we invested approximately $66 million and added 1.2 million shares at its IPO is now our largest position**, representing a market value of approximately $1.2 billion today.

71. Loeb made additional observations about Upstart's rapid rise in stock price and Third Point's involvement with the Company in an August 6, 2021 letter:

> Investments in our two biggest winners this year, Upstart and SentinelOne, were made at times when they had only a basic product and were at the earliest stages of revenues. From a financial point of view, I see these early stage investments, although they begin as a small part of our portfolio, as an indispensable way for us to create significant positions which we would never be able to replicate by waiting for such companies to come public.
>
> While I am pleased with both SentinelOne and Upstart's returns, I am even more excited that we have created a replicable process to make investments, add value to young companies, and continue to participate constructively and profitably across their lifecycle.

72. Beyond its deep entanglement with Upstart's day-to-day operations and strategies, Third Point also served as a major funder for Upstart's loans. For example, Third Point served as

a counterparty in transactions with Upstart, becoming "a loan buyer on the platform," and "sourcing loan pools from Upstart for [its] structured credit portfolio." In fact, the genesis of Third Point's initial Upstart investment only came "[f]ollowing a lead from [Third Point's] Structured Credit group, which had looked at funding Upstart's loan pools."

73. Prior to and during the Class Period, Third Point affiliates provided substantial funding for Upstart loans, allowing Upstart's loan origination volumes to increase materially:

| Year | Purchases by Third Point of **asset-backed securities ("ABS")** "sponsored and serviced" by UPST | Purchases by Third Point of **pass-through certificates** "backed by Upstart-powered loans" | Contributions of **loans as collateral** by Third Point in "private offering securitization transactions" "sponsored and serviced" by UPST |
|---|---|---|---|
| 2017 | $9.8 million | – | – |
| 2018 | $66.1 million | $219.4 million | – |
| 2019 | – | $454 million | $340.6 million |
| 2020 | – | $199.9 million | $150.3 million |
| 2021 | – | $381.9 million | $232.9 million |

## B. The COVID-19 Pandemic

74. In early 2020, the COVID-19 virus began rapidly spreading around the world. By February 2020, as fears and uncertainty mounted regarding the impact of the virus, the U.S. economy reacted negatively. On March 11, 2020, the World Health Organization declared a global pandemic, and the rapidly expanding COVID-19 crisis began triggering lockdowns resulting in severe economic disruptions in the United States and around the world. By March 2020, the U.S. stock market had entered bear market territory, and by April 2020, the U.S. unemployment rate rose to as high as 14.7%.

75. Beginning in March 2020, the U.S. government began responding to the pandemic by enacting policies designed to, among other things, provide fiscal stimulus to the economy and

significant monetary relief to individuals and businesses. The following programs and initiatives were among those undertaken by the U.S. government during the pandemic:

76. *Interest rate cuts*. On March 3, 2020, the U.S. Federal Reserve (the "Fed") began cutting its target range for the federal funds rate: first, the federal funds rate was cut by fifty basis points to a range of 1.00% to 1.25%. Soon after, on March 15, 2020, the rate was cut once again by one hundred basis points, to a target range of 0.00% to 0.25%. That same day, the Fed also cut its discount rate (another key interest rate metric) by one hundred and fifty basis points, down to 0.25%. As a result, for nearly two years, interest rates remained at these rock-bottom levels to mitigate the pandemic's economic impacts.

77. *Families First Coronavirus Response Act*. On March 18, 2020, the Families First Coronavirus Response Act was signed into law. That act allocated relief that included: (i) providing money for families that relied on free school lunches in light of widespread school closures; (ii) mandating that companies with fewer than 500 employees provide paid sick leave for those suffering from COVID-19, as well as providing a tax credit to help employers cover those costs; (iii) providing nearly $1 billion in additional unemployment insurance funds for states, as well as loans to states to fund unemployment insurance; and (iv) providing funding and cost waivers to make free COVID-19 testing widely available.

78. *Coronavirus Aid, Relief, and Economic Security Act* ("CARES Act"). On March 27, 2020, the CARES Act was signed into law and appropriated $2.3 trillion for a host of different pandemic relief efforts. The CARES Act provided, among other things: (i) one-time, direct cash payment of $1,200 per person, plus $500 per child; (ii) expansion of unemployment benefits to include furloughed workers, gig workers, and freelancers until December 31, 2020; (iii) an additional $600 of unemployment compensation, per week, until July 31, 2020; (iv) a

waiver of early withdrawal penalties for 401(k) retirement accounts for amounts of up to $100,000 until December 31, 2020; (v) mortgage forbearance and a moratorium on foreclosures on federally backed mortgages for 180 days; (vi) $500 billion in government lending to companies affected by the pandemic; (vii) $349 billion in loans and grants to small businesses through the Paycheck Protection Program and the expanded Economic Injury Disaster Loan ("EIDL") program; (viii) more than $175 billion for hospitals and healthcare providers; (ix) $150 billion in grants to state and local governments; and (x) $30.75 billion in funding for schools and universities.

79. *Paycheck Protection Program* ("PPP"). On April 9, 2020, in concert with the CARES Act, the Paycheck Protection Program was launched. The PPP loaned money to banks so they could, in turn, make forgivable loans to small and mid-sized businesses. On April 30, 2020, the PPP expanded the types of lenders that could participate in the program and, on June 5, 2020, the PPP was modified to, among other things, lower eligibility thresholds and expand its operational timeframe. The program ended on July 30, 2021, after disbursing approximately $800 billion in funding.

80. *Consolidated Appropriations Act* ("CAA"). On December 27, 2020, the CAA – a $900 billion end-of-the-year COVID-19 stimulus bill attached to a $1.4 trillion omnibus spending bill that would fund the government through September 30, 2021 – was signed into law. The CAA stimulus legislation included $300 per week in additional jobless benefits, direct payments of $600 to individuals ($1,200 for married couples), and further provided $325 billion in small business relief, including an additional $284 billion for forgivable first and second PPP loans, and $20 billion for new EIDL grants for businesses in low-income areas.

81. *American Rescue Plan Act.* On March 11, 2021, the American Rescue Plan Act was signed into law. It provided, among other things, for direct $1,400 stimulus payments to

individuals ($2,800 for married couples) making under a threshold amount, extended the CAA's pandemic unemployment assistance benefits of $300 per week through September 6, 2021, increased the total number of assistance weeks available from 50 to 79, reduced tax assessments on unemployment benefits, provided a 100% subsidy of COBRA health insurance premiums to unemployed workers through the end of September 2021, provided tens of billions in housing assistance funding and food aid, and increased the federal Child Tax Credit maximum deductions.

82. The cumulative effect of this government relief spending was that the U.S. economy was, by the summer of 2020, awash in money. Amidst this extensive COVID-19 related assistance and with full understanding of the pandemic and stimulus impact on the economy, Upstart went forward with its IPO on December 16, 2020.

## C. Defendants' Scheme and Fraudulent Conduct

### 1. Upstart Completes its IPO

83. On December 16, 2020, Upstart (remotely) rang the NASDAQ's ceremonial closing bell as it completed its IPO, offering approximately nine million shares to the public at $20.00 per share. Third Point increased its investment by purchasing 1.2 million additional shares (approximately 10% of the total offering) in the newly public company.

84. Immediately prior to the IPO, the Individual Defendants had signed and issued to investors a materially false and misleading Registration Statement and Prospectus in connection with the IPO (the "IPO Registration Statement") that remained alive and uncorrected throughout the Class Period. The IPO Registration Statement opened with a "Founder's Letter" from Girouard, Gu, and Counselman which made misleading claims concerning the capabilities of Upstart's AI platform in changing economic environments, including the COVID pandemic, as well as the lending platform's superior capabilities over traditional lending models.

85. Soon after the IPO, securities analysts initiated their coverage of the Company. They were largely impressed by what they perceived as the advantages of Upstart's technology and its business model. For example, in its initiation of coverage on January 11, 2021, Barclays characterized Upstart's "advanced [loan] underwriting engine" as its "secret sauce," and deemed its "proprietary, best-in-class AI-/ML- powered risk underwriting engine" to be "well beyond that of most competitors." The Barclays report also noted that Upstart "retains only a minimal amount of loans on its own balance sheet, largely for model testing and development," with the "percentage of outstanding loan balances held on [Upstart's] balance sheet . . . decreas[ing] from a high-single digit rate in 1Q18 to a low-single digit rate more recently," and with the expectation that this rate would "continue to decline . . . in the next few years."

86. Similarly, Jeffries initiated coverage the same day, noting that "Upstart retains very little of its originated receivables [*i.e.*, loans] . . . and is not accountable for the performance of the receivable," meaning "there is little balance sheet credit risk or direct credit risk" to Upstart. The Jefferies report also noted that Upstart's platform featured "a very advanced, AI technology system" that could "rapidly assess a consumers' creditworthiness and structure a loan in a manner that is superior from both a credit risk perspective and a structural perspective."

### 2. The Upstart Defendants Tout Upstart's Sophisticated AI Platform and Growth Prospects

87. As detailed below, the Upstart Defendants falsely claimed that, when compared to traditional lending models, Upstart's platform was uniquely qualified to handle macroeconomic changes quickly and effectively. For example, during an interview with CNBC's Jim Cramer on January 15, 2021, Girouard stated that "we help banks originate consumer credit with the power of AI" and described Upstart's system as using "a whole lot of automation," and further

emphasized that "our future [is] not to become a bank like other [financial technology companies] are doing."

88. But against those statements, Defendants understood that when the COVID stimulus started winding down, Upstart's platform would be unable to adapt to changing macroeconomic circumstances. Indeed, Defendants ***planned*** that Upstart's business would shrink when interest rates rose and the macroeconomic environment became more challenging, as such shrinkage was (only much later revealed to be) a putative "feature" of the Company's AI platform. In other words, Defendants knew – but misleadingly failed to disclose – that the Company's growth leading up to and during the Class Period was ephemeral.

89. Upstart held its inaugural earnings call in March 2021. During the call, Girouard reassured investors that the Company was not exposed to material credit or interest rate risk because "[w]e don't make loans, and we aren't exposed to material balance sheet risk." Girouard touted the purported fact that Upstart's model had a "pretty significant advantage in an environment where there's elevated levels of risk," and that the pandemic had "presented [Upstart] an opportunity" for its "platform to shine" because it "is really built differently." Datta represented that funding sources were not an impediment to Upstart's growth, stating that "our [funding] pipeline today, I'd say, is as good as it's ever been with respect to demand for loans on the funding side," and that "funding has not been an obstacle to" Upstart's loan volume growth "in any way."

90. The day following the earnings call, Upstart issued its 2020 Form 10-K. Upstart reemphasized that its AI model "changes in real time" and was "constantly improving," which served as "a benefit . . . to bank lending programs," which were "even more compelling and valuable during periods of economic downturn." But, while the Upstart Defendants were touting the capabilities of Upstart's platform to respond quickly and thrive in times of macroeconomic

turbulence, they falsely and misleadingly failed to disclose that the Company's platform was actually "somewhat manual" and not "nimble" enough to sufficiently react to quickly developing economic changes.

91. According to Upstart, the Company's AI platform incorporated the fact that pandemic stimulus would ultimately dry up, and it would quickly be able to adapt and price in the termination of government economic stimulus programs and related macroeconomic changes. The AI platform did no such thing. Rather, as the Upstart Defendants later revealed, Upstart's AI platform's response to economic changes required "a bunch of conversations and phone calls." As stimulus funds dried up, Upstart was forced to place loans on its own balance sheet, not for R&D purposes, but due to the failures of the Company's platform to respond to macroeconomic changes and the resulting deficiencies in underwriting and funding for Upstart-powered loans. To make matters worse, Defendants concealed that Upstart knew that the Company's loan originations would decline in the event of rising interest rates and other macroeconomic changes, as the platform was designed to do just that.

92. Following closely on the heels of the passage of the massive $1.9 trillion American Rescue Plan Act, in early April 2021 the Upstart Defendants doubled down and announced Upstart's SPO at a price of $120.00 per share. The Upstart Defendants continued to tout the Company's business model: a platform through which lenders and borrowers connected, with Upstart itself taking on very little risk (as neither the lender nor buyer of its loans), instead making its money from fees earned from its platform's activities and related services. The Upstart Defendants told the market that funders of Upstart loans had high confidence in the efficacy of Upstart's AI platform, and demand from funders for Upstart loans was strong.

93. During this time period, the Upstart Defendants also emphasized the purported superior ability of the Company's sophisticated AI platform to evaluate a borrower's creditworthiness and likelihood of default even under changing macroeconomic circumstances. According to the Upstart Defendants, the platform would therefore present a greater quantity of eligible borrowers with access to credit at competitive rates, resulting in greater funding opportunities for Upstart's partners – and more fees for Upstart.

94. For example, during a May 4, 2021 interview, Gu spoke about Upstart's technology, attributing the Company's loan performance during the pandemic to "our model . . . being able to respond to the sort of macroeconomic changes on really a dime." Gu also emphasized that on the "reverse side as things start[] normalizing again you want that system that can respond very dynamically to update macroeconomic data and that's sort of a system that we built . . . it [] worked incredibly well over the last year."

95. Similarly, during a May 19, 2021 interview at the Barclays Emerging and Fintech Forum, Girouard stated that Upstart had "buil[t] sort of [an] awareness of stimulus into our model." Several weeks later at a Bank of America Securities Global Technology Conference held on June 9, 2021, Girouard emphasized that "a model like ours actually can handle disruptions in the economy and dislocations better than a standard model" because "it's responsive," and "can very quickly adjust itself to handle the macro situation that is evolving out there . . . see the signals [and] respond to them."

96. Upstart's SPO Registration Statement asserted that Upstart's "constantly improving AI models provide a significant competitive advantage" because "more training data leads to higher approval rates and lower interest rates at the same loss rate." Upstart also emphasized the

purported fact that its AI platform improved in "real time" and was thus continuously on top of the latest developments during this tumultuous period.

97. Throughout the spring and summer of 2021, the Upstart Defendants continued their deception through these and other statements (as outlined below in Section V), creating a false perception about the Company's operations and the capabilities of Upstart's platform. Defendants' scheme created artificial demand for the Company's securities and caused them to trade at artificially inflated prices during the Class Period, with its common stock reaching a high of $401.49 per share on October 15, 2021.

98. Analysts and investors were impressed with the representations made by the Upstart Defendants about the Company's technology and continued bullish prospects. Following the August 8, 2021 earnings call discussing Upstart's Q2 2021 financial results, Jefferies noted that "Upstart retains very little of its originated receivables (currently, the company retains about 4% of loans for testing, monitoring and development purposes) and is not accountable for the performance of the receivable," meaning there was "little balance sheet credit risk or direct credit risk" to the Company.

99. Writing for Real Money, on August 12, 2021, Jim Cramer characterized Upstart's burgeoning business as "one of the premier disruptive names of our time, getting quick loans to deserving people using artificial intelligence to be sure they can pay those loans back." Cramer emphasized that Upstart "***has no credit exposure***" because it "makes loans for other banks."

100. In his Third Point investor letter dated October 27, 2021, Loeb referred to Upstart as one of "[o]ur top winners" and one of "our two largest positions." But while Loeb publicly lauded Upstart's "disruptive business model[]" and "high-growth trajector[y]" that "has started to upend the FICO-dependent, $84 billion unsecured personal loan market with its AI-driven

underwriting approach," various defendants were already in the process of dumping their Upstart holdings for massive gains. They knew that Upstart's platform would falter in macroeconomic turbulence when the government stimulus dried up because it was (unbeknownst to the public) designed to shrink Upstart's business in such times, despite Upstart Defendants' previous claims that the AI platform would "shine."

### D. Insider Selling Commences as Upstart's Business Model Begins to Deteriorate

101. Beginning in August 2021 – shortly after the IPO lock-up period expired – multiple defendants began cashing in massive quantities of Upstart stock. For example, between August and November of 2021 alone, Girouard, Gu, and Counselman collectively sold over $384 million in Upstart stock. Similarly, over the same period, Third Point sold over 4 million shares of Upstart stock for over $910 million in proceeds. Third Point then began extricating itself from Upstart's operations around the same time: on November 15, 2021, Schwartz suddenly and without explanation resigned from Upstart's Board of Directors.

102. On November 9, 2021, after the market closed, Upstart issued a press release announcing its financial results for Q3 2021. The press release announced the Company's total revenue was $228 million (a 250% year-over-year increase) and total fee revenue of $210 million (a 235% year-over-year increase). Defendant Girouard boasted that "[s]ince Upstart's IPO a year ago, we've more than tripled our revenue, tripled our profits, tripled the number of banks and credit unions on our platform, and tripled the number of auto dealerships we serve."

103. Despite these seemingly positive results, the press release also revealed that the loans held on Upstart's balance sheet had soared by more than 57% during the quarter, to $130 million. On this news, Upstart's stock price fell from a closing price of $313.71 on November 9, 2021, to a closing price of $256.59 on November 10, 2021 – a drop of over 18%.

During the follow-on conference call, in explaining this unexpected departure from the Company's oft-repeated representation that Upstart was not a bank, Datta rationalized the massive growth to the Company's held-loan portfolio by stating it was "us[ing] our balance sheet to support the scaling of our growing auto product as well as our expansion into the lower credit score segments of personal lending."

104. This representation was false. Upstart was forced to put hundreds of millions of dollars of loans on its own balance sheet because of the AI platform's inability to respond to changing macroeconomic factors in a timely or adequate manner, meaning that Upstart was experiencing increasing difficulty externally funding its loans. Nonetheless, Girouard falsely informed the market that "the demand is there" and Upstart's bank partners' "confidence [i]n our models . . . is there," with Datta adding that "Upstart continues to have a lot of credibility for the performance of the credit and our ability to underwrite the risk in a way that I think differentiates itself from other products in the market . . . even when we're past the current, let's call it, sort of distortion in the market, we will be in pretty good shape with respect to demand."

105. Following the call, analysts tried to make sense of this shifting landscape, as they remained in the dark concerning the true reasons for increased loans on Upstart's balance sheet – namely, the inability of the Company's AI platform to function well under changing macroeconomic circumstances, and the resulting evaporation of external funding for Upstart loans.

106. Meanwhile, insider selling continued at a frantic pace. Girouard made over $26 million in additional stock sales on December 1, 2021, and Third Point dumped an additional 1.2 million shares (the same amount it purchased at Upstart's IPO), worth nearly $209 million, on December 2 and 3, 2021. Third Point continued unloading its remaining shares in Upstart stock from December 6 to December 17, 2021, raking in over $524 million in additional proceeds. And

on or around December 20, 2021, Third Point dumped Upstart completely, cashing out on its remaining 4.5 million Upstart shares, worth approximately $599 million.

107. All told, Third Point's Upstart stock sales during the Class Period totaled approximately $2.2 billion. While Third Point had safely exited its position in Upstart by no later than the end of 2021, the deficiencies in Upstart's platform and the Company's mounting funding woes were only just starting to be revealed.

108. On February 15, 2022, Upstart announced its financial results for the fourth quarter and full year of 2021. Like the November revelation regarding the growing pile of loans held on Upstart's balance sheet, the Upstart Defendants once again revealed that Upstart's loan balances were continuing to skyrocket – this time increasing by more than 48% during the fourth quarter alone, to $252 million, and more than tripling (from approximately $78 million) year-over-year since Q4 2020. Rather than acknowledge the reasons for this phenomenon, namely the deficiencies with the Company's AI platform, the Upstart Defendants again kept the price of Upstart's stock inflated by misrepresenting the nature of, and reasons for, the material increase in the Company's loan balances.

109. During the follow-up conference call, Datta mischaracterized the material increase as being "temporary" and an "R&D" consequence associated with Upstart's foray into automobile lending, assuring investors that it had nothing to do with any problems finding external funding for Upstart-originated loans. Girouard assured investors of Upstart's "deep and diverse sources of liquidity" for such funding, and that the Company was "not expecting any meaningful adverse impact from rising defaults on our volumes or economics," while continuing to boast of the Upstart platform's unique ability to navigate choppy macroeconomic waters. While the Upstart

Defendants acknowledged that loan defaults had been at "unnaturally suppressed levels for more than a year," they reassured investors that Upstart was fully prepared for a return to "normal."

110. As the government's stimulus measures ultimately wound down, the default rates for Upstart loans quickly reverted to (much higher) "normal" levels. As a result, Upstart's banking partners and credit investors demanded materially higher interest rates on Upstart loans, which had a corresponding material adverse effect on the Company's operating results. Despite this, Girouard represented that Upstart was "confident that an economy and market in transition plays to our strengths," and that "the loans on [Upstart's] platform have been priced accordingly," with Datta adding that the rising default rates were not a "bug" but a "feature" of the Company's platform and that they were a "good thing" that would not have "a huge impact to our business."

111. Following the February earnings call, the Upstart Defendants continued to maintain that while Upstart's model expected credit to tighten and default rates to rise, the Company's system was "much more adept at reacting quickly doing the right things through a changing scenario." In fact, when asked by CNBC if "inflation makes a difference as things become pricier for consumers," Girouard responded, "I think this is all part of what our system is designed to work well with and ***we're somewhat of a rate agnostic system***. As interest rates go up our system adjusts to that but ***we're not overly rate sensitive like you might see elsewhere***." As investors would soon learn, none of this was true.

### E. The Truth Regarding Upstart's Platform and Prospects Emerges

112. After the market closed on May 9, 2022, Upstart issued a press release announcing its Q1 2022 financial results, which revealed that Upstart added a shocking amount of new loans to its own balance sheet, this time more than doubling to over ***$600 million in the span of a single quarter***. During the earnings call that followed, Datta revealed that the Company had "started to selectively use our capital as a funding buffer for core personal loans in periods of interest rate

fluctuation where the market clearing prices [are in] flux," thus beginning to correct the Upstart Defendants' prior misstatements regarding Upstart's careful and limited use of its balance sheet solely for R&D.

113. In a further partial corrective disclosure, the Upstart Defendants corrected their misrepresentations about the abilities of Upstart's platform to respond to changing economic circumstances, now describing the platform as "not as nimble as we would like," that it was "somewhat manual," and "requires a bunch of conversations and phone calls." These revelations were in direct contrast to their prior assurances that Upstart's system was able to adapt rapidly to changing macroeconomic environments.

114. Because Upstart's platform did not timely price in the materially higher risk premiums demanded by the Company's funding partners, many of the loans approved by Upstart's platform were rejected by the credit investors that previously purchased the Company's loans and securitizations. This, in turn, caused Upstart to retain a material number of mispriced loans it approved on its balance sheet, which rendered the Company highly exposed to both interest rate and credit risk.

115. In response to this news, securities analysts slashed their assessments of the Company, and Upstart's common stock price plummeted more than 56%, erasing approximately $3.7 billion of the Company's market capitalization, on extremely heavy trading volume.

116. An analyst for Stephens explained, "[w]hat pushed us to downgrade UPST . . . is that Upstart is originating loans on its balance sheet that it couldn't pass to its funding partners. This breaks the thesis for us of a marketplace lender, which is supposed to originate on behalf of funding partners." Similarly, an analyst for Wedbush described Upstart's disclosure as a

"divergence from its capital-light business model" that "could indicate UPST has few alternatives other than to hold more loans due to funding issues."

117. The next day, Girouard appeared on Jim Cramer's "Mad Money" and was criticized by Cramer as follows:

> Why do you have ***any*** loans on your balance sheet? ***I thought you were a platform***. . . . I was ***shocked to see how many loans you had on your balance sheet***. ***Shocked***. And it said to me that ***I did not know Upstart***. I thought I did, but there are other investors that you and I both know that thought we did, and we were ***shocked*** by the amount of . . . potentially bad loans on your balance sheet. ***Shocked!***

118. On July 7, 2022, the truth was further revealed to the market when Upstart announced its preliminary financial results for the second quarter of 2022, which cut the Company's revenue guidance for the quarter from a range of $295 to $305 million down to $228 million. In that announcement, Girouard admitted that, in contrast to the Upstart Defendants' assurances about secure funding for Upstart's platform loans, the truth was that "our marketplace is funding constrained, largely driven by concerns about the macroeconomy." Girouard also admitted that – contrary to the Upstart Defendants' public statements – the Company's platform had not adequately priced in macroeconomic changes, as Upstart was forced to convert loans on its balance sheet into cash at a loss, "given the quickly increasing rate environment."

119. As a result of these disclosures, Upstart's stock price declined from a closing price of $33.74 on July 7, 2022, to a closing price of $27.09 on July 8, 2022, a drop of nearly 20%, on extremely heavy trading.

120. On August 8, 2022, Upstart announced its Q2 2022 financial results. During the follow-up conference call, Upstart stated that the cut in the Company's previously announced revenue guidance was primarily caused by Upstart's "funding-constrained environment" and that Upstart would need to "upgrade and improve the funding side of [its] marketplace, bringing a

significant amount of committed capital on board," which would "take some time to bring to fruition." Upstart explained that "it may make sense to, at times, leverage our own balance sheet as a transitional bridge to this committed funding," which Girouard acknowledged was "a shift relative to what we planned and communicated earlier this year."

121. Defendants continued to conceal that Upstart's AI platform was intentionally designed to shrink loan originations during times of "rising rates and elevated consumer risk," contrary to the representations that the AI platform was "agnostic" to rising interest rates and that "volatility and turbulence is length to us . . . [and] is an environment that we shine in" and, thus, that macroeconomic turbulence was good for Upstart's business.

122. On November 8, 2022, Upstart announced its Q3 2022 financial results and held a conference call with analysts. During the conference call, both Girouard and Datta – for the first time – disclosed that Upstart's AI platform was designed to reduce loan originations significantly in the face of increasing interest rates and "elevated consumer risk," with such shrinkage actually being a "feature" of the platform. This new information corrected the Upstart Defendants' previous assurances about the AI platform being "agnostic" to rising interest rates and thriving in turbulent macroeconomic circumstances. As a result, Upstart's stock price continued to fall, dropping from a closing price of $19.04 on November 8, 2022 to a closing price of $17.06 on November 9, 2022. By comparison, on October 15, 2021, the Company's stock was trading as high as ***$401.49 per share***.

## V. THE UPSTART DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

123. Throughout the Class Period, because the Upstart Defendants chose to speak about the matters referenced below, they had a duty to make the statements not misleading by speaking completely and truthfully about the following material facts then known to them:

a. that Upstart's AI system was not accurately accounting for changing macroeconomic factors, including those relating to the termination of government stimulus programs, as it was not nimble enough to accurately and quickly react to changing macro-economic factors through an automated process, but instead required a manual process that included "a bunch of conversations and phone calls";

b. that Upstart's business was becoming increasingly funding constrained, as demand from Upstart loan funders materially decreased;

c. that the increasing number of loans on Upstart's own balance sheet were not for R&D purposes but rather due to the dwindling demand from funders of Upstart loans;

d. that the increasing number of loans on the Company's balance sheet were not marketable and would have a materially negative effect on Upstart's revenue; and

e. that "contraction in lending volume" during times of "rising rates and elevated consumer risk" was an intentional "feature" of Upstart's AI platform, with Upstart intending for its business to shrink in the face of such macroeconomic trends.

124. The Class Period begins on December 16, 2020, the first day Upstart's common stock began publicly trading pursuant to its IPO. Approximately 9 million shares of Upstart common stock were offered in the IPO at a price of $20.00 per share. Prior thereto, Defendants Girouard, Datta, Gu, and Schwartz signed and issued to investors a materially false and misleading

Registration Statement and Prospectus in connection with the IPO (the "IPO Registration Statement")[6] that remained alive and uncorrected throughout the Class Period.

**A. December 9, 2020 – IPO Registration Statement**

125. Upstart's Registration Statement opens with a letter from the Founder Defendants Girouard, Gu, and Counselman.[7] The letter misled investors concerning the capabilities of Upstart's AI platform in changing economic environments, including the COVID-19 pandemic. In part, the letter states:

> ***[W]ith an AI-based system, banks can lend responsibly in any environment, with a system that responds quickly and intelligently to changes in employment levels and economic output***. This isn't just theory: during the employment shock of the recent COVID-19 pandemic, unemployment increased from about 4% to 14% in just a few weeks. While this led to a temporary decrease in loan originations and in the availability of loan funding as well as a potential for increased losses, ***Upstart partner banks experienced immaterial impact to the performance of their loans***.

126. The IPO Registration Statement also contained material misrepresentations regarding the capabilities of Upstart's lending platform, stating in pertinent part that "our constantly improving AI models provide a significant competitive advantage – more training data leads to higher approval rates and lower interest rates at the same loss rate" and that ***Upstart's models improve in "real time."*** More specifically, the Registration Statement misleadingly compared Upstart's AI model to traditional credit risk models with respect to their ability to estimate default rates:

> The FICO score was invented in 1989 and has not fundamentally changed since that time. The FICO score is used by over 90% of lenders to determine who is approved

---

6 Upstart's initial IPO Registration Statement was filed with the SEC on November 5, 2020, and subsequently amended on November 6, December 4, December 7, and December 9, 2020, prior to the commencement of trading of Upstart common stock on the NASDAQ market on December 16, 2020. All references herein to the IPO Registration Statement refer to the version filed with the SEC on December 9, 2020.

7 The letter is signed by Girouard but states that it is also on behalf of Gu and Counselman.

> for credit and at what interest rate. While FICO is rarely used in isolation, many credit models are simple rules-based systems. A leading expert found that bank credit models commonly incorporate eight to 15 variables, with the more sophisticated models using as many as 30. Unsurprisingly, the world is more complicated than can be represented by these models, so they are limited in their ability to reliably estimate the probability of default.

127. With respect to the COVID-19 pandemic, the IPO Registration Statement misleadingly disclosed, in pertinent part:

> ***Due to the strength of our AI model, we expect that the COVID-19 pandemic will have minimal impact on bank partners and institutional investor performance for Upstart-powered loans originated prior to the second quarter of 2020***.
>
> ***Although significant government assistance was provided during the COVID-19 pandemic, the resilience of our bank partner results during this time provides evidence of the benefits that our AI models can offer to bank lending programs. We believe these benefits are even more compelling and valuable during periods of economic downturn***. (Footnote call numbers omitted.)

128. The statements referenced in ¶¶ 125-27 were materially false and misleading in that they misrepresented and omitted to state material facts necessary to make the statements not misleading, which were then known to, or recklessly disregarded by, the Upstart Defendants. In boasting of the abilities of Upstart's AI system and comparing it favorably to traditional credit models, the Upstart Defendants failed to disclose the system's material limitations – specifically, that it could not adequately account for macroeconomic factors, including the effects of government stimulus programs, in a timely or accurate manner – and led investors to believe it was superior to other credit models. Contrary to the Upstart Defendants' statements, Upstart's AI system could not help banks "lend responsibly in any environment," as the system did not respond "quickly and intelligently" to economic changes and failed to respond in "real time," instead requiring manual human intervention, including "a bunch of conversations and phone calls." The Upstart Defendants knew that due to the system's limitations, it did not provide "compelling and valuable" benefits "during periods of economic downturn."

129. Analysts readily accepted the Upstart Defendants' representations concerning the Company's business model and its AI system's superior capabilities. Barclays and Jefferies initiated coverage on Upstart on January 11, 2021. Both analysts highlighted the fact that Upstart did not retain loans on its balance sheet. Jefferies noted that "Upstart retains very little of its originated receivables (currently the company retains about 4% of loans for testing, monitoring and development purposes) and is not accountable for the performance of the receivable. Thus, there is little balance sheet credit risk or direct credit risk." Barclays likewise found Upstart's stated business model to be crucial, writing, "[i]t is important to note that UPST retains minimal amount of loans on its own balance sheet, largely for model testing and development."

130. Barclays and Jefferies also reiterated Upstart's statements concerning the capabilities of its AI system. Barclays stated that "Upstart's 'secret sauce' is its advanced underwriting engine, which we believe is well beyond that of most competitors." And Jefferies also praised Upstart's AI system, stating that "Upstart has developed a very advanced, AI technology system which can rapidly assess a consumer's creditworthiness and structure a loan in a manner that is superior from both a credit risk perspective and a structural perspective."

**B. Q4 & Full-Year 2020 Financial Results**

131. On March 17, 2021, Upstart issued a press release announcing its financial results for Q4 2020 and the full year ending on December 31, 2020. Later that day, Upstart held a conference call with analysts and investors to discuss the Company's operations and earnings release. Girouard falsely reassured investors that the Company was not exposed to material credit or interest rate risk, stating:

> Upstart is a fee-based business. ***We don't make loans and we aren't exposed to material balance sheet risk***. But despite this, we care a lot about how Upstart loans perform. So we're happy to report that ***the COVID-19 pandemic had no material impact on the returns that our bank partners and loan investors experienced this past year***.

132. Girouard also falsely boasted that Upstart had a "pretty significant advantage in an environment where there's elevated levels of risk":

> ***And so the technology has been improving dramatically. And I'd even say that COVID accelerated that because a change in the environment is really a learning opportunity for an AI system. So there was just very fast forward progress in the quality of the technology***. That generally means the throughput of our funnel gets much better. Now at the same time, the environment changed a lot, of course, and 2 things changed. First, the level of risk in the environment went up a lot, and that really meant that it really stressed out competing models. ***And we feel like we have pretty significant advantage in an environment where there's elevated levels of risk***. And having a system – an AI-based system that can discern risk and handle it properly becomes even a more important advantage.
>
> The second thing that happened, as we've mentioned, is demand for credit dropped. And this really is because people spent less, weren't traveling, weren't eating out, et cetera. Credit card balance is lower, as Sanjay mentioned. And that translates to us as demand for smaller loans. But we are a company that has invested a lot in automation. So smaller loans are something we handle really well from a profitability perspective.
>
> When you put those 2 together, I think what you're seeing is Upstart taking pretty significant market share in a – during a time of turbulence. When different models are handling things differently, companies are naturally reacting in different ways, whether they're pulling back, tightening credit, et cetera. ***But this has really presented an opportunity for a new platform to shine that is really built differently. And I think that's what we've seen play out during 2020, and we are certainly seeing it playing out as we get into 2021***.

133. Datta falsely represented that funding sources were not an impediment to Upstart's growth, stating, in pertinent part:

> ***And so our pipeline today, I'd say, is as good as it's ever been with respect to demand for loans on the funding side***. Dave talked a little bit about the demand or the interest from the banking side. And that's been really sort of encouraging. On the institutional side, equally, you're seeing a lot of new names and interest. I think you probably would have seen that manifest in the securitization markets at the end of the year or in Q1, which are some of the most constructive markets we've seen, certainly since we've begun ourselves.
>
> So I think a lot of folks are a combination of starting to feel more comfortable now even though yields are still – or required returns are still above where they were pre-COVID. There's certainly a much higher level of comfort. And therefore, showing interest where they didn't before. ***So I think the short summary of all of that is we feel really confident on the funding side. And the rapid reconstruction***

***of our own volume that you've seen in the results in our guidance, funding has not been an obstacle to that in any way.***

134. Girouard and Datta's statements in ¶¶ 131-33 were materially false and misleading in that they misrepresented material facts and omitted to state material facts necessary in order to make the statements not misleading. Upstart did not have a "pretty significant advantage" or a platform that was "really built differently." Rather, Upstart's system failed to adequately account for changing macroeconomic circumstances, as it was not nimble enough to accurately and quickly react to changing macro-economic factors through an automated process, but instead required a manual process that included "a bunch of conversations and phone calls." As a result, Upstart was exposed to "material balance sheet risk" and would be increasingly so exposed as stimulus funds and demand from funders for Upstart loans dried up.

### C. 2020 Form 10-K

135. On March 18, 2021, Upstart filed with the SEC its 2020 Form 10-K signed by Defendants Girouard, Datta, Gu, and Schwartz. The 2020 Form 10-K was materially false and misleading in that it misrepresented and omitted to state material facts necessary to make the statements contained therein not misleading, including: statements about the capabilities of the Company's AI platform, as well as statements made in its risk factors and MD&A, as discussed in ¶¶ 179-91.

136. The Company continued to mislead investors regarding the capabilities of its AI platform. For example, the Form 10-K states, "[b]ecause ***our model changes in real time***, we are able to extend new offer loans to applicants who were previously not eligible or were previously quoted a higher rate." Additionally, regarding the "Constantly Improving AI Models," the Form 10-K states, "[b]eyond the advantages accrued by our constantly growing volume of training data, ***our machine learning team continues to update our modeling techniques regularly***."

137. The Company's Form 10-K also assured investors that the "***AI models have been refined and updated to account for the COVID-19 pandemic*** . . . ."

138. The Form 10-K further stated the following:

> To support borrowers suffering from income loss due to the pandemic, Upstart worked with its bank partners to offer hardship plans that, among other things, allowed affected borrowers to defer loan payments for up to two months. At the peak, approximately 5.6% of borrowers on our platform had enrolled in a hardship program, less than half the rate of online lending industry benchmarks. Since this time, approximately 95% of these impacted borrowers have exited the hardship program and resumed making loan payments. ***Due to the strength of our AI model,*** we expect that the COVID-19 pandemic will have minimal impact on bank partners and institutional investor performance for Upstart-powered loans originated prior to the second quarter of 2020.
>
> ***Although significant government assistance was provided during the COVID-19 pandemic, the resilience of our bank partner results during this time provides evidence of the benefits that our AI models can offer to bank lending programs. We believe these benefits are even more compelling and valuable during periods of economic downturn.***

139. Regarding the loans held on Upstart's balance sheet, the Form 10-K stated that "the percentage of loans retained by bank partners has generally increased, while the percentage of loans funded through our balance sheet has generally decreased" and:

> As of December 31, 2020, loans included in the Company's consolidated balance sheets are classified as either held-for-sale or held-for-investment. The Company reclassified such loans held by the warehouse entities from held-for-investment to held-for-sale as of January 1, 2020, due to the ***Company's intent to sell the loans prior to maturity and increasing evidence of their marketability***. Other loans held on the Company's consolidated balance sheet retained their classification as held-for-investment. These loans include loans which do not satisfy the warehouse requirements and loans held in the consolidated securitizations.

140. The statements referred to in ¶¶ 136-39 were each materially false and misleading in that they misrepresented material facts and omitted to state material facts necessary to make the statements not misleading. The Upstart Defendants concealed that Upstart's technology had not "been refined and updated to account for the COVID-19 pandemic" when it came to adjusting for macroeconomic trends, and that Upstart was vulnerable to "an environment where there's elevated

levels of risk." Rather than "chang[ing] in real time," Upstart's system failed to accurately account for changing macroeconomic circumstances because it was not nimble enough to accurately and quickly react to changing macro-economic factors through an automated process, but instead required a manual process that included "a bunch of conversations and phone calls." As a result, Upstart's business was becoming increasingly funding constrained as demand from Upstart loan funders materially decreased. Furthermore, while acknowledging that the government had provided assistance during the COVID-19 pandemic, the Upstart Defendants implied that this was unrelated to the Company's performance, which, according to them, was based on the "***benefits that our AI models can offer***."

**D. April 6, 2021 – SPO Registration Statement**

141. The SPO Registration Statement contained material misrepresentations about the capabilities of Upstart's AI system, stating in pertinent part that "***our constantly improving AI models provide a significant competitive advantage – more training data leads to higher approval rates and lower interest rates at the same loss rate***" and that Upstart's models improve in "***real time***." In connection with this, the SPO Registration Statement favorably compared Upstart's AI system to traditional credit risk models in terms of its ability to estimate default rates:

> The FICO score was invented in 1989 and has not fundamentally changed since that time. The FICO score is used by over 90% of lenders to determine who is approved for credit and at what interest rate. While FICO is rarely used in isolation, many credit models are simple rules-based systems. A leading expert found that bank credit models commonly incorporate eight to 15 variables, with the more sophisticated models using as many as 30. Unsurprisingly, the world is more complicated than can be represented by these models, so they are limited in their ability to reliably estimate the probability of default.

142. With respect to the COVID-19 pandemic, the SPO Registration Statement misleadingly disclosed, in pertinent part:

> ***Due to the strength of our AI model, we expect that the COVID-19 pandemic will have minimal impact on bank partners and institutional investor performance for Upstart-powered loans originated prior to the second quarter of 2020***.
>
> ***Although significant government assistance was provided during the COVID-19 pandemic, the resilience of our bank partner results during this time provides evidence of the benefits that our AI models can offer to bank lending programs. We believe these benefits are even more compelling and valuable during periods of economic downturn***.

143. The statements referred to in ¶¶ 141-42 were each materially false and misleading in that they misrepresented material facts and omitted to state material facts necessary to make the statements not misleading. Contrary to the statements referred to in ¶¶ 141-42, Upstart's AI system was not accurately accounting for changing macroeconomic factors, including those relating to the termination of government stimulus programs, as it was not nimble enough to accurately and quickly react to changing macroeconomic factors through an automated process, but instead required a manual process that involved "a bunch of conversations and phone calls."

**E. Gu's Leaders in Lending Podcast Interview**

144. On May 4, 2021, Upstart executive Jeff Keltner interviewed Gu on the publicly available Leaders in Lending podcast. During the interview, Gu made a number of materially false and misleading statements related to Upstart's AI system's capabilities during the pandemic and in a down macroeconomic environment.

145. Keltner asked Gu, "[h]ow do you think about what happened during I mean the last 12 months have been kind of unprecedented time both from a macroeconomic environment point of view and an unemployment potentially fraud drivers view, how have you thought about your models' ability to perform through this kind of unprecedented economic experience kind of disruption to daily life and what are the results you've seen?" After alluding to the fact that, unlike

Upstart's AI models, traditional credit underwriting could not predict individual consumer credit risk, Gu stated the following:

> So now going back to this past year of course with sort of a very interesting time not only was a turn in the economic cycle but a very unusual one and essentially what we saw was that we saw certainly a lot of changes to consumer behavior but in aggregate we actually saw the sort of loan performance of the sort of entire ecosystem across all our bank partners all our sort of capital markets partners the returns that they were expecting to earn they pretty much across the board consistently achieved or beat over the course of the last year in spite of the pandemic. ***Now having said that I think a lot of that does have to do with some of the sort of unique circumstances that happen here which is another piece of what we sort of really built into our model and that's about being able to respond to the sort of macroeconomic changes on really a dime***. I mean when unemployment rates started going up in Q2 2020 that was a time where it was really important to do those very quickly and precisely to the sort of changes in unemployment rates and you want them to be able to tell like which sectors, occupations, etc. there was extra unemployment risks that you needed to be modeling in and how to model it relative to traditional norms. And you wanted your model to handle that because the alternative was sort of getting a group of people to sit around a table and kind of like do some back-of-the-envelope math and then sort of perhaps a like take a blunt cut to your credit box and that sort just means that you're either going to still take on too much risk or you're going to essentially stop running your business during this challenging time. Well what we found was we were able to continue approving a significant number of people for loans and have those people pay back because they were the right people to lend to. ***On the sort of reverse side as things started normalizing again you want that system that can respond very dynamically to update macroeconomic data and that's sort of a system that we built and it sort of worked incredibly well over the last year.***

146. Later in the interview, Gu provided further detail, misleadingly describing Upstart's AI models' ability to adapt to changing macroeconomic environments:

> So what we want to do is we want to take market consensus and so there're a variety of sources for market consensus statistics for things that have already happened and things that are expected to happen in the near future and we take those and we simply plug them into a system that's been fit against historical metrics meaning we've taken things like historical charge off rates on consumer credit across different asset classes, historical levels of unemployment across different industries and occupations and we've built models that connect these things to the way that they would impact our particular categories of loans. And so ***we've essentially built that into our models so that as soon as, as soon as the latest unemployment numbers are released on a weekly basis, on a monthly basis, or the latest sort of monthly projections are released from various consensus groups of economists***

> ***those numbers just essentially just get fed into the model, update the macroeconomic assumptions and then you're properly calibrated to the sort of market consensus on macroeconomic numbers.***

147. Gu also furthered the misleading perception that Upstart was purely a technology company and not acting as a bank with loans on its balance sheet. ***"We're not good at being a bank, we're not good at any of the things that a bank is good at but we are very good at building technology."***

148. The statements referenced in ¶¶ 145-47 were materially false and misleading in that they misrepresented and omitted to state material facts necessary to make the statements not misleading, which were then known to, or recklessly disregarded by, Gu, including that Upstart's AI system was not accurately accounting for changing macroeconomic factors such as those relating to the termination of government stimulus programs, as it was not nimble enough to accurately and quickly react to changing macro-economic factors through an automated process, but instead required a manual process that involved "a bunch of conversations and phone calls." Contrary to Gu's representations, Upstart's AI system was not able to respond to "macroeconomic changes on really a dime" and could not "respond very dynamically to update macroeconomic data." As a result of the deficiencies in Upstart's technology, demand from Upstart loan funders was materially decreasing and the Company would be forced to put more loans on its own balance sheet – not for R&D purposes, but because the Company was increasingly funding constrained.

**F. Q1 2021 Financial Results**

149. On May 11, 2021, Upstart issued a press release announcing its financial results for the first quarter of 2021, the period ended March 31, 2021. Later that day, Upstart held a conference call with analysts and investors to discuss the Company's operations and earnings release. During the conference call, Girouard issued materially false and misleading statements about the quality of Upstart's AI system and the funding of Upstart loans.

150. Girouard stated that the Company's growth was "primarily technology and model-driven. . . ." Girouard also stated, "we launched some improvements to our verification models that reduce the amount of friction applicants experience in applying for a loan, including those coming back to Upstart for a second loan. These improvements included more refined fraud signaling and increased automation of income verification." According to Girouard, Upstart had built a "proprietary platform that continues to accrue advantages by the day. It's the types of AI model upgrades described here, paired with the support of our bank partners, that have allowed Upstart to grow loan volumes by a factor of 20 in the last 4 years while reducing acquisition costs and generating real profit."

151. On the topic of funding Upstart's loans, Girouard misleadingly stated the following:

> We continue to add new bank partners to our platform, to see existing bank partners expand on their Upstart-powered lending programs and to ***add institutional investors who are happy to invest their capital into Upstart-powered bonds or high-quality loan assets*** with predictable yield. ***We've built an increasingly sophisticated supply chain of money that funds Upstart loans***, from super efficient bank depository capital, to broad and deep institutional and capital markets funding.

152. The statements referenced in ¶¶ 150-51 were materially false and misleading in that they misrepresented and omitted to state material facts necessary to make the statements not misleading, which were then known to, or recklessly disregarded by, Girouard. In touting Upstart's technology, Girouard omitted that it was not accurately accounting for changing macroeconomic factors, including those related to the termination of government stimulus programs, as it was not nimble enough to accurately and quickly react to changing macro-economic factors through an automated process, but instead required a manual process that involved "a bunch of conversations and phone calls." Due to these deficiencies, Upstart's business was becoming increasingly funding constrained, as demand from Upstart loan funders declined. Contrary to Girouard's misstatements, Upstart's loan funders were becoming less "happy to invest

their capital" into Upstart loans, and Upstart's purported "increasingly sophisticated supply chain of money that funds Upstart loans" was dwindling.

**G. Q1 2021 Form 10-Q**

153. On May 14, 2021, Upstart filed with the SEC its Form 10-Q for the quarter ended March 31, 2021 (the "Q1 Form 10-Q") signed by Girouard and Datta. The Q1 Form 10-Q was materially false and misleading, stating the following concerning the role of Upstart's bank partners:

> Our bank partners can retain loans that align with their business and risk objectives. For loans that are not retained by our bank partners, we help diversify the funding of these loans to a broad base of institutional investors that invest in Upstart-powered loans. In the three months ended March 31, 2021, approximately 17% of Upstart-powered loans were retained by the originating bank, while about 81% of Upstart-powered loans were purchased by institutional investors through our loan funding programs. ***Over the last few years, the percentage of loans funded through our balance sheet has generally decreased, while the percentage of loans purchased by institutional investors and loans retained by bank partners has generally increased***.

154. The Company's Q1 Form 10-Q reiterated the misstatement from Upstart's 2020 10-K that the "***AI models have been refined and updated to account for the COVID-19 pandemic*** . . . ." The Q1 Form 10-Q further stated the following:

> To support borrowers suffering from income loss due to the pandemic, Upstart worked with its bank partners to offer hardship plans that, among other things, allowed affected borrowers to defer loan payments for up to two months. At the peak, approximately 5.6% of borrowers on our platform had enrolled in a hardship program, less than half the rate of online lending industry benchmarks. Since this time, approximately 95% of these impacted borrowers have exited the hardship program and resumed making loan payments. ***Due to the strength of our AI model, we expect that the COVID-19 pandemic will have minimal impact on bank partners and institutional investor performance for Upstart-powered loans originated prior to the second quarter of 2020***.
>
> ***Although significant government assistance was provided during the COVID-19 pandemic, the resilience of our bank partner results during this time provides evidence of the benefits that our AI models can offer to bank lending programs. We believe these benefits are even more compelling and valuable during periods of economic downturn***.

155. The statements referred to in ¶¶ 153-54 were each materially false and misleading in that they misrepresented material facts and omitted to state material facts necessary to make the statements not misleading. In truth, Upstart's AI system was not accurately accounting for changing macroeconomic factors, as it was not nimble enough to accurately and quickly react to changing macroeconomic factors through an automated process, but instead required a manual process that involved "a bunch of conversations and phone calls." As a result, and unbeknownst to investors, demand from Upstart loan funders was decreasing and the Company would have to put more loans on its own balance sheet. Upstart's models had not been adequately "refined and updated for the COVID-19 pandemic" when it came to adjusting to macroeconomic trends, and Upstart was vulnerable to "an environment where there's elevated levels of risk."

156. Following the Q1 earnings announcement, analysts remained positive about Upstart's business and prospects. Jefferies noted that Upstart's "cloud-based, Artificial Intelligence (AI) lending platform results in a superior credit product with attractive economics for both consumers and lenders, a 'win-win' model for both participants," and Barclays remarked that Upstart had "a unique asset" that was "growing rapidly and profitably, and with a strong proprietary technological advantage via its AI/ML powered underwriting model."

**H. May 19, 2021 – Barclays Emerging and Fintech Forum**

157. On May 19, 2021, Girouard was interviewed at the Barclays Emerging and Fintech Forum. He falsely represented that Upstart had built awareness of the economic stimulus into the Company's AI system, and that the system understood that repayments were "probably a little buffered by stimulus":

> ***The other thing we have done during this period is build sort of awareness of stimulus into our model***. This sounds strange but if your model is AI and its training itself on sort of repayments that are going on right now, ***it[']s important that your model appreciates that repayments are probably a little buffered by stimulus***.

> And in 2022, 2023 you shouldn[']t assume there[']s going to be stimulus. In fact, there likely won[']t be. So, ***an AI system has to understand all the intricacies of an applicant and a borrower, but also the macroeconomic situation*** under which a loan is being originated.

158. The statements referred to in ¶ 157 were each materially false and misleading in that they misrepresented material facts and omitted to state material facts necessary to make the statements not misleading. In truth, Upstart's AI system was not accurately accounting for changing macroeconomic factors, including those relating to the termination of government stimulus programs, as it was not nimble enough to accurately and quickly react to changing macroeconomic factors through an automated process. Instead, Upstart's AI system required a manual process that involved "a bunch of conversations and phone calls."

159. During the Barclays Forum, Girouard also reiterated: "***Important to say, first of all we[']re not a lender***. We help banks originate credit. We are a consumer brand. We do market directly to consumers and then refer them to our bank partners."

160. The statement referred to in ¶ 159 was materially false and misleading in that it misrepresented material facts and omitted to state material facts necessary to make the statement not misleading. Contrary to Girouard's assertion, Upstart was increasingly acting as a "lender" as demand from its loan funders was drying up. As demonstrated in ¶ 186, the amount of loans held on Upstart's balance sheet was increasing dramatically during this time period, from approximately $1 million at Q2 2020 to approximately $50 million (and growing) in Q2 2021, and, unbeknownst to investors, the increase was not for R&D purposes but was instead a result of Upstart acting as a lender for loans its funding partners rejected. Moreover, the Upstart Defendants understood that with a decline in stimulus and the Company's AI platform's inability to adapt to the changing macroeconomic environment, Upstart's loans would be increasingly undesirable to its funders and would end up on Upstart's balance sheet.

### I. June 9, 2021 – Bank of America Securities Global Technology Conference

161. On June 9, 2021, Girouard was interviewed at the Bank of America Securities Global Technology Conference. In response to a question about why Upstart's loans "sell[] at a premium to a lot of other FinTechs," and whether "there anything else an investor could do to really verify the value of this credit model," Girouard falsely emphasized that Upstart's revenue model ***"is almost entirely fees paid by banks [and] not subject to claw-backs" and not "anything related to quality of credit performance."*** When pressed about the fact that Upstart's AI model had "lived . . . entirely through a period where we've had low default rates and extremely low interest rates," and whether "your AI [can] respond to a change in the credit cycle," Girouard falsely reassured investors, stating that ***"a model like ours actually can handle disruptions in the economy and dislocations better than a standard model"*** **because *"it's responsive,"*** it ***"can very quickly adjust itself to handle the macro situation that is evolving out there,"*** and its AI model could "see the signals [and] respond to them."

162. The statements referred to in ¶ 161 were each materially false and misleading in that they misrepresented material facts and omitted to state material facts necessary to make the statements not misleading. Upstart's models could not "handle disruptions in the economy and dislocations better than a standard model" or "adjust . . . to handle the macro situation that is evolving out there." Rather, Upstart's AI system was not accurately accounting for changing macroeconomic factors, including those relating to the termination of government stimulus programs, as it was not nimble enough to accurately and quickly react to changing macroeconomic factors through an automated process, but instead required a manual process that involved "a bunch of conversations and phone calls." As a result, demand from funders for Upstart loans was dwindling and Upstart was forced to put more loans on its own balance sheet. The amount of loans

held on Upstart's balance sheet was increasing dramatically during this time period, from approximately $1 million at Q2 2020 to approximately $50 million (and growing) in Q2 2021, and, unbeknownst to investors, the increase was not for R&D purposes but was instead a result of Upstart acting as a lender for loans its funding partners did not want. Moreover, the Upstart Defendants understood that with a decline in stimulus and its AI model's inability to adapt to the changing macroeconomic environment, Upstart's loans would be increasingly undesirable to its funders and would end up on Upstart's balance sheet. And in boasting of the AI platform's ability to thrive through economic disruptions, Girouard concealed that the Company's AI platform was designed to shrink Upstart's business in the face of rising interest rates and other macroeconomic changes.

**J. June 30, 2021 – Investing in AI, Episode #10**

163. On June 30, 2021, Girouard was interviewed on a podcast entitled "Investing in AI." Girouard was asked about Upstart's early (pre-IPO) history. The interviewer stated that Upstart "started out, actually, lending money" itself, then asked Girouard if such lending "was still a part of the business model" and whether Upstart "intended to get back to that at some time." Girouard responded that "[w]e were never actually a lender . . . but in the early days we of course had to prove ourselves . . . in the early days of course you need skin in the game and you need to be improving it somewhat on your own dime but again even in those days it was only 20%." Girouard continued:

> If you fast forward to today you know there's 18 different banks in our platform there's more than 100 different investors beyond those banks on our platform and we fund probably 2 to 3%, something in that range, every month ***and the reason is, is that's how we test: we test and validate new things that have known risk to them because they're, they're just sort of like being proven out***, and you can't go out to your bank partners who are naturally very conservative and say hey we want to try this new thingy here and it might or might not work but you know what do you think and ***so it's always important us to have capital that is really for R&D purposes. It's to accelerate the development of new models or addressing new***

> ***customer segments or whatever it might be, and so that's the only reason really we still do some bit of lending on our platform, it's not material to our financials***, um, 96 or 97% of our revenue is, really comes in the form of fees from banks and has nothing to do with performance of the credit.

164. The statements referred to in ¶ 163 were each materially false and misleading in that they misrepresented material facts and omitted to state material facts necessary to make the statements contained therein not misleading. In truth, due to the deficiencies in Upstart's technology, demand from Upstart loan funders was materially decreasing and Upstart was putting more loans on its own balance sheet not for R&D purposes but rather due to the dwindling demand from funders of Upstart loans. Upstart was seeing more loans on its own balance sheet by Q2 2021 – from approximately $1 million at Q2 2020 to approximately $50 million (and growing) in Q2 2021 – and it was false and misleading to state that "R&D purposes" were "the only reason really we still do some bit of lending on our platform." Rather, Upstart was holding these loans on its balance sheet because it was unable to sell them. Furthermore, absorbing such loans on its balance sheet was material to Upstart's financials.

**K. Q2 2021 Financial Results**

165. On August 10, 2021, Upstart held a conference call with analysts and investors to discuss the Company's operations and earnings release for the period ended June 30, 2021. During the conference call, Girouard and Datta boasted of the robust funding for Upstart's loans. Girouard stated: "***more than 97% of our revenue came in the form of fees from banks or loan servicing with 0 credit exposure or demands on our balance sheet***." When Datta was asked about loan investors, he stated: "I mean I think the only things to call out really is just ***an ongoing expansion of the overall universe of investors*** . . . overall, I would just characterize it as a continuing evolution of ***a program that's working really well and expanding***."

166. Defendant Datta also responded to a question about investor demand for loans and the supply/demand balance, stating: "I mean we've had definitely robust increases on the supply side, both with our number of banking partnerships, which has increased nicely, as well as the investment dollars that flow through to the institutional world. But I think ***we're in very much the same position of equilibrium that we've been in the past***, which is – there's – finding ***the borrowers, economically and profitably, tends to be the limiting factor in our growth. And I think that's probably still the case*** even at this new level of volume."

167. The statements referred to in ¶¶ 165-66 were each materially false and misleading in that they misrepresented material facts and omitted to state material facts necessary make the statements not misleading. Due to Upstart's platform's deficiencies in accounting for changing macroeconomic conditions, Upstart was becoming increasingly funding constrained, as demand from Upstart loan funders materially decreased. Thus, Upstart's "universe of [loan] investors" was experiencing a contraction rather than an "ongoing expansion," and Upstart was not in a "position of equilibrium." In truth, finding funding ***was*** a "limiting factor in [Upstart's] growth," as Upstart was increasingly funding constrained. Unbeknownst to investors, this was the real reason for the Company's growing inventory of loans on its own balance sheet, from approximately $1 million in Q2 2020 to approximately $50 million (and growing) in Q2 2021.

168. Following the Q2 earnings call, analysts remarked positively on Upstart's business and prospects. Jefferies noted that "Upstart retains very little of its originated receivables (currently, the company retains about 4% of loans for testing, monitoring and development purposes) and is not accountable for the performance of the receivable." The same analyst also repeated the Upstart Defendants' statements to investors that the Company had "little balance sheet credit risk or direct credit risk."

169. Writing for Real Money on August 12, 2021, Jim Cramer characterized Upstart as "one of the premier disruptive names of our time, getting quick loans to deserving people using artificial intelligence to be sure they can pay those loans back," emphasizing that it "has no credit exposure" because it "makes loans for other banks," and again touting the fact that Upstart had "so far been so strong in their origination that one bank just suspended its use of FICO scores."

### L. Q2 2021 Form 10-Q

170. On August 13, 2021, Upstart filed with the SEC its Form 10-Q for the quarter ended June 30, 2021 (the "Q2 Form 10-Q"), which was signed by Girouard and Datta. The Q2 Form 10-Q reiterated prior false statements. For instance, it misleadingly stated the following concerning the role of Upstart's bank partners:

> Our bank partners can retain loans that align with their business and risk objectives. For loans that are not retained by our bank partners, we help diversify the funding of these loans to a broad base of institutional investors that invest in Upstart-powered loans. ***Over the last few years, the percentage of loans funded through our balance sheet has generally decreased, while the percentage of loans purchased by institutional investors has generally increased.***

171. The Company's Q2 Form 10-Q reiterated the misstatement from the Company's 2020 Form 10-K that the "***AI models have been refined and updated to account for the COVID-19 pandemic*** . . . ."

172. The Q2 Form 10-Q further stated the following:

> During the peak of the COVID-19 pandemic, we made certain operational changes, including temporary reductions in our marketing activities and certain operational expenses. In order to support borrowers suffering from income loss due to the pandemic, Upstart also worked with its bank partners to offer hardship plans that, among other things, allowed affected borrowers to defer loan payments for up to two months. At the peak, approximately 5.6% of borrowers on our platform had enrolled in a hardship program, less than half the rate of online lending industry benchmarks. As of June 30, 2021, approximately 95% of those impacted borrowers have exited the hardship program and resumed making loan payments. ***Due to the strength of our AI models, the COVID-19 pandemic has had a minimal impact on the credit performance of Upstart-powered loans, including those originated prior to the second quarter of 2020.***

> ***Although significant government assistance was provided during the COVID-19 pandemic, the resilience of our bank partner results during this time provides evidence of the benefits that our AI models can offer to bank lending programs. We believe these benefits are even more compelling and valuable during periods of economic downturn***.

173. The statements referred to in ¶ 170-72 were each materially false and misleading in that they misrepresented material facts and omitted to state material facts necessary to make the statements not misleading. In truth, Upstart's AI system was not accurately accounting for changing macroeconomic factors, including those relating to the termination of government stimulus programs, as it was not nimble enough to accurately and quickly react to changing macroeconomic factors through an automated process, but instead required a manual process that involved "a bunch of conversations and phone calls." The Upstart Defendants concealed that because of the system's deficiencies and decreasing demand from funders, Upstart was on a dangerous path of taking on more and more credit risk as it was increasingly being forced to become a lender itself.

174. Buoyed by the Upstart Defendants' stream of false and misleading statements, analysts continued to embrace Upstart's narrative. On September 7, 2021, Piper Sandler issued an analyst report which characterized the Company as having "appl[ied] AI to rewrite the rules of the game," which in turn had allowed it to "buil[d] a better 'mousetrap' to price loans (measure risk)" that "provide[d] lenders with a structurally superior lending offering, and thereby a significant competitive moat." In raising its price target on the Company, Piper Sandler also reiterated that "[c]ore to our thesis on Upstart is that it is not a lending company, but partners with lending companies – validated by its fee-based revenue model . . . ." Accordingly, it noted that "banks [will] likely increase dependency on Upstart, given they have a superior solution to price risk (vs. traditional processes, FICO scores, etc.); further, as more banks see success with Upstart given

higher conversion rates, lower fraud, lower default rates, and competitive pressures, these proof points would increase usage of Upstart."

**M. September 9, 2021 – Deutsche Bank Technology Conference**

175. On September 9, 2021, Girouard was interviewed at the Deutsche Bank Technology Conference. During the interview, Girouard discussed Upstart's AI technology, characterizing it as "sort of a holy grail of credit and lending" that "more accurately measur[ed] risk than legacy systems, which tend to be FICO-centric," and which had "the effect of . . . being able to approve more borrowers at lower rates, and actually lower loss rates." Girouard also stated that Upstart's AI technology was a ***"fairly magical thing" because it "is always getting better . . . we are getting more sophisticated AI as we go and our model is inevitably getting more accurate as time goes by."***

176. With respect to Upstart's business model, Girouard explained that "***we've chosen the path of being a technology company, not a bank***. . . . We instead choose to work with banks and credit unions and others who want to originate credit using our technology . . . we direct them [consumers] to our banks and credit unions as partners who use our AI technology to originate better credit." Girouard elaborated that "***we don't take risk in the loans***" because while ***"we provide a toolset to banks originally, credit and charge them fees to use it," "we aren't in any sense a lender ourselves."***

177. Girouard was asked specifically about whether Upstart's model could "withstand the brunt of" credit tightening and default rates rising. Girouard responded as follows:

> Yes. I'd say ***our model expects that to happen***. And really, our banks are earning excess profits at the moment, because default levels are significantly below target. So when they drift back up, which we expect, they will, they'll [sic] banks will be back to making what they're supposed to earn on these portfolios of loans.

> And that's as it should be, ***we do think a lot of the industry is doing the inappropriate thing of, because the fall rates are unnaturally low, they're passing along that goodness to the consumer*** in the form of lower prices.
>
> Now, that all sounds good, but it's actually super dangerous, because ***this environments*** [sic] ***not going to be around forever. That's the kind of I think sophistication. And also just, frankly, conservatism about how we do things in upstart*** that matters a lot. You can always in lending, you can take advantage of the moment all the time, you can lend as much as you want to lend in a benign environment, it might work for a while.
>
> But ultimately ***a strong system, and also just the discipline, not to just go for the extra in a bit of growth is important***. Now, it all sounds odd, because Upstart has grown enormously in the last year, that has really been just taking market share, because our system held up well and proved itself through COVID.
>
> And that's really taken us from one of many to really the number one in the category that we're in, which is personal lending. And now, as you might know, we're sort of moving into auto lending as well as our next large segment.

178. The statements referred to in ¶¶ 175-77 were each materially false and misleading in that they misrepresented material facts and omitted to state material facts necessary to make the statements not misleading. Contrary to Girouard's representations, Upstart's AI system was not accurately accounting for changing macroeconomic factors, including those relating to the termination of government stimulus programs, as it was not nimble enough to accurately and quickly react to changing macroeconomic factors through an automated process, but instead required a manual process that involved "a bunch of conversations and phone calls." Because of these deficiencies and the resulting decreased demand from funders of Upstart loans, Upstart became a lender itself and took on the risk of its loans, contrary to Girouard's representations that "we aren't in any sense a lender ourselves" and that Upstart merely "provide[d] a toolset to banks." Rather than having the "sophistication" and "discipline" to "not just go for the extra [] bit of growth," Upstart was secretly doing just that by having loans originated that its funding partners simply did not want and putting those loans on its own balance sheet to bolster its growth story as long as it could.

### N. Upstart's Class Period MD&As Were False and Misleading

179. Section 13(a) of the 1934 Act requires issuers such as Upstart to file periodic reports on Form 10-K and Form 10-Q and requires registrants to comply with Regulation S-K Item 303.

180. Item 303(a)(3)(ii) of Regulation S-K requires that annual reports filed on Forms 10-K describe, among other things, "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." In addition, this Item requires that annual reports describe "any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations."

181. Instruction 3 to Item 303(a) of Regulation S-K requires that the "discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

182. Item 303(b) of Regulation S-K requires discussion of material changes in such known trends or uncertainties in quarterly reports on Form 10-Q.[8]

---

[8] The MD&A *Objective* was amended starting for public companies with fiscal years ending on after August 9, 2021, and states in part:

> *(a) Objective*. The objective of the discussion and analysis is to provide material information relevant to an assessment of the financial condition and results of operations of the registrant including an evaluation of the amounts and certainty of cash flows from operations and from outside sources. The discussion and analysis **must focus specifically on material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition**. This includes descriptions and amounts of matters that have had a material impact on reported operations, as well as matters that are reasonably likely based on management's assessment to have a material impact on future operations. The discussion and analysis must be of the financial statements and other statistical data that the registrant believes will enhance a reader's

183. Upstart's accumulation of inaccurately priced and riskier loans created an uncertainty or event that was known to Upstart and was reasonably expected to have a material effect on the registrant's (*i.e.*, the Company's) future revenues. Upstart's failure to disclose the impact to its revenue about the material amounts of the loans accumulating on its balance sheet omitted material information about its revenue necessary for an understanding of its results of operations.[9]

184. During the Class Period, Upstart reported its financial results in publicly filed reports on Forms 10-Q and 10-K and discussed those results in its quarterly earnings calls. Beginning no later than Q1 2021, Upstart began retaining and holding higher risk loans on its balance sheet that the Company could not pass to its funding partners. Those loans exposed Upstart to ever increasing delinquency and default risk. Upstart, however, misled investors into believing "the percentage of loans funded through our balance sheet has generally decreased" and loans retained on their balance sheet were "temporary."

185. By 2022, the loans held on Upstart's balance sheet had increased sharply and the Company once again misled investors, stating (for example) during the Q1 2022 earnings call that

---

> understanding of the registrant's financial condition, cash flows and other changes in financial condition and results of operations.

[9] The MD&A rule for *Results of operations* was amended for public companies with fiscal years ending on or after August 9, 2021, and states in part:

> *Results of operations.* (i) *Describe* any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, would be material to an understanding of the registrant's results of operations. (ii) Describe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

the loans were held exclusively for "R&D . . . [and as a] . . . market-clearing mechanism." These statements were materially false and misleading. Investors were unaware of the reasonably likely negative impact this trend would have on future periods. The Company's public investors were unaware that the buildup of higher risk loans on Upstart's balance sheet was exposing the Company to substantial fair value adjustments that would negatively impact future net revenue. Without this information, investors without access to non-public information lacked the ability to evaluate Upstart's true revenue growth and ability to meet Wall Street guidance expectations.

186. The following chart depicts the accumulation of loans on Upstart's balance sheet and the fair value adjustments to those loans that materially reduced Upstart's revenue:




187. Upstart classified the loans held on its balance sheet as either "held-for-investment" or "held-for-sale." As described in its 2022 Form 10-K filing for fiscal year 2021, however,

beginning in January 2020, the Company reclassified its held-for-investment loans to held-for-sale "due to the Company's intent to sell the loans prior to maturity and increasing evidence of their marketability." The amount of loans held in both the investment and sale categories consistently increased, with loans held-for-investment growing from $19 million in 2020 to nearly $110 million by December 2021.

188. Beginning on January 1, 2022, Upstart once again reclassified all loans held on its balance sheet to held-for-sale "due to the Company's intent and ability to sell the loans prior to maturity," according to Upstart's May 10, 2022 Form 10-Q filing. Upstart misled investors into believing that the loans retained by Upstart were "primarily originated for research and development purposes" yet in the same filing the Company noted that "[a]ll loans purchased during the three months ended March 31, 2022 were classified as held-for-sale."

189. The accumulation of loans on Upstart's balance sheet exposed the Company to credit risk, defaults, and delinquencies, which, in turn, negatively impacted Upstart's net revenue.

190. The IPO Registration Statement was also required to furnish the information called for under Item 303 of Regulation S-K [17 C.F.R. § 229.303], *Management's Discussion and Analysis of Financial Condition and Results of Operations* ("MD&A"). In 1989, the SEC issued interpretative guidance associated with the requirements of Item 303 of Regulation S-K, which states, in pertinent part, as follows:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

Moreover, SEC Release 33-8350, from 2003, states as follows:

> One of the most important elements necessary to an understanding of a company's performance, and the extent to which reported financial information is indicative of future results, is the discussion and analysis of known trends, demands,

> commitments, events and uncertainties. Disclosure decisions concerning trends, demands, commitments, events, and uncertainties generally should involve the:
>
> - consideration of financial, operational and other information known to the company;
>
> - identification, based on this information, of known trends and uncertainties; and
>
> - ***assessment of whether these trends and uncertainties will have, or are reasonably likely to have, a material impact on the company's liquidity, capital resources or results of operations.***
>
> As we have explained in prior guidance, disclosure of a trend, demand, commitment, event or uncertainty is required unless a company is able to conclude either that it is not reasonably likely that the trend, uncertainty or other event will occur or come to fruition, or that a material effect on the company's liquidity, capital resources or results of operations is not reasonably likely to occur.
>
> * * *
>
> One of the principal objectives of MD&A is to provide information about the quality and potential variability of a company's earnings and cash flow, so that readers can ascertain the likelihood that past performance is indicative of future performance. Ascertaining this indicative value depends to a significant degree on the quality of disclosure about the facts and circumstances surrounding known material trends and uncertainties in MD&A.

191. The IPO Registration Statement was materially false and misleading because the MD&A contained therein failed to disclose known material events and uncertainties associated with the limitations of Upstart's platform and deficient external funding that were reasonably likely to have a material adverse effect on the Company's operating results, as alleged herein.

### O. Upstart's Class Period Sarbanes-Oxley Certifications Were False and Misleading

192. In addition, the 2020 and 2021 Forms 10-K also falsely represented that Upstart's disclosure controls and procedures were effective at the reasonable assurance level, stating, in pertinent part, as follows:

> **Evaluation of Disclosure Controls and Procedures**
>
> The Company's management, with the participation and supervision of the Company's Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of the Company's disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Based on that evaluation, ***the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of December 31, 2020, the Company's disclosure controls and procedures were designed and function effectively*** to provide reasonable assurance that information required to be disclosed by the Company in reports filed or submitted under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in SEC rules and forms, and that such information is accumulated and communicated to our management, including the Company's Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

193. The 2020 and 2021 Forms 10-K also contained Girouard and Datta's false and misleading certifications on Upstart's disclosure controls pursuant to the Sarbanes Oxley Act of 2002 ("SOX"), attesting that:

> I, [Defendants Girouard and Datta], certify that:
>
> 1. I have reviewed this Annual Report on Form 10-K of Upstart Holdings, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

> 4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:
>
> > (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> >
> > (b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
> >
> > (c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
>
> 5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> > (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
> >
> > (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

194. Upstart's Forms 10-Q during the Class Period also repeated, in all material respects, the materially false and misleading evaluation of Disclosure Controls and Procedures set forth in ¶ 192, and Girouard's and Datta's certifications thereon pursuant to SOX quoted in ¶ 193, above.

195. Girouard's and Datta's scienter is underscored by the SOX-mandated certifications, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about Upstart was made known to them and that the Company's disclosure related controls were operating effectively.

196. Girouard and Datta knew or should have known that their evaluations of the Company's internal controls were not reliable and were not based on the care required by publicly traded companies.

197. On the May 9, 2022 earnings call, a research analyst from Atlantic Equities LLP observed that it was surprising to hear that the Company was putting loans on its balance sheet and that "it's just not a normal course of business for you given you're a platform business." In response, Girouard disclosed, for the first time, that unlike their banking partners, Upstart lacked the necessary controls and mechanisms to adapt to changing markets and changing return hurdles, which caused accumulation of loans on its balance sheet:

> "Okay, I think – Sanjay kind of explained this. Generally, we view ourselves as a marketplace where ultimately, price discovery happens and loans are funded or not funded when they make sense by our bank partners or by capital markets, institutional investors, etc. . . . Some of this works very fluidly, particularly on the bank and the credit union side***, where they have very direct controls to change their return hurdles, etc. We don't have those mechanisms in place as well on the other side. It's more of a manual process***, so when something changes as quickly as it did in interest rates and the risk premiums in the market changed very rapidly, then we step in to sort of bridge that, but it's sort of a temporary thing. And as Sanjay said, ***it is an intention of ours to make the system more automated and more fluid. So we don't have any need to do that, it's not part of our business to hold loans*** generate net interest income from loans in our balance sheet, but we want to make sure there's fluidity in the system ***and we're definitely going to do some more work. So we can do that without any of our balance sheet participation in that."***

198. On the same earnings call, Datta disclosed, for the first time, that Upstart's balance sheet risk (putting new loans on the balance sheet) was increasing due to their platform not working as previously represented. Datta stated:

> [H]istorically, our balance sheet has been almost exclusively for the purposes of R&D. We have used our balance sheet in the last quarter to do what I call sort of a market-clearing mechanism. . . .
>
> I think it would be fair to say that our platform, its ***ability to react to the new market-clearing price, it's probably not as nimble as we would like. It's somewhat manual. It requires a bunch of conversations and phone calls***. . . ."

## VI. DEFENDANTS CONTINUE THEIR FRAUDULENT SCHEME, BUT FACTS REVEALING THE FRAUD BEGIN TO LEAK

### A. Q3 2021 Financial Results – The Upstart Defendants Reveal A Dramatic Increase in Loans on Upstart's Balance Sheet but Conceal the Reasons for It

199. On November 9, 2021, after the market close, Upstart issued a press release announcing its financial results for the third quarter of 2021. The press release revealed that the amount of loans held on Upstart's balance sheet had dramatically increased by more than 57% **during the quarter**, to $130 million. While Upstart's Q3 2021 revenue increased 18% from the same period in 2021, its revenue from interest income increased 171%, another indication that the Company was holding more loans on its balance sheet. But, this was not the type of revenue investors wanted to see increase, because revenue from interest income was characteristic of a lender – which Upstart had time and again emphasized it was not. On this news, some artificial inflation was released from Upstart's stock price, as it fell from a closing price of $313.71 per share on November 9, 2021, to a closing price of $256.59 per share on November 10, 2021.

200. Later that day, Upstart held a conference call with analysts and investors to discuss the Company's operations and earnings release. While the disclosure of the increase in loans on the Company's balance sheet was a partial disclosure of the fraud, the Upstart Defendants continued to mislead investors. The Upstart Defendants failed to reveal that Upstart was putting loans on its balance sheet because of the AI system's inability to timely or adequately respond to changing macroeconomic factors, which resulted in riskier loans than Upstart's funding partners wanted. Rather, Datta falsely stated in pertinent part that "the absolute dollar volume of loans we carry is edging upwards as ***we use our balance sheet to support the scaling of our growing auto product, as well as our expansion into the lower credit score segments of personal lending***."

201. Datta and Girouard falsely assured investors that demand from funders was high and that Upstart would continue to be "in pretty good shape" in that regard:

> Girouard: [W]e have a lot of banks who are originating loans for their own balance sheets. We have some banks that are selling through to 100-plus, 150-plus capital markets partners, and that creates this very liquid environment that we work in.
>
> I'll just speak maybe to the bank side. I mean, ***we definitely have very rapidly growing interest from bank partners*** for some of the reasons we've said in the past, which is banks tend to be very heavy in deposits and light in loans, and that's an environment that works really well for us. I would say ***we just continue to see increased interest***. Our ability to get banks onto our platform quickly has definitely improved. We -- I've mentioned in my remarks, we got a bank partner on in less than 50 days, which is a new record for us.
>
> So ***the demand is there***. I think ***the confidence in our models from the bank partners is there***. The returns for the banks have actually been excessive, meaning higher than they would have expected on loans, principally because the macro environment has really suppressed default rates for us, probably like a lot of others. So that -- the banking side is very, very strong, and we feel very confident we're going to continue to add banks and credit union partners at a rapid clip.
>
> * * *
>
> Datta:
>
> I think the things that we think about in the more medium to long term which are important to us are 2. One, I do believe, over this period of time, this sort of whole category of digital personal loans has really, I think, gained a lot of credibility as a legitimate source of yield.
>
> And you're starting to see institutions that are much more conservative and traditional coming to the space. ***And so I think there's been an increasing acceptance into the mainstream of investment finance on the credit side.***
>
> And then the second more important one is, how do we look within that? And I think that ***Upstart continues to have a lot of credibility for the performance of the credit and our ability to underwrite the risk in a way that I think differentiates itself*** from other products in the market. So we think the combination of those couple of things will be such that ***even when we're past the current, let's call it, sort of distortion in the market, we'll be in pretty good shape with respect to demand***.

202. Finally, Datta misleadingly spoke about the effects consumer behavior and economic indicators returning to pre-pandemic conditions would have on the Company's business, stating in pertinent part:

> [W]e are seeing the early signs of a return to the pre-COVID consumer profile with personal savings rates in the economy now having fallen back to pre-COVID levels and credit card balances steadily edging upwards to within 90% of pre-COVID levels. We expect the continuation of this trend to eventually lead to an increase in consumer default rates, consistent with pre-COVID levels. ***And we believe that any issuer who has not priced this in is likely to experience a deterioration in the performance of their returns. We also expect these macro dynamics to ultimately lead to an increase in borrower*** loan demand, although this has yet to manifest in our results and remains upside to our forecast as the exact timing is unclear.

203. The next day, on November 10, 2021, Girouard made a number of media appearances to discuss Upstart's Q3 results, including an appearance on CNBC's Closing Bell. During the interview, Girouard was asked what effects the stimulus and eventual increase in interest rates would have on Upstart's business. Girouard's response was dismissive, as he falsely suggested that Upstart's AI system would be able to navigate the new macroeconomic cycle:

> CNBC: David clearly rates are at record lows and we know they're only likely to rise from here. That puts pressure on borrowers. But on top of that we've seen extraordinary growth. Buy now, pay later is one area of consumer credit that has soared of late. And when I look through your decks as well there's certain rhetoric that does just jump out to you. You say you can triple the volume of loans for certain banks without loan loss rates going up in any way. Do you understand when people then say to you sorry is this not a bit of a warning sign? Could we be in a massive bubble that's building here in consumer credit?
>
> Girouard: Yeah I mean you know independent of us certainly consumers being overweighed in credit is a bad thing but clearly on the macro sense the consumer has not been healthier so from that sense for sure the consumer is in great shape due to stimulus, due to lower spending during the pandemic that's all true. ***The core of what we do though is more accurate risk models. It really is independent of the macro cycle though certainly it considers the cycle and when you can more accurately separate good risk from bad risk you can suddenly begin to offer better rates and more approvals to people that are credit worthy that will pay back a loan. So it's really in some sense unique.*** It's not, it's independent of the where we are in the cycle. Though importantly it actually is helpful for banks to navigate a complicated cycle like we saw in the last couple years particularly with the pandemic.

> CNBC: That's interesting cause I was going to ask you if inflation makes a difference as things become pricier for consumers to afford if you see that in a pick -up in loans especially now that the savings rates are back almost to pre-pandemic levels.
>
> Girouard: Yeah I think we're just seeing a reemergence of a demand for credit because consumer spending is going up, credit balances, you know BNPL is great but in the end it ends up with consumers having more debt and spending more which is you know the primary sort of offer to the merchant in BNPL is that consumers will spend more. ***Well guess what that ends up eventually in people being a bit over their ski so you know I think this is all part of what our system is designed to work well with and we're somewhat of a rate agnostic system. As interest rates go up our system adjusts to that but we're not overly rate sensitive like you might see elsewhere.***

204. The statements referred to in ¶¶ 200-03 were each materially false and misleading in that they misrepresented material facts and omitted to state material facts necessary to make the statements not misleading. In truth, Upstart's AI system was not accurately accounting for changing macroeconomic factors, including those relating to the termination of government stimulus programs, as it was not nimble enough to accurately and quickly react to changing macroeconomic factors through an automated process, but instead required a manual process that involved "a bunch of conversations and phone calls." Because of the deficiencies in Upstart's technology, demand from Upstart loan funders was materially decreasing, and Upstart was putting more loans on its balance sheet because it was increasingly funding constrained, not for R&D into its auto product or expansion into other credit score segments. Finally, Girouard knew that Upstart's platform was not "independent of the macro cycle," "rate agnostic," or "overly rate sensitive," as it was actually designed to shrink Upstart's business in the face of rising interest rates and other macroeconomic changes.

**B. Q3 2021 Form 10-Q**

205. On November 12, 2021, Upstart filed with the SEC its Form 10-Q for the quarter ended September 30, 2021 (the "Q3 Form 10-Q"), which was signed by Defendants Girouard and

Datta. The Q3 Form 10-Q reiterated the prior misstatement concerning the role of Upstart's bank partners:

> Our bank partners can retain loans that align with their business and risk objectives. For loans that are not retained by our bank partners, we help diversify the funding of these loans to a broad base of institutional investors that invest in Upstart-powered loans. Over the last few years, ***the percentage of loans funded through our balance sheet has generally decreased, while the percentage of loans purchased by institutional investors has generally increased***.

206. The Q3 Form 10-Q reiterated the misstatement from the Company's 2020 Form 10-K that the "***AI models have been refined and updated to account for the COVID-19 pandemic*** . . . ."

207. The Q3 Form 10-Q further stated the following:

> ***Due to the strength of our AI models, the COVID-19 pandemic has had a minimal impact on the credit performance of Upstart-powered loans, including those originated prior to the second quarter of 2020***.
>
> ***Although significant government assistance was provided during the COVID-19 pandemic, the resilience of our bank partner results during this time provides evidence of the benefits that our AI models can offer to bank lending programs. We believe these benefits are even more compelling and valuable during periods of economic downturn***.

208. The statements referred to in ¶¶ 205-07 were each materially false and misleading in that they misrepresented material facts and omitted to state material facts necessary to make the statements not misleading. In truth, Upstart's AI system was not accurately accounting for changing macroeconomic factors, including those relating to the termination of government stimulus programs, as it was not nimble enough to accurately and quickly react to changing macroeconomic factors through an automated process, but instead required a manual process that involved "a bunch of conversations and phone calls." As a result, rather than "the COVID-19 pandemic [having] a minimal impact on the credit performance of Upstart-powered loans," the Company was increasingly having to hold loans on its own balance sheet. The Upstart Defendants

concealed that because of the system's deficiencies, Upstart was on a dangerous path of taking on more and more credit risk.

209. Analysts understood that despite Upstart's Q3 2021 revenue increase, the news release revealed that not all the revenue was good revenue, as interest income resulting from loans on Upstart's balance sheet increased considerably. For instance, Barclays stated, "[i]mportantly, however, the beat in the quarter was largely due to greater interest income and fair value adjustments vs. our model, which investors likely view as lower quality than UPST's core fee revenue. The improvement in the non-core revenue line (nearly triple vs. Q2) was due to two factors: higher gains realized from loan sales into ABS markets (which UPST expects will wane in Q4), and greater interest income, as UPST is currently holding auto loans on the company's balance sheet." At the same time, however, analysts and investors remained in the dark concerning the full scope of the reasons for increased loans on Upstart's balance sheet – namely, the inability of the Company's AI platform to function well under changing macroeconomic circumstances, and the resulting diminution in external funding for Upstart loans.

**C. Q4 & Full-Year 2021 Financial Results**

210. On February 15, 2022, Upstart issued a press release announcing its financial results for the fourth quarter and full year of 2021. The press release revealed that Upstart's loan balance increased during the fourth quarter to $252 million.

211. Later that day, Upstart held a conference call with analysts and investors to discuss the Company's operations and earnings release. During the conference call, Girouard and Datta issued a series of statements that were materially false and misleading in that they misrepresented and omitted to state material facts, then known to or recklessly disregarded by them.

212. Datta again misleadingly characterized the increase in loans held on the Company's balance sheet as being "temporary" and an "R&D" consequence associated with Upstart's foray into automobile lending, stating in pertinent part:

> $170 million was reinvested back into our balance sheet in the form of loans made ***in support of new R&D programs***. Consequently, our balance of loans, notes and residuals at the end of the year was $261 million, up from $140 million in Q3 and ***reflecting the accelerated pace of R&D***. Most notably, ***auto lending has been funded since inception entirely from our own balance sheet. This is, as always, a temporary incubation period*** until we reach the point where the loans can be directed to our bank partners and institutional investors at reasonable scale, which we anticipate will begin to happen next quarter.

213. Datta also assured investors that the increase in loans on Upstart's balance sheet had nothing to do with any problems getting funding for Upstart loans. Datta acknowledged that putting loans on Upstart's balance sheet was "obviously not our core model," but he reassured investors that Upstart would soon return to that "core business model":

> So currently, we're earning net interest income off of those loans, which is obviously not our core model. At some point, those loans will start to make their way to banks and investors. As I said in the prior remarks, ***we anticipate that happening over the next quarter or so***. And when that happens, ***we'll begin to pivot to a fee model that's more akin to our core business model***, but that's still in front of us.

214. Meanwhile, Girouard touted the fact that Upstart had "42 banks and credit unions as well as more than 150 institutional investors funding loans on the Upstart platform, providing ***deep and diverse sources of liquidity***."

215. Girouard acknowledged that loan defaults had been at "unnaturally suppressed levels for more than a year," but reassured investors that Upstart was fully prepared for a return to "normal," including by pricing the loans on its platform appropriately. According to Girouard, Upstart was "confident that ***an economy and market in transition plays to our strength***."

216. Additionally, Datta reassured investors that Upstart had anticipated normalizing default rates as the stimulus faded and that "***the loans on [Upstart's] platform have been priced accordingly***" with rising default rates being "***correctly predicted***."

217. Datta further stated in pertinent part:

> As we, along with our bank partners, investors, ***have been anticipating this shift and as the loans on our platform have been priced accordingly, we are not expecting any meaningful adverse impact from rising defaults on our volumes or economics***. Note that this recent upturn in loan default is not to be confused with the longer-term secular vintage-over-vintage increase in absolute default profile on our platform, which has been alluded to in some public forums. ***This phenomenon is almost purely a function of change in borrower mix as our models expand the frontiers of approvability and pull more applicants into the lendable universe over time. Viewed in this context, rising absolute default rates*** that are correctly predicted and priced are ***not a bug, but in fact, a feature of our platform*** and a trend we expect to see continue as we successfully progress against our core corporate mission of expanding access to credit.

218. Datta also made materially false and misleading statements during the following question-and-answer session of the February 15, 2022 conference call:

> <u>Andrew M. Boone – Director & Equity Research Analyst, JMP Securities LLC:</u>
>
> **I wanted to go first to default rates**. So Sanjay, I think **you talked about it being a feature, not a bug. But can you just give us a little bit more detail?** Can you provide any incremental just pieces of data to give us more confidence there, talk about cohorts or anything else to just give us a little bit more confidence.
>
> <u>Datta:</u>
>
> Yes, Andrew. So I guess I was just trying to maybe draw a distinction between two different things that often get conflated. One of them, which is talked about a lot is – it is the fact with each successive vintage that's originated on our platforms, the absolute level of delinquency default goes up, and that's reflected in our securitizations. And so the first point I was making was that's, ***in our view, not a bad thing. It's happening because we are expanding our universe of approval of borrowers*** over time. And any time you go from a situation where you have a small amount of data and you're acting conservatively, over time, having a lot more data and then relaxing your constraints around risk, then your average delinquencies will rise just mathematically. And ***as long as you're predicting that correctly and pricing the loans accordingly, our view is that this is a good thing.*** So in fact, I would say it's maybe the best single distillation of our entire history of success in corporate value creation as a platform, right? Like that's what we're doing. We're

expanding the frontiers of approvability and making the universe bigger, whereas we started from a position that was more conservative.

So I would say like put that aside. So that's one thing that's happening, but that's just sort of a reflection of our business journey. But the second point, which is different, but equally about the delinquencies is that if you imagine that sort of delinquencies by vintage, which – where each vintage has a higher delinquency than the last, it is a true statement that every single one of those individual data points is lower than where we had expected it to be.

Now that's a statement that's equally true about all vintages and equal in magnitude about all vintages. And we are – we have been of the belief that, that's because of the stimulus and the economy. And we've been consistently messaging that we have been predicting that, that would revert at some point and those little dots would return to the sort of position where we originally expected them to be. And lo and behold, since October or November, each of those vintage curves is now reverting back to where we expected. So this is something that's more of a local phenomenon. It's not just about the secular vintage-over-vintage profile of our business, but it's more about each individual vintage returning to a higher level of default. ***But the fact that we had been sort of predicting it for more than a year, and seeing it finally materialize separately is not a huge impact to our business.***

If you are in some temporary suspended state of abnormality, as long as you don't delude yourself into thinking that that's the new normal, the eventual resumption of normalization shouldn't be a big surprise. And so we're going through that shift, but that's something that is new as of October or November. It's not sort of a longer-term sort of increase in default profile, which I was just reacting, too, because we see it discussed a lot in the public forum. So we thought it was worth clarifying.

219. The statements referred to in ¶¶ 212-18 were each materially false and misleading in that they misrepresented material facts and omitted to state material facts necessary to make the statements not misleading. In truth, "an economy and market in transition" did not "play[] to [Upstart's] strength" as Upstart's technology was unable to timely and accurately respond to macroeconomic changes, including those relating to the termination of government stimulus programs, as it was not nimble enough to accurately and quickly react through an automated process, but instead required a manual process that involved "a bunch of conversations and phone calls." Upstart's platform did not "correctly predict" rising default rates and price Upstart loans "accordingly," and rising default rates were in fact a negative, not "a feature" of Upstart's platform,

having a material negative "impact to [Upstart's] business." Unbeknownst to investors, the AI platform was intentionally designed to shrink Upstart's loan originations and business in times of "elevated consumer risk" and other macroeconomic challenges. To maintain the façade of the Company's growth story, and due to the deficiencies of Upstart's platform in responding to macroeconomic changes, Upstart was pumping out loans that funders did not want, forcing the Company to put more such loans on its own balance sheet for reasons other than R&D, which would have a materially negative effect on Upstart's revenue. And, because Upstart was increasingly funding constrained, it was not in a position to "begin to pivot to a fee model that's more akin to [its] core business model" "over the next quarter or so."

**D. 2021 Form 10-K**

220. On February 18, 2022, Upstart filed with the SEC its 2021 Form 10-K, which was signed by Girouard, Datta, and Gu (the "2021 Form 10-K"). The 2021 Form 10-K contained materially false and misleading statements and failed to disclose material information, including statements about the effects of the COVID-19 pandemic and government assistance programs on Upstart's business, the capabilities of the Company's AI platform, and statements made in the risk factors and MD&A sections, as discussed in ¶¶ 179-91.

221. The Company continued to mislead investors regarding the capabilities of its AI model. For example, the 2021 Form 10-K states, "[b]ecause ***our model changes in real time***, we are able to extend new offer loans to applicants who were previously not eligible or were previously quoted a higher rate."

222. The 2021 Form 10-K also assured investors that the "***AI models have been refined and updated to account for the COVID-19 pandemic*** . . . ."

223. The 2021 Form 10-K further stated the following:

> In order to support borrowers suffering from income loss due to the pandemic, Upstart also worked with its bank partners to offer hardship plans that, among other things, allowed affected borrowers to defer loan payments for up to two months. At the peak, 5.6% of borrowers on our platform had enrolled in a hardship program, less than half the rate of online lending industry benchmarks, and 95% of those impacted borrowers eventually exited the hardship program and resumed making loan payments. ***Due to the strength of our AI models, the COVID-19 pandemic has had a minimal impact on the credit performance of Upstart-powered loans, including those originated prior to the second quarter of 2020.***
>
> ***Although significant government assistance was provided during the COVID-19 pandemic, the resilience of our bank partner results during this time provides evidence of the benefits that our AI models can offer to bank lending programs. We believe these benefits are even more compelling and valuable during periods of economic downturn***.

224. The 2021 Form 10-K also repeated, in all material respects, the materially false and misleading evaluation of Disclosure Controls and Procedures set forth in ¶ 192 and Girouard's and Datta's certifications thereon pursuant to SOX quoted in ¶ 193, above.

225. The 2021 Form 10-K touted Upstart's AI models and noted that it had added 500+ variables:

> We leverage the power of AI to more accurately quantify the true risk of a loan. Our AI models have been continuously upgraded, trained and refined for more than eight years. We have discrete AI models that target fee optimization, income fraud, acquisition targeting, loan stacking, prepayment prediction, identity fraud and time-delimited default prediction. Our models incorporate more than 1,500 variables and benefit from a rapidly growing training dataset that currently contains more than 21.6 million repayment events. ***The network effects generated by our constantly improving AI models provide a significant competitive advantage –*** more training data leads to higher approval rates and lower interest rates at the same loss rate.

226. Despite the growing amount of loans on the Company's balance sheet, the 2021 Form 10-K once again misled investors that ***"[o]ver the last few years, the percentage of loans funded through our balance sheet has generally decreased, while the percentage of loans purchased by institutional investors has generally increased."***

227. Regarding the loans held on Upstart's balance sheet, 2021 Form 10-K stated:

> Upstart powered loans originated by bank partners are either retained by the bank partners, purchased by the Company and immediately sold to institutional investors under loan sale agreements, or purchased and held by the Company for a period of time before being sold to third-party investors, ***or held to maturity by the Company for the primary purpose of product research and development***. Loans retained and held on the Company's consolidated balance sheets are classified as either held-for-investment or held-for-sale, and loans purchased for immediate resale to third-party investors are classified as held-for-sale.

228. The statements referred to in ¶¶ 225-27 were each materially false and misleading in that they misrepresented material facts and omitted to state material facts necessary to make the statements not misleading. Contrary to the statements referred to in ¶¶ 225-27, Upstart's AI system was not accurately accounting for changing macroeconomic factors, including those relating to the termination of government stimulus programs, as it was not nimble enough to accurately and quickly react through an automated process, but instead required a manual process that involved "a bunch of conversations and phone calls." Unbeknownst to investors, the AI platform was even intentionally designed to shrink Upstart's loan originations and business in times of "elevated consumer risk" and other macroeconomic challenges. Additionally, Upstart's business was becoming increasingly funding constrained as demand from Upstart loan funders declined, and the Company was consequently putting more loans on its own balance sheet – not for R&D purposes, but rather due to the dwindling demand from funders of Upstart loans. And, because of the deficiencies of Upstart's AI system, the increasing number of loans that the Company was putting on its balance sheet were not marketable and would have a materially negative effect on Upstart's revenue.

## E. March 8, 2022 – JMP Securities Conference

229. On March 8, 2022, Girouard presented at the JMP Securities Conference. During the conference, Girouard described how government stimulus programs caused default rates

during the Class Period to be about "40% to 50% below what we estimated them to be at the time of origination." According to Girouard, the "ridiculously low" default rates were "not going to last forever" and Upstart expected to see "default rates return" when "COVID is sort of coming to an end and the stimulus dries up." In addition, Girouard stated that default rates started to rise "in second half of last year [2021], maybe towards the fourth quarter" – approximately the ***same time*** as the commencement of the massive insider selling described herein.

230. After describing how default rates were rising without the stimulus programs, Defendant Girouard falsely reassured investors by stating the following:

> I mean, it's not surprising to anyone who's in the industry, lending is a highly cyclical industry. It's very tied to the state of the economy, and things change quickly when the economy changes. So anyone who's been in banking or lending forever, of course, knows like you're trying to watch the tea leaves or read things or see and react and do things responsibly. And ***ultimately, our system, we believe, is much more adept at reacting quickly doing the right things through a changing scenario***.
>
> * * *
>
> But what also happened and not just to us, but across the industry, is default rates were just ridiculously low. And this, of course, was because the government was sort of air dropping checks on everybody. The stimulus out there and also the fact that consumers weren't spending. So they're – sort of debt carried was dropping. It really, in effect, maybe shocking to everybody, it was actually a net positive for the consumer in terms of their financial situation. . . . And what we were seeing is loss rates, 40% to 50% below what we estimated them to be at the time of origination. Now left to itself, our models would quickly just go, oh, great, the world has changed. It's time to lower rates because people don't default anymore. ***But – and this is where it is important, an AI-based system doesn't know what it doesn't know and the humans need to intervene. And in this case, we introduced, two years ago now almost, the notion of stimulus and how that is buffering credit performance.***
>
> Now we also knew – so anyway, we communicated to our bank partners and credit unions and loan investors like you're getting an enormous surplus right now. Default rates are half of what they should be. And you're getting enormous amount of sort of excess profits, if you will. But guess what, it's not going to last forever. We fully expect when COVID is sort of coming to an end and the stimulus dries up, we will see default rates return to, without knowing much more, 2019 levels, right? And that's essentially what we've seen.

> It happened starting, I'd guess, maybe in Q4 [2021] and has continued. And now I'd say we're probably pretty close to where we were pre-COVID. So yes, the default rates have increased a lot. It is as we expected. ***We are now in a position where the world is normalized***. Now the world in 2022, of course, has all these other variables all of a sudden happening that are a little unclear. Fed raising rates, the prospect of recession, geopolitical issues causing other sorts of disruption. So the bottom line is like there's no such thing as, oh, everything is just normal again.
>
> We're just dealing with the next set of disruptions. But I think what we're doing over time is proving to our bank partners that ***this is the system you need to deal with a noisy, crazy background economy*** because there's no reason to believe it's ever going to just be steady state again. We may or may not hit a recession next year, some debate about that. So that's the heart of it is that lending is a cyclical industry. We aren't going to change that, but ***we can certainly help lenders navigate that more adeptly***.

231. Analysts took note of Girouard's representations. For example, a securities analyst had the following exchange with Girouard:

> Andrew M. Boone JMP Securities LLC, Research Division – Director & Equity Research Analyst:
>
> So one of the things you said there that kind of pricked my ears up was just ***the fact that your system recognizes stuff faster, right***? So do you feel like we're now – is it stabilizing? Or kind of what's the second derivative, right? Or what . . . .
>
> Girouard:
>
> Yes, that's a good question. ***We do see it stable now***. We saw essentially default rates starting again, I don't exactly know the month last year, but it's second half of last year, maybe towards the fourth quarter. And I think we now see it pretty stable and pretty similar to 2019. So we kind of view it as, at least in terms of that sort of notion of stimulus going away, COVID going away is sort of mission accomplished, if you will, because ***we think it's now behind us***. We're also in a seasonal – usually, the first quarter is a trough of demand. It's usually our seasonally slowest quarter.
>
> So there's some of that always in there. But no, ***we feel good. We're in a good position. Our system did all the right things***. And now we're back to at least with respect to COVID and the stimulus and the effect of that. I feel like ***we're largely beyond it***. There's probably some parts of it that's still remaining.

232. The statements referred to in ¶¶ 229-31 were each materially false and misleading in that they misrepresented material facts and omitted to state material facts necessary to make the

statements not misleading. Rather than being "much more adept at reacting quickly" and "doing the right things through a changing scenario," Upstart's AI system was not accurately accounting for changing macroeconomic factors, including those relating to the termination of government stimulus programs, as it was not nimble enough to accurately and quickly react to changing macroeconomic factors through an automated process, but instead required a manual process that involved "a bunch of conversations and phone calls." Unbeknownst to investors, the AI platform was even intentionally designed to shrink Upstart's loan originations and business in times of "elevated consumer risk" and other macroeconomic challenges. Nor was Upstart "in a good position" or "largely beyond" "COVID and the stimulus"; rather, due to the deficiencies in Upstart's AI system, Upstart's business was becoming increasingly funding constrained as demand from Upstart loan funders materially decreased, and the Company was consequently putting more loans on its own balance sheet – not for R&D purposes, but rather due to the dwindling demand from funders of Upstart loans. And, because of the deficiencies of Upstart's AI system, the increasing number of loans that the Company was putting on its balance sheet were not marketable and would have a materially negative effect on Upstart's revenue.

### F. March 9, 2022 – Morgan Stanley Technology, Media, and Telecom Conference

233. On March 9, 2022, Girouard presented at the Morgan Stanley Technology, Media, and Telecom Conference. During the conference, Girouard reiterated false and misleading statements he made on March 8, 2022, stating in pertinent part:

> . . . . we had a lot of government stimulus really pushed down default rates unnaturally, and probably in our world, 40% to 50% below what our models would have estimated. But ***we kind of took the opportunity to build the notion of stimulus – government stimulus into our model. So you can think of it as our models are getting a little bit better over time at dealing with the macro***.
>
> ***Now we're normalizing, stimulus has largely gone away, consumers are kind of returning to old spend habits, et cetera, and default rates have sort of gone back***

> ***roughly to 2019 level***. And that's the job of our software is like to give banks and lenders the comfort that it will handle that right. It will do the right things. It won't price things too low because there's government stimulus driving down default rates, et cetera.
>
> And so yes, ***I would say generally, it hasn't – the return [of loan defaults] has not negatively impacted our business in the sense of – there's a lot of liquidity on our platform***. . . . So I guess in our view, – from a strategic perspective, ***volatility and turbulence is length to us. It is an environment that we shine in, and we think we'll continue to do so***.

234. Girouard then doubled down on his misrepresentations about Upstart's system and its ability to handle changes in the economy, stating in pertinent part:

> I mean I would just say it's really – we are, by definition, we serve a cyclical industry, and ***it is our job to serve it particularly well when it's complicated and noisy out there as it is right now. And we're adept at it.*** We're – maybe think of it in 1 or 2 ways. What's our value prop to our banks and lending partners? And then how do we, as a company ourselves survive it? So I think the value prop gets strengthened to banks. It helps them deal more adeptly with changing environments and such. So I don't think – I think if anything, ***more noise, more volatility ends up being a good thing for us as a company because we can handle it, manage it better than others***. Our own business, of course, we're a very lightweight company. ***We're a small balance sheet.*** We have low fixed costs.
>
> And honestly, the truth of Upstart is we serve a cyclical or a industry, ***you better be ready for volumes to go up and down, and we fully do***. We don't assume our volumes are always going to go up into the right based on the nature of the industry we serve. But having said that, even during COVID, even the first few weeks of COVID, when almost every bank in the country just said, put the brakes on, let's stop. I mean Upstart didn't really lose significant money even in what I would consider to be probably the most extreme handful of weeks that we've seen since God knows when. So I think in the end, ***we're a company that thrives in this type of environment, and we will, without question, come out stronger on the other side of whatever it is***.

235. Girouard also repeated the misleading statement that Upstart had a unique business model that did not include being a lender:

> Our business is unique in that. We aren't a bank. ***We're not a lender***. ***We don't intend to be***. We're a 2-sided business in the sense that we are a consumer brand.

236. The statements referred to in ¶¶ 233-35 were each materially false and misleading in that they misrepresented material facts and omitted to state material facts necessary to make the

statements not misleading. In truth, Upstart's AI system was not quickly and accurately accounting for changing macroeconomic factors, Upstart had not adequately built "the notion of stimulus" into its models, and Upstart's platform was in fact "sensitive to interest rates." As such, "volatility and turbulence" was not "length" to the Company, and Upstart could not handle "more noise" and "more volatility" "better than others," nor was it "thriv[ing] in this type of environment." Due to the deficiencies in Upstart's AI system, Upstart's business was becoming increasingly funding constrained, as demand from Upstart loan funders materially decreased. While Girouard promised that Upstart was "not a lender" and did not "intend to be" and that Upstart had "a small balance sheet," the truth was that the platform's deficiencies and lowered demand from funders was forcing Upstart to put more loans on its own balance sheet. Finally, while Girouard discussed the possibility of loan volumes going "up and down," he led investors to believe that Upstart would strive to not "lose significant money" from lower loan volumes, failing to disclose that the AI platform was intentionally designed to shrink Upstart's loan originations and business in times of rising interest rates and "elevated consumer risk," directly contradicting the prior assurances that the AI platform was not sensitive to interest rates.

### G. Girouard's March 21, 2022 Leaders in Lending Interview

237. On March 21, 2022, Girouard was interviewed by Upstart executive Jeff Keltner for the Leaders in Lending podcast. During the podcast, Girouard reiterated that Upstart was a technology company and not a bank:

> I think we reached a point in the history where it felt to us that the sort of notion of being a brand with a hidden bank behind it and sort of selling loans to hedge funds or whomever maybe through to securitizations wasn't ultimately the best business model and so we kind of saw a fork in the road where you know either you become a chartered bank of one type or another you take deposits and also then that improves your cost of funding it improves your liquidity etc. There's a lot of great reasons to do that or you just say we're not a bank. ***We really want to be a technology company and partner with banks and you know as a lot of us being like you and I are ex-Google people becoming a bank didn't feel natural to us.*** It

> just felt like look we're building great technology here. I don't know if we have the DNA of being a bank ourselves.

238. The statements referred to in ¶ 237 were each materially false and misleading in that they misrepresented material facts and omitted to state material facts necessary to make the statements not misleading. In truth, Upstart was increasingly taking on the role of being a bank or lender, as the Company was putting more loans on its own balance sheet – not for R&D purposes as a "technology company," but rather due to the dwindling demand from funders of Upstart loans.

### H. Q1 2022 Financial Results: Upstart Defendants Further Reveal the Truth About Upstart's AI System, but Continue to Conceal the Full Extent of the Company's Funding Deficiencies

239. After the close of trading on May 9, 2022, Upstart issued a press release announcing its financial results for the first quarter of 2022. Again, Upstart had added a shocking amount of new loans to its own balance sheet, more than doubling to over $600 million in the span of a single quarter. But this time, during the conference call with analysts and investors to discuss the Company's operations and earnings release, the Upstart Defendants admitted that the increasing amount of loans on Upstart's balance sheet was not merely for R&D purposes but rather because of deficiencies in the Company's AI platform, which had led to a decrease in demand from funders of Upstart loans. Datta admitted that – contrary to the Upstart Defendants' statements earlier in the Class Period – Upstart's platform and "its ability to react" to changing economic circumstances was not "as nimble" and was "somewhat manual," requiring "a bunch of conversations and phone calls."

240. Despite previously and repeatedly asserting that Upstart was not a bank and only used its balance sheet for R&D-related loans, Datta revealed that the Company "started to selectively **use our capital as a funding buffer for core personal loans** in periods of interest rate

fluctuation where the market clearing price is in flux. Our balance of loans, notes and residuals at the end of the quarter was consequently up to $604 million from $261 million in Q4."

241. Datta and Girouard also stated, in pertinent part, as follows:

> Datta: And as I said, I mean, **historically, our balance sheet has been almost exclusively for the purpose of R&D**. We have used our balance sheet in the last quarter to do what I call sort of a market-clearing mechanism. And by that, what I mean is **when interest rates in the economy change quite quickly, I think it would be fair to say that our platform, its ability to react to the new market-clearing price, it's probably not as nimble as we would like. It's somewhat manual. It requires a bunch of conversations and phone calls.** And so when interest rates smooth and investors are -- so each deciding what their new return hurdles are, there can be a gap or a delay in responding to funding. And that's a situation where **we've chosen to sort of step in with our balance sheet and almost sort of bridge to the new market-clearing price. And if that is happening often and abruptly, we've been sort of playing that role with our balance sheet. I don't view that to be a long-term or necessarily sizable activity for us.** I think that developing the mechanisms to respond more nimbly to new price discovery as rates change is something that's on our road map, and something that we want to start to invest in so that it can happen in a much more automated way. At the end of the day, we view our platform as being a platform that responds to risk and rates in the environment.
>
> * * *
>
> Girouard: Sanjay kind of explained this. Generally, we view ourselves as a marketplace where ultimately, price discovery happens and loans are funded or not funded when they make sense by our bank partners or by capital markets, institutional investors, et cetera. Some of this works very fluidly, particularly on the bank and the credit union side, where they have very direct controls to change their return hurdles, et cetera. **We don't have those mechanisms in place as well on the other side. It's more of a manual process**.
>
> **So when** something changes as quickly as it did in interest rates and **the risk premiums in the market changed very rapidly, then we step in to sort of bridge that. But it's sort of a temporary thing**. And as Sanjay said, **it is an intention of ours to make the system more automated and more fluid so we don't have any need to do that.** It's not part of our business to hold loans generate net interest income from loans in our balance sheet, but we certainly want to make sure there's fluidity in the system. And we're definitely going to do some more work so we can do that without any of our balance sheet participation in that.

242. In response to these revelations, artificial inflation was released from Upstart's stock price, as it plummeted more than ***56%***, from $77.13 per share on May 9, 2022 to $33.61 per

share on May 10, 2022, erasing almost ***$3.7 billion*** of the Company's market capitalization on extremely heavy trading volume. Still, the full truth was not yet revealed, as the Upstart Defendants misrepresented that the increased number of loans on Upstart's balance sheet was a mere "***temporary***" issue, utilized as a "market-clearing mechanism" due to ***temporary lower demand*** from funders for Upstart loans.

243. Analysts reacted strongly. For instance, during the May 9, 2022 conference call, an Atlantic Equities analyst stated, "I'm kind of surprised to hear that you're using your balance sheet to put some loans on there, which aren't just for R&D purposes. And it strikes me as it's just not a normal course of business for you given you're a platform business."

244. A May 10, 2022 Stephens report downgraded Upstart even when shares were "already trading down 44% after-market," because "**Upstart is originating loans on its balance sheet that it couldn't pass to its funding partners. This breaks the thesis** for us of a marketplace lender, which is supposed to originate **on behalf of** funding partners."

245. Similarly, a May 10, 2022, Wedbush report noted that while Upstart claimed the increase in loans on its balance sheet was "due to interest rate moves," Wedbush saw the increased balance sheet usage "as **a divergence from its capital-light business model**," which "could indicate UPST has **few alternatives other than to hold more loans due to funding issues**." Wedbush further commented: "It makes us wonder if lenders pulled back from their commitments."

246. On May 10, 2022, Girouard appeared on CNBC's "Mad Money" television program. During the program, host Jim Cramer expressed the "shock" that investors had experienced because of the Upstart Defendants' prior misrepresentations:

> Why do you have any loans on your balance sheet? I thought you were a platform. . . . **I was shocked to see how many loans you had on your balance**

> **sheet. Shocked**. And it said to me that I did not know Upstart. I thought I did, but there are other investors that you and I both know that thought we did, and we were shocked by the amount of bad loans on your, or potentially bad loans on your balance sheet. **Shocked!**

247. Girouard's response continued to mislead investors:

> Yeah first of all just to make it really clear in the first quarter a single digit percentage of the loans that were originated on our platform came from our balance sheet. That hasn't changed in our history. ***We've said we use putting loans on our balance sheet to test new products and new models and that's largely what those represented so it's not a new, a change in our model***.

248. Cramer further illustrated the real reason that Defendants had added more loans to Upstart's balance sheet, namely that Upstart couldn't get rid of the loans:

> [I]t was certainly ill-advised to have that many loans on your balance sheet, and a lot of the bankers tell me it's because you couldn't get, you couldn't get rid of them—there was no way you could get rid of them.

249. To end the interview, again Girouard misled investors by claiming "***the fundamentals of our business have not changed***."

250. The statements referred to in ¶¶ 240-41, 247, and 249 were each materially false and misleading in that they misrepresented material facts and omitted to state material facts necessary to make the statements not misleading. In truth, Upstart had increasingly been putting loans on its balance sheets throughout the Class Period as it was unable to sell those loans to its funding partners. This represented a "change in [the Company's] model" and, accordingly, the "fundamental of [Upstart's] business" had "changed" such that the Company was effectively functioning as a bank.

251. On May 17, 2022, Datta appeared at the Barclays Emerging Payments and Fintech Forum. There, he admitted that the market had what he called a "visceral reaction" to Upstart adding more loans to its own balance sheet and that it raised questions "about the underlying business model."

**I. Q2 2022 Preliminary Financial Results**

252. On July 7, 2022, Upstart announced its preliminary financial results for the second quarter of 2022. The Company cut its revenue guidance for the quarter from a range of $295 to $305 million, down to $228 million. In the announcement explaining the reasons for the cut in revenue guidance, Girouard admitted that – contrary to the Upstart Defendants' assurances about secure funding for Upstart's platform loans – the truth was, "**our marketplace is funding constrained, largely driven by concerns about the macroeconomy**." Girouard also admitted that Upstart was forced to convert loans on its balance sheet into cash ***at a loss***, "given the increasing rate environment."

253. As a result of these disclosures, Upstart's stock price dropped from a closing price of $33.74 per share on July 7, 2022 to a closing price of $27.09 per share on July 8, 2022, a drop of nearly 20%, on heavy trading.

**J. November 8, 2022 Q3 2022 Financial Results**

254. On November 8, 2022, Upstart announced its Q3 2022 financial results and held a conference call with analysts. Despite previous assurances that the macroeconomic environment would not hinder the performance of its platform, Upstart's news release revealed that the Company was now "eyes wide open to the challenges of the current macroeconomy . . . ." The Company announced a 31% decrease in revenue from the same period the prior year and an increase in balance sheet loans to over $700 million.

255. During the November 8, 2022 conference call, both Girouard and Datta for the first time disclosed that Upstart's AI platform was designed to reduce loan originations significantly in the face of increased interest rates. Girouard stated, "I want to be clear, contraction in lending volume in a time of rising rates and elevated consumer risk is a feature of our platform, not a bug."

And Datta reiterated these remarks, stating that the reduction in loan volumes in the changing macroeconomic conditions was "working as intended."

256. Analysts recognized that, despite the Upstart Defendants' Class Period statements, Upstart could not perform in the changing macroeconomic environment. On November 10, 2022, analysts at Bank of America stated, "[a]lthough UPST's business model has shown tremendous growth in a benign credit environment, we are concerned about the company's ability to perform in an environment of rising rates and defaults."

257. The fact that Upstart's inability to perform had caused loans to pile up on its balance sheet did not go unnoticed. Barclays commented as follows:

> Balance sheet funding increased to $710M from $642M in Q2, a new high water-mark, which leads us to believe that the market's dislocated demand for UPST loans could be more prolonged than originally expected. While this strategy may be warranted to help UPST weather this macro storm, we acknowledge that for some investors, this pushes the story more in the direction of a traditional lender vs. a Fintech company.

258. Morgan Stanley also noted that Upstart's AI platform could not perform in the changing macroeconomic environment. A November 9, 2022, Morgan Stanley report stated that "Institutional investors' and bank partners' willingness to continue absorbing volumes, and in turn credit risk, has enabled rapid growth. However, going forward, we think the current macro backdrop will drag on the growth trajectory of UPST's funding channels, impairing UPST's efforts to scale, and signaling downside risks to estimates and valuations."

259. In response to these disclosures, the Company's stock price fell from a closing price of $19.04 per share on November 8, 2022, to close at $17.06 on November 9, 2022, a drop of more than 10%, on extremely heavy trading.

## VII. ADDITIONAL SCIENTER ALLEGATIONS

260. As alleged herein, all Defendants acted with scienter in that they knew or were reckless in not knowing that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.[10] Each Defendant's intent to deceive and deliberate reckless disregard for the truth is demonstrated by substantial direct and circumstantial evidence supporting a strong inference of scienter. Many of the facts relevant to scienter are set forth above, including:

a. the Upstart Defendants' admission that Upstart's AI system was not able to accurately or quickly account for changing macroeconomic factors, including those relating to the termination of government stimulus programs, and instead required a manual process that included "a bunch of conversations and phone calls";

b. the Upstart Defendants' admission that deficiencies in Upstart's AI system led to a material decrease in demand from funders of Upstart loans and that the Company's business was becoming increasingly funding constrained;

c. the Upstart Defendants' admission that the Company was putting more loans on its balance sheet because of decreased demand from funders of Upstart loans;

d. the Upstart Defendants' admission that the increasing amount of loans on Upstart's balance sheet would have a materially negative effect on revenue; and

---

[10] The cumulative knowledge of all members of the Company's management team, including the Individual Defendants, is properly imputed to Upstart.

e. the Upstart Defendants' admission that Upstart's AI system was designed to shrink lending volume during times of "rising rates and elevated consumer risk."

261. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants and the Third Point Defendants (who had a seat on the Company's board of directors), and who thereby exercised significant control over Upstart's operations.

262. Given their executive level positions with Upstart, the Individual Defendants controlled the contents of Upstart's public statements during the Class Period. Each of the Individual Defendants was responsible for the accuracy of Upstart's corporate statements and are, therefore, responsible and liable for the misrepresentations contained therein. The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. The scienter of the Individual Defendants, who, as executive officers and/or directors of the Company, knew or recklessly ignored facts contrary to their public statements, can be imputed to Upstart.

263. Furthermore, the Individual Defendants' scienter is enhanced by the proximity between their false statements and the true state of affairs within Upstart. For example, during the September 9, 2021 Deutsche Bank Conference, Defendant Girouard emphasized that Upstart had "chosen the path of being a technology company, not a bank" and "we aren't in any sense a lender ourselves." Contrary to these representations, the deficiencies in Upstart's platform and the decrease demand from funders caused the amount of loans held-for-investment to grow from $19 million in 2020 to nearly $110 million by December 2021.

264. Because of their positions and access to material non-public information, the Individual Defendants and the Third Point Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed and were being concealed from the public and that the positive representations that were being made were false and misleading.

265. Defendants knew, or recklessly ignored, that the Upstart Defendants' false and misleading statements created a false perception about the Company's operations, and, indeed, the capabilities of the lending platform itself, which created artificial demand for the Company's securities and caused them to trade at artificially inflated prices during the Class Period.

266. As detailed herein and further below, Defendants took full advantage of their deceptive conduct and purposefully commenced the IPO and the SPO before the benefits of the government stimulus programs lapsed so as to facilitate those offerings and maximize the amount of money the Company, the Individual Defendants, and entities managed or advised by Defendant Third Point could raise from the sale of artificially inflated Upstart common stock during the Class Period. (*See chart next page.*)




267. In fact, the Company received more than $430 million in combined net proceeds from the sale of artificially inflated Upstart common stock in the IPO and SPO, the Individual Defendants collectively sold more than $460 million of Upstart common stock, and entities managed or advised by Defendant Third Point sold more than $2 billion of Upstart common stock at artificially inflated prices to unsuspecting investors during the twenty-three-month Class Period.

**A. The Core Operations Doctrine Enhances the Inference of Scienter**

268. Through their role as Company insiders, all Defendants had knowledge of the core operations of Upstart.

269. Defendants Girouard and Datta were the CEO and CFO of Upstart, respectively. They were responsible for, and remained well informed of, issues critical to the Company's success. For Upstart, no issues were more critical to its success than its AI-powered lending models and the lending platform based on them. Throughout the Class Period and at all relevant

times, the Upstart Defendants emphasized the critical importance of these items to the Company's bottom line in SEC filings, press releases, industry conference appearances, quarterly earnings calls, and other public forums.

270. That the Company's AI platform constituted a core operation of the Company during the Class Period is not open to debate. Scienter may be inferred from the fact that the Upstart Defendants made repeated and specific statements to the investing public concerning the benefits of the AI platform. For example, during Upstart's Q4 2020 earning conference call on March 15, 2021 – the Company's inaugural earnings call – Girouard noted that Upstart's "unique combination of scale, rapid growth, and profits" were "driven by our underlying AI technology." The Upstart Defendants also hailed Upstart's AI platform as the "holy grail of credit lending" during the September 9, 2021, Deutsche Bank Technology Conference.

271. The Company's AI technology and the lending platform it powered were thus critical to Upstart's revenues (and thus its future prospects) throughout the Class Period, with the overwhelming majority of the Company's revenue during the Class Period coming from fees paid by banks for loan referrals generated by Upstart's AI lending platform, loan origination using Upstart's AI lending platform, or servicing loans generated by Upstart's AI platform. Indeed, "more than 97% of our [Upstart's] revenue came in the form of fees from banks or loan servicing with zero credit exposure or demands on our balance sheet," according to the Company's August 10, 2021 Q2 earnings call.

272. Analysts accepted the Upstart Defendants' false statements and deemed Upstart's AI technology its "secret sauce" and a "superior mousetrap" that it could use to "rewrite the rules of the game." Moreover, they viewed its fee-based revenue model as "one of the most important

aspects of Upstart's business model" because "it is not leveraging its own balance sheet to originate loans."

273. Given their admission of the importance of Upstart's AI lending platform, its place as Upstart's principal source of revenue for the Company during the Class Period, and because its business model centered around a fee-based lending model utilizing its AI technology, Defendants can be presumed to have knowledge of adverse facts impacting this strategy. It is appropriate to infer that Defendants were aware of facts pertaining to Upstart's AI-generated loans, including that the Company was using its own balance sheet to fund them in direct contrast to its core fee-based business model. Indeed, if the Upstart Defendants were not knowledgeable about these material matters on which they purported to speak in specific detail, such deliberate recklessness would satisfy the scienter requirement.

### B. Individual Defendant Gu Had Particularly Detailed Knowledge of How Upstart's AI System Worked During the Class Period

274. Individual Defendant Gu, Upstart's Senior Vice President of Product and Data Science, led Upstart's data science team, which uses machine learning and unconventional data to assess borrower risk, and was thus aware at all times of how Upstart's AI models worked, including the limitations at the heart of Upstart's platform. Gu's scienter is further underscored by the fact that he developed the statistical models used to predict the "financial potential rather than financial history" at the heart of Upstart's underwriting technology, thus demonstrating his knowledge of how the system worked.

### C. Defendants Were Motivated to Artificially Inflate Upstart's Stock Price to Enable Themselves to Profit from Their Sales of Upstart Stock

275. Defendants were motivated to engage in their fraudulent course of conduct to allow Defendants Counselman, Girouard, Gu, and Third Point to sell shares of their Upstart common

stock at inflated prices, which yielded them gross proceeds of more than ***$2.7 billion*** during the Class Period:

| Defendant | Date of Sale(s) | Number of Shares | Price (Range) | Proceeds |
|---|---|---|---|---|
| Counselman | 8/19/2021 | 608,355 | $193.23 - $213.17 | $122,725,904.80 |
| | | | | |
| Girouard | 9/1/2021 | 137,498 | $223.37 - $228.14 | $30,998,136.67 |
| | 10/1/2021 | 137,498 | $286.28 - $314.10 | $41,563,396.48 |
| | 11/1/2021 | 137,498 | $323.95 - $342.88 | $46,243,736.63 |
| | 12/1/2021 | 137,498 | $177.36 - $207.97 | $26,793,332.26 |
| | 1/3/2022 | 91,665 | $144.73 - $155.60 | $13,626,671.99 |
| | 2/1/2022 | 91,665 | $107.49 - $111.10 | $10,025,708.14 |
| | 3/1/2022 | 133,038 | $155.24 - $160.08 | $21,064,494.43 |
| | 4/1/2022 | 91,665 | $108.03 - $109.71 | $9,939,723.32 |
| | 5/2/2022 | 45,833 | $80.00 | $3,666,640.00 |
| | | **1,003,858** | | **$203,921,839.92** |
| | | | | |
| Gu | 8/16/2021 | 155,000 | $189.29 - $213.82 | $31,291,271.59 |
| | 9/15/2021 | 155,000 | $262.27 - $277.20 | $41,912,017.18 |
| | 10/15/2021 | 155,000 | $381.90 - $401.16 | $60,562,896.72 |
| | 11/15/2021 | 39,000 | $233.24 - $261.58 | $9,552,761.12 |
| | 3/1/2022 | 2,000 | $160.01 | $320,020 |
| | | **506,000** | | **$143,638,966.61** |
| | | | | |
| Third Point | 8/20/2021 | 396,822 | $199.62 | $79,213,607.64 |
| | 8/23/2021 | 484,400 | $202.62 | $98,149,128.00 |
| | 8/24/2021 | 100,000 | $208.69 | $20,869,000.00 |
| | 11/15/2021 | 2,150,000 | $233.45 - $261.16 | $512,859,518.95 |
| | 11/19/2021 | 750,000 | $205.99 - $228.39 | $159,722,581.32 |
| | 11/23/2021 | 200,000 | $190.31 - $205.38 | $39,628,131.86 |
| | 12/2/2021 | 805,000 | $160.65 - $183.57 | $138,529,382.45 |
| | 12/3/2021 | 395,000 | $168.28 - $191.28 | $70,397,173.92 |
| | 12/6/2021 | 100,000 | Not Reported | $16,675,230 |
| | 12/13/2021 | 1,000,000 | Not Reported | $154,268,800 |
| | 12/14/2021 | 1,100,000 | Not Reported | $157,465,770 |
| | 12/15/2021 | 200,000 | Not Reported | $29,653,520 |
| | 12/16/2021 | 218,000 | Not Reported | $32,700,000 |
| | 12/17/2021 | 982,000 | Not Reported | $133,846,109 |
| | 12/20/2021 (on or around) | 4,500,000 | Not Reported | $599,293,350 (listed by Third Point as aggregate market value) |
| | | **13,381,222** | | **$2,243,271,303.14** |

| Defendant | Date of Sale(s) | Number of Shares | Price (Range) | Proceeds |
|---|---|---|---|---|
| | | | | |
| **Totals** | | **15,499,435** | | **$2,713,558,014.47** |

276. Through these sales, Defendants Counselman, Girouard, Gu, and Third Point personally benefited from the artificial inflation of Upstart's stock caused by Defendants' scheme to defraud and the materially false and misleading statements and omissions alleged herein. The nearly 15.5 million shares sold by Defendants during the Class Period were highly unusual in both amount (based on the sheer dollar value of shares sold) and timing (made while the Upstart Defendants were making materially false and misleading statements to investors and failing to disclose material information that they had a duty to disclose).

277. In connection with Defendants' insider trading, Counselman, Girouard, Gu, and Third Point each had intimate access to material non-public information concerning Upstart's business in real-time, as a result of their roles with the Company, and each of these Defendants began selling Upstart stock between August 12 and September 1, 2021, when the Company's stock price was at its height and prior to the release of corrective information that began to reveal Defendants' fraudulent scheme

278. The sales by Third Point were particularly unusual and suspicious. As one of Upstart's earliest investors, one of its chief advisors, and a major funder of Upstart loans, Third Point went from owning 19.3% of the Company to owning none of it by December 2021, selling millions of shares during the Class Period to unsuspecting investors at a time when Third Point was aware of material, non-public information that contradicted the Upstart Defendants' public statements. Notably, Third Point's sales came just before and just after Schwartz resigned from his Board seat. Third Point sold hundreds of thousands of shares in August 2021, which was followed soon after by Schwartz's sudden resignation on November 15, 2021. That same day,

Third Point cashed out on over two million shares for proceeds exceeding $500 million. In its final sale of Upstart stock on or around December 20, 2021, Third Point sold millions more shares with a market value of nearly $600 million. In sum, Third Point's total approximate proceeds for its Class Period sales in Upstart amounted to an ***over $2.2 billion***.

279. Defendants were motivated to make materially false and misleading statements, conceal material adverse information from investors, and engage in the fraudulent scheme of conduct described herein so that they could personally profit from the artificial inflation in the trading price of Upstart securities during the Class Period.

### D. Defendants Girouard and Datta's False SOX Certifications Add to the Inference of Scienter

280. Certifications pursuant to SOX are not directed solely at ensuring numerical accuracy and preventing dishonest accounting practices and any interpretation restricting its scope to these purposes would be artificially narrow and inconsistent with the remedial purpose of the statute.

281. The SEC interprets the fair presentation of companies' financial results to include any additional disclosure necessary to provide investors with a materially accurate and complete picture of an issuer's financial condition.

282. Here, the inference of Girouard and Datta's scienter is enhanced by the SOX-mandated certifications they signed, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about Upstart was made known to them and that the Company's disclosure related controls were operating effectively.

283. When viewed collectively, as required by applicable law, Plaintiffs' allegations support a strong inference of fraudulent intent on the part of the Defendants or, at the very least,

the strong inference that Defendants' conduct was highly unreasonable and an extreme departure from standards of ordinary care. In either case, Plaintiffs adequately plead scienter.

## VIII. THE STATUTORY SAFE HARBOR DOES NOT APPLY TO THE UPSTART DEFENDANTS' FALSE AND MISLEADING STATEMENTS

284. The statements alleged herein to be false and misleading are not subject to the protections of the PSLRA's statutory Safe Harbor for forward-looking statements because: (a) they are not forward looking; (b) they are subject to exclusion; or (c) even if purportedly forward-looking, the Upstart Defendants cannot meet the requirements for invoking the protection, *i.e.*, identifying the statements as forward-looking and demonstrating that the statements were accompanied by meaningful cautionary language. Many of the statements were misleading in light of omissions of material present or historical facts and cannot be considered forward-looking.

285. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, the Upstart Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Upstart who knew that the statement was false when made.

286. Under the PSLRA's statutory Safe Harbor for written statements, a forward-looking statement is protected if it is: (a) identified as such; and (b) "accompanied by meaningful cautionary language." 15 U.S.C. § 78u-5(c)(1)(A)(i). An oral forward-looking statement must be accompanied by a cautionary statement that it is forward-looking, that actual results may differ materially and that additional information concerning risk factors is contained in a readily available written document. In addition, the oral statement must: (a) identify the written document, or

portion thereof, that contains such factor; and (b) the referenced written documents must contain meaningful cautionary language. 15 U.S.C. § 78u-5(c)(2)(B).

287. The Safe Harbor excludes from protection all forward-looking statements that are included in financial statements purportedly prepared in compliance with Generally Accepted Accounting Principles ("GAAP"), including those filed with the SEC on Form 8-K. 15 U.S.C. § 78u-5(b)(2)(A).

288. Statements of historical fact, current condition, or a mixture thereof are not "forward-looking" and thus not protected by the Safe Harbor.

289. To the extent any of the statements were identified as forward-looking statements, they do not fall within the protections of the Safe Harbor because they lacked specific, meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. A warning that identifies a potential risk, but implies that such risks had not materialized (*i.e.*, states that something might occur but does not state that something has already actually occurred) is not meaningful and does not fall within the protections of the Safe Harbor.

290. Meaningful risk disclosures must also be substantive and tailored to the forward-looking statement they accompany. Many of Upstart's purported risk disclosures remained unchanged over the course of the Class Period, despite the fact that such risks had in fact materialized, which change in circumstance was material to the reasonable investor. Upstart's risk disclosures were therefore neither substantive nor tailored and do not satisfy the requirements of the Safe Harbor.

291. Nor were the historic or present-tense statements made by the Upstart Defendants assumptions underlying or relating to any plan, projection or statement of future economic

performance, as they were not stated to be such assumptions when made, nor were any of the projections or forecasts made by the Upstart Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

292. The Upstart Defendants' forward-looking statements also do not fall within the protections of the Safe Harbor because they had no reasonable basis. The Upstart Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false or misleading and/or the forward-looking statement was authorized and/or approved by an executive officer of Upstart, who knew that those statements were false or misleading when made.

## IX. APPLICABILITY OF THE PRESUMPTION OF RELIANCE

293. Plaintiffs and the Class are entitled to a presumption of reliance pursuant to *Basic v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because, during the Class Period, the material misstatements and omissions alleged herein would induce a reasonable investor to misjudge the value of Upstart stock without knowledge of the misrepresented or omitted material facts. Plaintiffs and other members of the Class purchased or acquired Upstart stock between the time Defendants misrepresented and failed to disclose material facts about their business operations and financial prospects, and the time the true facts were disclosed. Accordingly, Plaintiffs and the other members of the Class relied, and were entitled to have relied, upon the integrity of the market for Upstart securities, and are entitled to a presumption of reliance on the Upstart Defendants' materially false and misleading statements during the Class Period.

294. At all relevant times, Upstart securities traded in an efficient market for the following reasons, among others:

a. Upstart stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient national stock market;

b. as a regulated issuer, Upstart filed periodic public reports with the SEC and NASDAQ;

c. Upstart regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d. Upstart was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of those reports was publicly available and entered the public marketplace.

295. As a result of the foregoing, the market for Upstart securities promptly digested current information regarding Upstart from all publicly available sources and reflected such information in Upstart's stock price. Under these circumstances, all purchasers of Upstart stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices, and a presumption of reliance applies.

296. A Class-wide presumption of reliance is also appropriate in this action under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S.C. 128 (1972), because Plaintiffs' and the

Class's claims asserted herein against Defendants are predicated upon Defendants' omissions of material fact for which there was a duty to disclose.

## X. LOSS CAUSATION

297. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Upstart securities and operated as a fraud or deceit on Class Period purchasers of Upstart securities by failing to disclose and misrepresenting the adverse facts detailed herein, including that (1) Upstart's AI platform was not responding to changes in the macroeconomic environment; (2) Upstart's AI platform was not adapting to the end of government stimulus or increased interest rates; and (3) the more risky loans originating from Upstart's AI platform were being shunned by funding partners and causing growth of personal loans on Upstart's balance sheet. As a result of the Upstart Defendants' misrepresentations and all Defendants' fraudulent course of conduct, the price of Upstart securities declined significantly as the prior artificial inflation came out of the Company's stock price.

298. On November 9, 2021, Upstart announced its Q3 2021 financial results and participated in a conference call with analysts. The Company revealed, among other matters, a material increase in the amount of loans on its balance sheet.

299. This partial disclosure caused Upstart's stock price to fall by over 18%, from a closing price of $313.71 on November 9, 2021 to a closing price of $256.59 on November 10, 2021, with over 14 million shares traded. In contrast, on November 10, 2021, the S&P 500 Index declined only 0.8% and the S&P InfoTech index declined only 1.7%.

300. On May 9, 2022, Upstart announced its Q1 2022 financial results and participated in a conference call with analysts. During the conference call, the Company revealed that it had started to fund loans and consolidate loans on its balance sheet. As a result, notes and residuals at

the end of the quarter had consequently risen to $604 million from $261 million in Q4. Analysts were blindsided by the news. One analyst stated, "I'm kind of surprised to hear that you're using your balance sheet to put some loans on there, which aren't just for R&D purposes. And it strikes me as it's just not normal course of business for you given you're a platform business."

301. In response to the news, the price of Upstart's common stock plummeted, dropping $43.52 per share, or 56%, from a closing price of $77.13 per share on May 9, 2022 to a closing price of $33.61 per share on May 10, 2022, with over 68 million shares traded. In contrast, on May 10, 2022, the S&P 500 Index increased 0.2% and the S&P Info Tech Index increased 1.6%.

302. On July 7, 2022, Upstart released its preliminary Q2 2022 financial results. The Upstart Defendants continued to mislead investors about the magnitude of the Company's issues related to its ability to find investors to purchase loans and securitizations. But, Girouard did inform investors that "[Upstart's] revenue was negatively impacted by two factors approximately equally. First, our marketplace is funding constrained, largely driven by concerns about the macroeconomy among lenders and capital market participants. Second, in Q2 we took action to convert loans on our balance sheet into cash, which, given the quickly increasing rate environment, negatively impacted our revenue."

303. The July 7, 2022, preliminary news concerning Upstart's Q2 financials, including its revenue being negatively impacted by a lack of investors funding its loans and selling loans on its balance sheet, caused Upstart's stock price to decline by 19.7%. The stock dropped from a July 7 closing price of $33.74 per share to close at $27.09 per share on July 8, with nearly 29 million shares traded. On July 8, the S&P 500 Index declined only 0.1% and the S&P Info Tech Index increased 0.1%.

304. On November 8, 2022, Upstart announced its Q3 2022 results. At that time, Girouard announced that the Company was "eyes wide open to the challenges of the current macroeconomy. . . ." The Company also announced a 31% decrease in revenue from Q3 2021, and a net loss of ($58.1) million, down from $28.6 million the prior year.

305. Later that day, Upstart held a conference call with analysts. During the call, Girouard acknowledged that revenue declined primarily because loan volume had decreased in Upstart's platform. Next, Girouard finally admitted the decrease in loan volume was expected by the Company in times of rising interest rates. While the Upstart Defendants previously stated that the platform was "agnostic" to rising interest rates, Girouard now confirmed that "contraction in lending volume in a time of rising rates and elevated consumer risk is a **feature of our platform**, not a bug."

306. Datta repeated a similar version of Girouard's acknowledgment that Upstart's platform performed no better than other models during times of macroeconomic turmoil. Datta stated, "[a]s a result of our model's adjustments to these changing macroeconomic conditions, our loans today are being priced at APRs that are significantly higher than those from the beginning of the year, which is one of the principal driving factors behind the overall volume contraction our business is currently experiencing. As David said, **this is, in fact, working as intended**." Datta also announced that the drop in revenue was due to "negative fair value adjustments and losses on sales incurred by the loans on [Upstart's] balance sheet . . . ."

307. The November 8, 2022 disclosures caused Upstart's stock to decrease from a November 8, 2022 close of $19.04 per share to a November 9, 2022 close of $17.06 per share, a drop of approximately 10.4%. In contrast, on November 9, 2022, the S&P 500 Index decreased only 2.1% and the S&P Info Tech Index decreased 2.7%.

308. As a result of their purchases of Upstart securities during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. The Upstart Defendants' materially false and misleading statements and all Defendants' fraudulent scheme caused Upstart securities to trade at artificially inflated levels throughout the Class Period, with the Company's common stock reaching a high of $401.49 per share on October 15, 2021. Defendants' misstatements and omissions and fraudulent scheme were the proximate cause of those stock price declines and the losses suffered by Plaintiffs and other Class members.

309. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Upstart's business and prospects. As true facts about the Company were revealed to the market, the price of Upstart securities fell significantly. These declines removed the inflation from the price of Upstart securities, causing real economic loss to investors who had purchased Upstart securities during the Class Period.

310. The markets for Upstart securities were open, well-developed and efficient at all relevant times. During the Class Period, as detailed herein, Defendants made materially false and misleading statements, omitted material information, and engaged in a fraudulent scheme to deceive the market. This artificially inflated the price of Upstart's securities and operated as a fraud or deceit on Plaintiffs and the Class. As Defendant's misleading statements, material omissions, and course of fraudulent conduct became apparent to the market, beginning on November 9, 2021, the price of Upstart stock fell, as the prior inflation came out of the price. As a result of their purchase or acquisition of Upstart securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss.

311. The economic loss suffered by Plaintiffs and other members of the Class was a direct result of Defendants' wrongful conduct. The decline in the price of Upstart securities was a direct result of the nature, extent, and impact of Defendants' scheme and the Upstart Defendants' prior false and misleading statements and omissions being revealed to investors and the market. The timing and magnitude of the price decline of Upstart securities negates any inference that the losses suffered by Plaintiffs and other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific factors unrelated to Defendants' wrongful conduct.

## XI. CONTROL PERSONS

312. As alleged herein, the Individual Defendants were responsible for drafting, producing, reviewing and/or disseminating the false and misleading statements, information and omissions alleged herein; were aware of, or recklessly disregarded, the fact that the false and misleading statements and omissions were being issued by the Company; and approved or ratified these statements, all in violation of the federal securities laws.

313. As officers and controlling persons of a publicly held company whose shares are registered with the SEC and traded on the NASDAQ, the Individual Defendants had a duty to disseminate prompt, accurate, and truthful information with respect to Upstart and to correct any previously issued statements that had become materially misleading or untrue so that the market price of the Company's securities would be based upon truthful and accurate information. The Individual Defendants each violated these specific requirements and obligations during the Class Period.

314. Because of their positions with the Company, the Individual Defendants possessed the power and authority to control the content of the Company's SEC reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*,

the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material nonpublic information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

315. Because of their positions with, and influence over, the Company, the Third Point Defendants possessed the power and authority to control the content of the Company's SEC reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market.

316. The Third Point Defendants also served as control persons. At the time of Upstart's IPO, Third Point owned over 19% of the Company's common stock as a major early investor in the Company and occupied a seat on Upstart's Board of Directors through Defendant Schwartz, who served a Board member until November 15, 2021. As admitted by Defendant Loeb, the Third Point Defendants wielded major influence over Upstart as an "incubat[or]" of the Company. They were involved in multiple aspects of Upstart's operations, including the Company's "organizational development," its "tech focus," staffing, "talent acquisition," "go-to-market strategies," and "capital markets strategy." Further, Third Point's structured credit team was "instrumental in evaluating Upstart's loan and securitization products." And the Third Point Defendants were further involved in Upstart's business as a major funder of Upstart loans, providing well over $1 billion in funds from 2017 through 2021.

317. As Defendant Girouard admitted, Defendants Schwartz and Third Point Ventures were "critical partners" of Upstart, "helping Upstart to connect the dots from an early-stage startup to a market leader . . . ." And through their involvement in Upstart's business, the Third Point Defendants obtained "intimate knowledge of [Upstart's] management team[], strategy, and promise."

## XII. CLASS ACTION ALLEGATIONS

318. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired Upstart securities during the Class Period, *i.e.*, from December 16, 2020 to November 8, 2022, inclusive, and who were damaged thereby. Excluded from the Class are Defendants; members of the immediate families of the Individual Defendants; Upstart and Third Point's subsidiaries and affiliates; any person who is or was an officer or director of Upstart or Third Point during the Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

319. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. The Company's stock is actively traded under the symbol "UPST" on the NASDAQ and there were more than 80 million shares of Upstart common stock outstanding during the Class Period. While the exact number of Class members is unknown at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Upstart or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

320. Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

321. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests that conflict with those of the Class.

322. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: (a) whether Defendants violated the 1934 Act by the acts and omissions as alleged herein; (b) whether the Upstart Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading; (c) whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, operations, and prospects of Upstart; (d) whether statements made by the Upstart Defendants to the investing public during the Class Period misrepresented and/or omitted material facts about the business, operations, and prospects of Upstart; (e) whether the market price of Upstart securities during the Class Period was artificially inflated due to the material misrepresentations, failures to correct the material misrepresentations, and fraudulent course of conduct complained of herein; and (f) the extent to which the members of the Class have sustained damages and the proper measure of damages.

323. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

**COUNT I**
**For Violation of § 10(b) of the 1934 Act and Rule 10b-5 and Rule l0b-5 Promulgated Thereunder Against All Defendants**

324. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

325. During the Class Period, Defendants engaged in a scheme to defraud and/or disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

326. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Upstart securities in violation of Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

327. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Upstart securities. Plaintiffs and the Class would not have purchased Upstart securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' materially false and misleading statements and course of conduct.

328. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Upstart securities during the Class Period.

**COUNT II**
**For Violation of Section 20(a) of the 1934 Act Against the Individual Defendants and the Third Point Defendants**

329. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein. For purposes of this Count, Defendants include the Individual Defendants and Third Point Defendants.

330. The Individual Defendants and Third Point Defendants acted as controlling persons of Upstart within the meaning of Section 20(a) of the 1934 Act as alleged herein.

331. By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations and/or intimate knowledge of the materially false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be materially false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

332. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

333. Defendant Third Point, together with Third Point Ventures and its affiliates, was one of the largest beneficial owners of Upstart common stock during the Class Period. Defendant Third Point, together with Third Point Ventures and its affiliates, by virtue of its ownership of Upstart common stock, and Defendant Schwartz, through his role at Third Point and seat on Upstart's board of directors, had the power and authority to, and did, cause Upstart to engage in the wrongful conduct alleged.

334. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Upstart securities during the Class Period.

335. By reason of such conduct, the Individual Defendants and Third Point Defendants are liable pursuant to Section 20(a) of the Exchange Act.

336. As set forth above, Defendants each violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants and Third Point Defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**COUNT III**
**For Violation of Section 20(A) of the 1934 Act Against the Founder Defendants, Third Point, Third Point Ventures, and Loeb**

337. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

338. Count III is brought pursuant to § 20A of the 1934 Act against the Founder Defendants, Third Point, Third Point Ventures, and Loeb on behalf of Plaintiffs who were damaged by Defendants' insider trading.

339. As detailed herein, Defendants were in possession of material, non-public information concerning Upstart. The Founder Defendants, Third Point, Third Point Ventures, and Loeb took advantage of their possession of material, non-public information regarding Upstart to obtain billions of dollars in insider trading profits during the Class Period.

340. The Founder Defendants, Third Point, Third Point Ventures, and Loeb's sales of Upstart common stock were made contemporaneously with Plaintiffs' purchases of Upstart securities during the Class Period.

341. Defendant Counselman made the following sales:

| Defendant | Date of Sale(s) | Amount | Price |
|---|---|---|---|
| Counselman | 8/19/2021 | 608,355 | $193.23 - $213.17 |

Counselman's sales were made contemporaneously with the following purchases by Plaintiffs:

| Plaintiff | Date of Purchase | Amount | Price |
|---|---|---|---|
| Sebag | 8/23/2021 | 2,000 | $202.96 |
| Universal-Investment-Gesellschaft mbH | 8/24/2021 | 3,000 | $207.78 |

342. Defendant Third Point made the following sales:

| Defendant | Date of Sale(s) | Amount | Price |
|---|---|---|---|
| Third Point | 8/20/2021 | 396,822 | $199.62 |
| Third Point | 8/23/2021 | 484,400 | $202.62 |
| Third Point | 8/24/2021 | 100,000 | $208.69 |
| Third Point | 11/15/2021 | 2,150,000 | $233.45 - $261.16 |
| Third Point | 11/19/2021 | 750,000 | $205.99 - $228.39 |
| Third Point | 11/23/2021 | 200,000 | $190.31 - $205.38 |
| Third Point | 12/2/2021 | 805,000 | $160.65 - $183.57 |
| Third Point | 12/3/2021 | 395,000 | $168.28 - $191.28 |
| Third Point | 12/6/2021 | 100,000 | Not Reported |
| Third Point | 12/13/2021 | 1,000,000 | Not Reported |
| Third Point | 12/14/2021 | 1,100,000 | Not Reported |
| Third Point | 12/15/2021 | 200,000 | Not Reported |
| Third Point | 12/16/2021 | 218,000 | Not Reported |
| Third Point | 12/17/2021 | 982,000 | Not Reported |

Third Point's sales were made contemporaneously with the following purchases by Plaintiffs:

| Plaintiff | Date of Purchase | Amount | Price |
|---|---|---|---|
| Sebag | 8/23/2021 | 2,000 | $202.96 |
| Universal | 8/24/2021 | 3,000 | $207.78 |
| Sebag | 11/16/2021 | 2,000 | $238.59 |
| Sebag | 11/17/2021 | 1,000 | $242.53 |
| Universal | 11/18/2021 | 500 | $233.06 |
| Universal | 11/18/2021 | 18,181 | $233.06 |
| Sebag | 11/19/2021 | 868 | $209.03 |
| Sebag | 11/23/2021 | 2,107 | $197.64 |
| Sebag | 12/2/2021 | 2,000 | $176.90 |
| Universal | 12/7/2021 | 500 | $183.21 |
| Sebag | 12/10/2021 | 5,000 | $166.58 |
| Sebag | 12/13/2021 | 2,000 | $152.71 |
| Sebag | 12/17/2021 | 5,000 | $131.67 |

343. Defendant Girouard made the following sales:

| Defendant | Date of Sale(s) | Amount | Price |
|---|---|---|---|
| Girouard | 9/1/2021 | 137,498 | $223.37 - $228.14 |
| Girouard | 10/1/2021 | 137,498 | $286.28 - $314.10 |
| Girouard | 12/1/2021 | 137,498 | $177.36 - $207.97 |
| Girouard | 1/3/2022 | 91,665 | $144.73 - $155.60 |
| Girouard | 2/1/2022 | 91,665 | $107.49 - $111.10 |
| Girouard | 3/1/2022 | 133,038 | $155.24 - $160.08 |

Girouard's sales were made contemporaneously with the following purchases by Plaintiffs:

| Plaintiff | Date of Purchase(s) | Amount | Price |
|---|---|---|---|
| Sebag | 9/1/2021 | 1,000 | $224.43 |
| Sebag | 9/3/2021 | 12,000 | $245.75 |
| Sebag | 10/1/2021 | 3,000 | $286.56 |
| Sebag | 12/1/2021 | 3,000 | $179.84 |
| Sebag | 12/2/2021 | 2,000 | $176.90 |
| Sebag | 1/3/2022 | 3,000 | $146.90 - $147.04 |
| Sebag | 1/6/2022 | 10,000 | $115.90 - $116.42 |
| Sebag | 3/1/2022 | 10,000 | $147.73 - $151.74 |
| Universal | 3/2/2022 | 23 | $151.14 |
| Sebag | 3/3/2022 | 10,000 | $146.67 |
| Sebag | 3/4/2022 | 15,000 | $128.46 - $128.79 |

344. Defendant Gu made the following sales:

| Defendant | Date of Sale(s) | Amount | Price |
|---|---|---|---|
| Gu | 8/16/2021 | 155,000 | $189.29 - $213.82 |
| Gu | 9/15/2021 | 155,000 | $262.27 - $277.20 |
| Gu | 11/15/2021 | 39,000 | $233.24 - $261.58 |
| Gu | 3/1/2022 | 2,000 | $160.01 |

Gu's sales were made contemporaneously with the following purchases by Plaintiffs:

| Plaintiff | Date of Purchase | Amount | Price |
|---|---|---|---|
| Universal | 9/17/2021 | 1,600 | $303.32 |
| Sebag | 11/16/2021 | 2,000 | $238.59 |
| Sebag | 11/17/2021 | 1,000 | $242.53 |
| Universal | 11/18/2021 | 18,181 | $233.06 |
| Sebag | 11/19/2021 | 868 | $209.03 |
| Sebag | 3/1/2022 | 10,000 | $147.73 - $151.74 |
| Universal | 3/2/2022 | 23 | $151.14 |
| Sebag | 3/3/2022 | 10,000 | $146.67 |
| Sebag | 3/4/2022 | 15,000 | $128.46 - $128.79 |

345. Plaintiffs who purchased shares of Upstart securities contemporaneously with sales by the foregoing Defendants suffered damages because: (1) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§ 10(b) and 20(a) of the 1934 Act as alleged herein; and (2) they would not have purchased the securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the materially false and misleading statements and concealment alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, pray for relief and judgment as follows:

A. Determining that this action is a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiffs as class representatives under Rule 23, and Lead Plaintiffs' counsel as class counsel;

B. Awarding damages in favor of Plaintiffs and the other Class members for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the members of the Class pre-judgment and post-judgement interest, as well as their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Awarding such other relief as this Court deems appropriate.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

Respectfully submitted on this 5th day of December, 2022.

**PLEVIN & GALLUCCI COMPANY, L.P.A.**

By: *<u>/s/ David R. Grant</u>*

David R. Grant, Trial Attorney (0065436)
55 Public Square
Suite 2222
Cleveland, Ohio 44113
Telephone: 216.861.0804
Facsimile: 216.861.5322
Email: DGrant@pglawyer.com

*Local Counsel for Lead Plaintiff Universal-Investment-Gesellschaft mbH*

**MOTLEY RICE LLC**
Gregg S. Levin (*pro hac vice* pending)
Max N. Gruetzmacher (*pro hac vice* pending)
Christopher F. Moriarty (admitted *pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: 843.216.9000
Facsimile: 843.216.9450
Email: glevin@motleyrice.com
mgruetzmacher@motleyrice.com
cmoriarty@motleyrice.com

*Counsel for Lead Plaintiff Universal-Investment-Gesellschaft mbH and Lead Counsel for the Putative Class*

**ROBBINS GELLER RUDMAN & DOWD LLP**
Ryan A. Llorens
T. Alex B. Folkerth
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619.231.1058
Facsimile: 619.231.7423
Email: RyanL@rgrdlaw.com
AFolkerth@rgrdlaw.com

*Counsel for Plaintiff Emmanuel Sebag*

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Casey E. Sadler
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: 310.201.9150
Facsimile: 310.432.1495
Email: rprongay@glancylaw.com
csadler@glancylaw.com

*Counsel for Plaintiff Kathy Brooks*

**MURRAY MURPHY MOUL + BASIL LLP**
Joseph F. Murray
Brian K. Murphy
1114 Dublin Road
Columbus, OH 43215
Telephone: 614/488-0400
Facsimile: 614/488-0401
Email: murray@mmmb.com
murphy@mmmb.com

*Additional Counsel for Lead Plaintiff Universal-Investment-Gesellschaft mbH and Emmanuel Sebag*

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that on this day a copy of the foregoing document was filed with the Court's CM/ECF system which served the same on all counsel of record.

This the 5th day of December, 2022.

*/s/ David R. Grant*
David R. Grant, Trial Attorney (0065436)