## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

|  |  |
|---|---|
| *In re* **UPSTART HOLDINGS, INC.** **SECURITIES LITIGATION.** | **Case No. 2:22-cv-02935** |
|  | **Judge Algenon L. Marbley** |
|  | **Magistrate Judge Elizabeth P. Deavers** |

## OPINION & ORDER

Lead Plaintiff Universal-Investment-Gesellschaft mbHaf ("Universal") and plaintiffs Kathy Brooks and Kevin Crain (all together, "Plaintiffs") bring an updated Motion for Class Certification with respect to their claims against Defendants Upstart Holdings, Inc. ("Upstart"), David Girouard, Sanjay Datta, Paul Gu, Anna Counselman, and Robert Schwartz. (Mot., ECF No. 100). For the reasons set forth below, this Court **GRANTS** Plaintiffs' Motion (ECF No. 100) and **CERTIFIES** the proposed class. This Court **APPOINTS** Plaintiffs Universal, Brooks, and Crain as Class Representatives and the law firms of Motley Rice LLC and Robins Geller Rudman & Dowd LLP as Class Counsel.

## I.  BACKGROUND

### A.  Factual Background

This Court set out the facts in detail in its previous Order resolving Motions to Dismiss filed by Defendants and former defendants to this matter. (ECF No. 68). This Court restates the facts relevant here, which are drawn from Plaintiffs' well-pled allegations.

Girouard, Gu, and Counselman founded Upstart in 2012, with Girouard as chief executive officer and Gu and Counselman as senior vice presidents. (*See* Compl., ECF No. 45, ¶ 58). Sanjay Datta was hired as the chief financial officer. Girouard and Gu held board seats, with Girouard

serving as chair. Robert Schwartz, managing partner of investor Third Point Ventures, also served as a member of the Upstart board. (*Id.* ¶ 69–70).

Upstart uses an artificial intelligence ("AI") underwriting model instead of the traditional FICO credit score model. (*See id.* ¶¶ 45, 59, 126). Upstart uses the AI model to evaluate prospective borrowers and to decide whether to issue a personal loan and at what rate. (*See id.* ¶ 3). Upstart's banking partners then originate the loan, but Upstart had an agreement with its partners to buy back any undesired loans. (*See id.* ¶ 65). Upstart would sell those loans to institutional investors. (*See id.* ¶¶ 61, 66, 73). Upstart claimed its AI model would generate "better" loans for Upstart's bank partners with "higher approval rates and lower interest rates at the same loss rate." (*Id.* ¶ 126). As a facilitator, Upstart would be insulated from risk because it would not hold any loans on its balance sheet long term. (*Id.* ¶¶ 3, 60, 63).

After raising millions of dollars in capital, Upstart went public on December 16, 2020 with a share price of $20.00 per share. (*See id.* ¶ 83). At that point, Upstart generated nearly all its revenue through fees charged to banking partners. (*See id.* ¶ 64). Upstart held only 2% of the loans generated by the AI model; all others were retained by banking partners or sold to credit investors. (*See id.* ¶¶ 61, 64, 66). In early April 2021, Upstart put forth a second public offering, this time at $120.00 per share. (*Id.* ¶ 92). Upstart's stock price continued to climb, reaching a high of $401.49 per share on October 15, 2021. (*See id.* ¶ 97).

Throughout this time, Upstart, its executives, and directors touted the strength of the Upstart business model, platform, and AI model. In both public disclosures filed with the Securities and Exchange Commission and in Upstarts first public earnings call, Upstart, its executives, and directors reiterated that the AI model was nimble and "able to respond to the sort of macroeconomic changes on really a dime," and that Upstart carried very little loan risk because

demand for Upstart-generated loans from banks and investors remained strong. (*Id.* ¶ 94; *see id.* ¶¶ 91, 93–96).

At the same time, Upstart executives and insiders began to sell their stock. Upon expiration of the 181-day lock-up period, Girouard, Gu, and Counselman all sold substantial amounts of Upstart stock. (*See id.* ¶ 275). Counselman sold 608,355 shares on August 19, 2021, bringing in over $122 million in proceeds. (*Id.*). Girouard sold approximately 90,000–140,000 shares at the beginning of each month from September 2021 to May 2022 for proceeds totaling nearly $204 million. (*Id.*). Gu also sold shares on a regular schedule: 155,000 shares in the middle of the month in August, September, and October 2021, and smaller amounts in November 2021 and March 2022. (*Id.*). His stock sales generated $143.6 million. (*Id.*).

On November 9, 2021, Upstart announced its financial results for the third quarter of 2021. While total revenue and total fee revenue had both risen dramatically, so too had the amount of loans that Upstart retained on its balance sheet. (*See id*. ¶ 298). In the wake of the announcement, Upstart's stock price fell from $313.71 at closing on November 9, 2021, to $256.59 the next day. (*Id.* ¶ 299). Girouard explained on the earnings call that followed that the retained loans increase was not a concern, because Upstart's bank partners continued to have faith in the AI model and demand for the loans remained strong. (*See id.* ¶ 104).

In the months that followed, Upstart's financial results worsened. Loans on the balance sheet continued to grow, from $130 million at the end of the third quarter of 2021 to $252 million at the end of 2021, and then to $604 million at the end of the first quarter of 2022. (*Id*. ¶¶ 108, 112). During the February 2022 earnings call, Upstart executives maintained that the increase in loans held during 2021 was not a cause for concern, that the loans were priced correctly, and that the AI model had no problem accounting for rapidly increasing interest rates. (*See id*. ¶¶ 110–

111).  Datta explained the increase in loans as a "temporary" issue, associated entirely with research and development for a planned expansion into the automobile lending sector.  (*Id*. ¶ 109).

But after Upstart announced the increase in loans held during the first quarter of 2022, Datta explained on an earnings call that Upstart had started to use its balance sheet as a "funding buffer" to hold on to loans that it could not immediately offload.  (*See id*. ¶ 112).  That is, Upstart was forced to retain loans that had been sold back to it by its banking partners and that it could not repackage and sell to investors.  (*Id*. ¶ 114).  This exposed the company to interest and credit risk.

Following that call, the price of Upstart stock dropped 56%.  (*See id*. ¶¶ 115–117). Analysts suggested that Upstart's value proposition as a marketplace lender—i.e., as a facilitator between borrowers and lenders—was untenable if it could not pass on the loans generated by its platform to external funding partners.  (*See id.*).  The stock price continued to drop after Upstart cut its earnings guidance for the second quarter of 2022 on July 7, 2022, and Girouard admitted that Upstart was "funding-constrained" due to the loans, and had converted some loans on its balance sheet into cash at a loss.  (*See id.* ¶¶ 118–119).

On November 8, 2022, Upstart announced a 31% decrease in revenue for the third quarter compared to the prior year, and a net loss of $58.1 million.  (*Id*. ¶ 305).  Rising interest rates had caused a substantial decrease in loans generated by Upstart's platform by increasing the costs of borrowing.  (*See id*. ¶ 305).  Previously, Girouard had indicated that the AI model was "rate agnostic," but he and Datta, in discussing Upstart's third quarter of 2021 performance, acknowledged that higher interest rates had led to the AI model pricing loans at higher annual percentage rates.  (*Id*. ¶¶ 111, 305–06).  The next day, Upstart stock dropped to a low of $17.06. (*Id*. ¶ 122).

## B.     Procedural Background

Plaintiffs brought claims against Upstart, Girouard, Gu, Counselman, Datta, and Schwartz, as well as claims against Third Point Ventures and associated executives and entities ("Third Point Defendants").  (*See id.* ¶ 1).  This Court appointed Universal as Lead Plaintiff and Motley Rice as Lead Counsel.  (ECF No. 23).  Separately, individual plaintiffs filed derivative actions in this Court; those cases have been consolidated and stayed pending a decision in this case.  (*See* ECF, No. 2:22-cv-02961).

Defendants and Third Point Defendants moved to dismiss.  (ECF Nos. 58, 60).  This Court granted the motion as to Third Point Defendants and granted in part and denied in part the motion as to Defendants.[1]  (Op. & Ord., ECF No. 68).  These claims remain: (1) Plaintiffs Exchange Act § 10(b) and Rule 10b-5 claims against Defendants; (2) Plaintiffs Exchange Act § 20(a) control liability claims against Girouard, Gu, Counselman, Datta, and Schwartz; and (3) Plaintiffs Exchange Act § 20A insider trading claims against Girouard, Gu, and Counselman.  This Court narrowed the scope of the § 10(b) and Rule 10b-5 claims to those based on five categories of alleged misrepresentations: (1) statements about the advantages of Upstart's AI underwriting model over traditional, FICO-based models; (2) statements about the ability of the model to "quickly adjust" to changing macroeconomic conditions; (3) the November 9, 2021, and February 15, 2022, statements that demand for Upstart loans is "there"; (4) the November 9, 2021, and February 15, 2022, statements that loans were only being retained for R&D purposes; and (5) statements that the loan problem was a temporary concern.  (*Id.* at 56).

---

[1] Following this updated Motion for Class Certification, Plaintiffs moved for leave to amend their complaint to restore their claims against Third Point Defendants.  (ECF No. 130).  That motion is still pending.

Universal requested an extension to the class certification motion deadline. (ECF No. 124, 5). While that request was pending, Brooks and Crain filed the first motion for class certification to meet the deadline in the event this Court did not grant the extension. (*Id*.). After this Court granted the extension, Brooks and Crain withdrew their motion and Universal, Brooks, and Crain filed the instant updated Motion for Class Certification. In their updated Motion, Plaintiffs seek certification of the following Class:

> All persons and entities who purchased or otherwise acquired Upstart Holdings, Inc. ("Upstart" or the "Company") common stock or exchange-traded Upstart call options, or who sold exchange-traded Upstart put options (together, the "Securities"), between December 16, 2020, and November 8, 2022, inclusive (the "Class Period"). Excluded from the Class are: (i) Defendants; (ii) the officers and directors of Upstart at all relevant times; and (iii) members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

(Mem., ECF No. 101, 1). Plaintiffs specify that "Defendants" in the class definition refers to Defendants Upstart, Girouard, Gu, Counselman, Datta, and Schwartz. (*Id*.). Plaintiffs request that this Court appoint Plaintiffs as Class Representatives and Motley Rice LLC and Robins Geller Rudman & Dowd LLP as Class Counsel. (*Id*.). Plaintiffs' Motion is now ripe for review.

## II.    STANDARD OF REVIEW

Plaintiffs seek certification of the putative class under Federal Rules of Civil Procedure 23(a) and 23(b)(3). A plaintiff seeking class certification bears the burden of establishing compliance with all four requirements of Rule 23(a), referred to by the shorthand of "(1) numerosity, (2) commonality, (3) typicality, and (4) adequacy." Fed. R. Civ. P. 23(a); *Alkire v. Irving*, 330 F.3d 802, 820 (6th Cir. 2003). In ruling on a motion for class certification, a district court should not consider the merits of the plaintiffs' claims, but may consider evidence outside the pleadings to determine whether the prerequisites of Rule 23 are met. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974). That said, on occasion, "it may be necessary for the court to

6

probe behind the pleadings before coming to rest on the certification question," *see Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982), and "rigorous analysis" may involve some overlap between the proof necessary for class certification and the proof required to establish the merits of the plaintiffs' underlying claims." *Wal-Mart Store, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011). A court, however, should not conduct free-ranging merits inquiries at this stage, but may consider the merits only to the extent "they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, 568 U.S. 455, 466 (2013).

In addition, under Rule 23(b)(3), class certification is appropriate if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3) (referred to by the shorthand of "predominance and superiority").

Additionally, even though Rule 23 has no express ascertainability requirement, many courts, including the Sixth Circuit, have held that it is implicitly required for class certification, at least for a class certified under Rule 23(b)(3). *Cole v. Memphis*, 839 F.3d 530, 541 (6th Cir. 2016); *see also Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013). Ascertainability is met where the "class description [is] sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Cole*, 839 F.3d at 541 (quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012)).

### III.   LAW AND ANALYSIS

### A.   Rule 23(a) Prerequisites to Class Certification

Plaintiffs must satisfy the four requirements of (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy.  Fed. R. Civ. P. 23(a).  This Court considers each in turn.

#### *1.  Numerosity*

Plaintiffs argue that numerosity is satisfied because thousands of investors traded millions of Upstart securities during the proposed class period.  Defendants do not submit an argument contesting the existence of numerosity.

To satisfy numerosity, the class must be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  The impracticability requirement "imposes no absolute limitations" nor any "strict numerical test."  *In re Am. Med. Sys., Inc.*, 75 F.3d at 1079.  A class size of "substantial proportions" usually satisfies the requirement "by the numbers alone."  *Id*. Further, "[t]he numerosity requirement is generally assumed to have been met in class action suits involving nationally traded securities."  *Ross v. Abercrombie & Fitch Co.*, 257 F.R.D. 435, 442 (S.D. Ohio 2009).

This Court finds that Plaintiffs have met the numerosity requirement.  Plaintiffs submit that Upstart stock was listed and actively traded on the NASDAQ, with more than 80 million shares outstanding as December 31, 2021.  (Cain Rep., ECF No. 102-4, Ex. 10).  The average weekly trading volume approximated 32.8 million shares.  (*Id.* at 15).  At least 988 institutional investors owned common stock during the proposed class period.  (*Id.* at 21 n. 51).  Plaintiffs also submit that options were actively traded during the proposed class period with trades of more than 17 million call option contracts and 12 million put option contracts.  (*Id.* at 37).  The Court finds Plaintiffs' evidence of nationally traded securities satisfies numerosity.  *See, e.g.*, *Willis v. Big*

*Lots, Inc.*, 242 F. Supp. 3d 634, 644 (S.D. Ohio 2017) (finding numerosity where the plaintiffs submitted evidence that, during the Class Period, the defendants' stock was traded on the NYSE during the Class Period, had an average daily trading volume above 1.5 million shares, and was owned in part by about 450 large institutional investors); *Ross*, 257 F.R.D. at 442 (finding numerosity satisfied given that the defendants' stock traded on the NYSE, had a daily trading volume of roughly 1.8 million shares, and had roughly 86 million to 99 million shares outstanding as of the dates the company filed its annual reports with the SEC during relevant years).

### 2. Commonality

Plaintiffs argue that commonality is met because Defendants engaged in a fraudulent scheme and made material misrepresentations that affected all investors. Defendants do not submit an argument contesting the existence of commonality.

To meet the commonality requirement, the case must present issues of law or fact common to the class. "[T]here need only be one question common to the class, [but] that question must be a 'common issue the resolution of which will advance the litigation.'" *Alkire*, 330 F.3d at 820 (quoting *Sprague v. GMC*, 133 F.3d 388, 397 (6th Cir. 1998)). As explained by the Sixth Circuit, "named plaintiffs must show that there is a common question that will yield a common answer for the class (to be resolved later at the merits stage), and that that common answer relates to the actual theory of liability in the case." *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 505 (6th Cir. 2015). The interests and claims of the various plaintiffs need not be identical, however, because "the commonality test is met where at least one issue whose resolution will affect all or a significant number of the putative class members." *Amos v. PPG Indus., Inc.*, No. 2:05-cv-70, 2018 WL 5259579, at *5 (S.D. Ohio Jan. 5, 2018).

Plaintiffs allege that Defendants caused Plaintiffs harm when Defendants made materially false or misleading statements and omissions to investors and engaged in a fraudulent scheme in violation of federal securities law. There are several questions common to the class which must be resolved to determine liability. *Big Lots, Inc.*, 242 F. Supp. 3d at 645 (Because "[w]hether Defendants made certain misrepresentations and omissions, whether such misrepresentations and omissions were material, and whether Defendants acted with the requisite scienter, are all common issues capable of classwide resolution . . . courts have repeatedly found [the commonality] requirement satisfied in securities actions"). The Rule 23(a) commonality prong requires only one such common question. *Alkire*, 330 F.3d at 820. Therefore, this Court finds that the commonality requirement is met.

### 3. Typicality

#### a. Plaintiffs' Arguments

Plaintiffs assert that their claims are typical of the class because they arise out of the same course of conduct. Plaintiffs contend that Defendants made material misrepresentations and omissions and engaged in a fraudulent scheme resulting in inflated stock prices. As a result, Plaintiffs and the class bought Upstart securities at artificially high prices.

#### b. Defendants' Arguments

Defendants respond that Universal and Brooks fail typicality because they bought additional Upstart securities after the proposed class period, after the revelation of the alleged fraud. Additionally, Defendants argue that Brooks is atypical because she made a net profit on her Upstart common stock transactions, and only a net loss on Upstart options. Finally, Defendants contend that Brooks and Crain cannot represent the class as to § 20A claims because they lack standing as to those claims.

*c.  The Court's Analysis*

To meet the typicality requirement, the "claims or defenses of the representative parties" must be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  A class representative's claim is typical if "it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and the claims are based on the same legal theory." *Myers v. Marietta Mem'l Hosp.*, No. 2:15-CV-2956, 2017 WL 3977956, at *7 (S.D. Ohio Sept. 11, 2017) (quoting *Swigart v. Fifth Third Bank*, 288 F.R.D. 177, 185 (S.D. Ohio 2012)). "Typical does not mean identical, and the typicality requirement is liberally construed." *Id.*

Plaintiffs meet the typicality requirement because their claims arise out of the same alleged course of conduct and are based on the same legal theory.  Plaintiffs and the proposed class paid artificially inflated prices for Upstart securities as a result of Defendants' alleged material misrepresentations and omissions and alleged fraudulent scheme.  *Wilkof v. Caraco Pharm. Lab'ys, Ltd.*, 280 F.R.D. 332, 341 (E.D. Mich. 2012) (finding the typicality requirement met where the named plaintiffs and the putative class alleged "injur[ies] stemming from Defendant's alleged false representations and the effect of those false representations on the market").

Universal and Brooks are not atypical because of their purchases of Upstart securities after the proposed class period.  Rather, "purchasing a stock after a corrective disclosure that deflates the stock price may not even be relevant to the typicality inquiry because 'a party may believe a stock to be a bargain after such deflation, and may believe that it is now trading at a price with defendants' fraud removed from it.'"  *Weiner v. Tivity Health, Inc.*, 334 F.R.D. 123, 130 (M.D. Tenn. 2020) (quoting *Ross*, 257 F.R.D. at 446).  The contrary view is "against the weight of authority, a deviation from the general rule, and not generally accepted." *Id.* (collecting cases) (internal citations omitted).  Accordingly, "courts routinely certify a class with representatives who

purchased stock during and after a class period." *Id.* (quoting *In re Select Comfort Corp. Sec. Litig.*, 202 F.R.D. 598, 607 (D. Minn. 2001)).

Nor does Brooks fail typicality because her losses stem from trading options, rather than common stock. First, a net profit on securities does not contradict a claim of fraud as to those same securities—"[f]raud requires only that the plaintiff was injured, not that [s]he *never* enjoyed a benefit." *Bond v. Clover Health Invs., Corp.*, No. 3:21-CV-00096, 2023 WL 1999859, at *7 (M.D. Tenn. Feb. 14, 2023). And Brooks claims losses on options trading that far exceed the gain Defendants assert that she made trading common stock. As the proposed class covers securities including common stock and options, Brooks did not make a net profit on the covered securities.

Finally, Defendants argue that Brooks and Crain cannot represent the class for lack of standing to bring § 20A claims. Brooks and Crain have individual standing vis-a-vis Defendants because they allege a redressable injury-in-fact, traceable to each defendants' conduct. *Lujan v. Defens. of Wildlife*, 504 U.S. 555, 560–61 (1992); *see also Fox v. Saginaw Cnty.*, 67 F.4th 284, 292–94 (6th Cir. 2023) (in a class action, at least one named plaintiff must meet these requirements for each defendant). Thus, whether Brooks and Crain can represent the class "depends solely on whether [they are] able to meet the additional criteria encompassed in Rule 23." *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998). Plaintiffs' claims "need not be identical" to those of all class members to meet the typicality requirement. *See id.* at 424. Further, Brooks' trade data shows that she did make contemporaneous purchases with Gu and Girouard and Defendants do not dispute that Universal can bring a § 20A claim. Moreover, the § 20A claims rely on the same § 10(b) violation as the required predicate Exchange Act violation. *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 599 (S.D. Tex. 2003). Therefore, Crain's § 10(b) claims share "a common element of fact or law" with the proposed class's § 20A

claims. *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007) (quoting *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 n. 31 (6th Cir. 1976)).

For the foregoing reasons, Plaintiffs meet the typicality requirement.

### 4. Adequacy

#### a. Parties' Arguments

Plaintiffs contend that they will adequately represent the proposed class because they do not have conflicts of interests with the other class members and they have retained attorneys with significant securities class action experience. Defendants argue that Plaintiffs have not adequately supervised the litigation, are not familiar with the case or their duties, and that the case is lawyer-driven.

#### b. The Court's Analysis

To establish adequacy, Plaintiffs must show that they, as "the representative parties[,] will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The Sixth Circuit has held that "[b]ecause named class members must act through class counsel, adequacy of representation turns in part on 'the competency of class counsel' and in part on the absence of 'conflicts of interest.'" *Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 626 (6th Cir. 2007) (quoting *Gen. Tel. Co. of Sw.*, 457 U.S. 147 at 157 n. 13). Accordingly, the adequacy requirement "calls for a two-pronged inquiry: (1) the representatives must have common interests with unnamed members of the class, and (2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Swigart*, 288 F.R.D. at 185–86 (quoting *Senter*, 532 F.2d at 525). As for the first prong, the court must be satisfied that "the class members have interests that are not antagonistic to one another." *Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir. 2000). For the

13

second prong, the court must be satisfied that "class counsel are qualified, experienced and generally able to conduct the litigation." *Id.*

Under the Sixth Circuit two-prong test, courts evaluate proposed class representatives for "conflicting interest[s], not [] personal qualifications." *Rankin v. Rots*, 220 F.R.D. 511, 520 (E.D. Mich. 2004). Accordingly, personal qualifications come into play only when they create conflicting interests. For example, proposed class representatives must not "demonstrate so little knowledge of and involvement in the case that [they] are unable to protect class interests from possibly competing class counsel interests." *In re AEP ERISA Litig.*, No. C2-03-67, 2008 WL 4210352, at *2 (S.D. Ohio Sept. 8, 2008). Similarly, proposed class representatives fail adequacy if their participation is "so minimal that they virtually have abdicated to their attorneys the conduct of the case." *Ross*, 257 F.R.D. at 451 (quoting *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 727–28 (11th Cir. 1987)). Even attacks on a proposed class representative's credibility only demonstrate inadequacy when the attacks "are so sharp as to jeopardize the interests of absent class members." *Gooch v. Life Invs. Ins. Co. of Am.*, 672 F.3d 402, 431 (6th Cir. 2012).

Plaintiffs satisfy the first prong for the same reasons they satisfy the typicality requirement. Plaintiffs' interests are aligned with the proposed class members. Further, Plaintiffs have retained qualified proposed class counsel. *See Plumbers & Pipefitters Nat. Pension Fund v. Burns*, 292 F.R.D. 515, 521 (N.D. Ohio 2013) (noting that hiring of competent counsel is "strong evidence that plaintiffs seek fairly and adequately to represent the proposed class members"). Motley Rice and Robbins Geller have demonstrated their qualifications working together and separately as class counsel in securities class actions. *See, e.g., In re Twitter Inc. Sec. Litig.*, No. 16-cv-05314-JST (N.D. Cal.); *In re FirstEnergy Corp. Sec. Litig.*, 2023 WL 2709373, at *12; *Dougherty v. Esperion*

*Therapeutics, Inc.*, No. 16-10089, 2020 WL 6793326, at *8 (E.D. Mich. Nov. 19, 2020); *Big Lots, Inc.*, 242 F. Supp. 3d at 650.

Defendants' arguments do not go to class counsel's competency, but attack Plaintiffs themselves as insufficiently vigorous. Defendants' "arguments ignore the Sixth Circuit's two-factor test." *Doughterty*, 2020 WL 6793326, at *7. In doing so, Defendants rely on cases that apply "more rigorous" adequacy tests, such as the Fifth Circuit's test. *Id.*; *see, e.g.*, *In re Enron Corp.*, 529 F. Supp. 2d 644, 675 (S.D. Tex. 2006) (applying the Fifth Circuit two-prong test that "examines the zeal and competence of the class representatives' counsel and the class representatives' willingness, experience, and ability to handle class actions, to take an active role in and control of the litigation, and to protect the interests of the absent members"); *Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307, 315 (E.D. Va. 2007) (applying the same Fifth Circuit test); *see also Butterworth v. Quick & Reilly, Inc.*, 171 F.R.D. 319, 322 (M.D. Fla. 1997) (requiring the named "plaintiff [] demonstrate that she will vigorously prosecute the action," in addition to meeting the conflict of interest and qualified counsel requirements that are in the Sixth Circuit test); *Simon v. Ashworth, Inc.*, No. CV071324GHKAJWX, 2007 WL 4811932, at *2 (C.D. Cal. Sept. 28, 2007) (applying two-prong test that considered "the zeal and competence of counsel *and* the party") (emphasis added).

Plaintiffs have shown "[a]n understanding of the basic facts underlying the claims, some general knowledge, and a willingness and ability to participate in discovery." *Plumbers & Pipefitters Nat. Pension Fund*, 292 F.R.D. at 520. Plaintiffs have reviewed case documents, coordinated with counsel, defended against motions to dismiss, and engaged in the discovery process. This is enough to meet the adequacy requirement. *Id*.

Defendants' other arguments depend on evidence taken out of context. For example, Defendants contend that Crain does not know who his attorneys are. But Crain correctly identified his attorney as Joseph Murray before agreeing that Robins Geller "also represent[s]" him in this action. (Crain Depo., ECF No. 128-1, 59:9–22). Robins Geller may not represent Crain individually, but the firm is proposed class counsel. Even if Crain misunderstood this detail, he is still an adequate representative. *See*, *e.g.*, *Dougherty*, 2020 WL 6793326, at *8 (finding the adequacy requirement satisfied given the plaintiffs' active involvement in reviewing case documents, communicating with class counsel, and participating in discovery, despite minor missteps such as being unaware of the name of their expert). Similarly, Brooks's accidental omission of some transactions from her initial certification does not disqualify her. *See id.*; *see also In re SLM Corp. Sec. Litig.*, No. 08 CIV. 1029 WHP, 2012 WL 209095, at *8 (S.D.N.Y. Jan. 24, 2012) ("Courts routinely reject criticisms based on errors in certifications, particularly where there is no evidence of bad faith or intent to deceive").

Finally, Defendants' concerns about litigation costs and lack of coordination between Plaintiffs are misplaced. This Court must approve any attorneys' fees awarded and will consider issues concerning fees before doing so. *See Beach v. Healthways, Inc.*, No. 3:08-0569, 2010 WL 1408791, at *5 (M.D. Tenn. Apr. 2, 2010). As to lack of coordination, Defendants rely on cases considering the appointment of Lead Plaintiff under the PSLRA, not class certification. *See*, *e.g.*, *Owens v. FirstEnergy Corp.*, No. 2:20-CV-03785, 2020 WL 6873421, at *13 (S.D. Ohio Nov. 23, 2020). Moreover, Plaintiffs worked together to move for class certification; Crain and Brooks filed their initial class certification motion without Universal only "to meet the Court-ordered deadline in the event the Court did not grant Universal's request for an extension." (Ord. Denying Mot. to Compel, ECF No. 124, 5).

Under the Sixth Circuit standard, "[t]o satisfy the adequacy test, the named representative of a class need only be adequate and need not be the best of all possible plaintiffs." *Ballan v. UpJohn, Co.*, 159 F.R.D. 473, 482 (E.D. Mich. 1994). Plaintiffs meet the Rule 23(a) adequacy requirement.

## B. Rule 23(b) Requirements for Class Certification

Plaintiffs seek to certify this class under Rule 23(b)(3). Accordingly, this Court must assess whether: (1) questions of law or fact common to members of the class predominate over questions affecting individual members; and (2) the class action is a superior method to others for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3).

### 1. Predominance

#### a. Plaintiffs' Arguments

Plaintiffs contend that common questions predominate because all claims are based on the same alleged course of conduct and can be proven based on common evidence. The § 10(b) claims depend on common questions as to whether Defendants made material misrepresentations or omissions with the requisite scienter and whether those statements caused losses. Further, Plaintiffs argue that reliance on Defendants' misrepresentations or omissions is a common question because it depends on the fraud-on-the-market presumption set out in *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988). In response to Defendants' arguments, Plaintiffs contend that their out-of-pocket damages method matches their theory of liability and that the method is the standard measurement of damages for Exchange Act claims.

#### b. Defendants' Arguments

Defendants challenge whether Plaintiffs have proposed a damages model that meets the requirements of *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). Defendants contend that

Plaintiffs' model does not measure damages attributable to their theory of liability. Defendants also argue that the alleged misrepresentations do not match the corrective disclosures, preventing Plaintiffs from demonstrating artificial inflation. Defendants also contend that constant percentage or constant dollar inflation methods are inconsistent with the theory of liability. Finally, Defendants argue that an options class fails predominance for the same reasons as the common stock class.

### c. The Court's Analysis

To obtain class certification, Plaintiffs must show that common questions of fact or law predominate over individual questions. Fed. R. Civ. P. 23(b)(3). The Sixth Circuit has observed that "[t]o satisfy the predominance requirement in Rule 23(b)(3), a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof." *Bridging Communities Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1124–25 (6th Cir. 2016) (quoting *Beattie*, 511 F.3d at 564). "In securities class action cases, the crucial requirement for class certification will usually be the predominance requirement of Rule 23(b)(3)." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014) ("*Halliburton II*").

As the Supreme Court instructed, "[c]onsidering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton*, 563 U.S. 804, 810 (2011) ("*Halliburton I*"). A claim based on violations of § 10(b) and Rule 10b–5 requires proof of: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* at 810 (internal

quotation marks and citations omitted). Plaintiffs' claims for control liability under § 20(a) and for insider trading liability under § 20A require a predicate violation of the Exchange Act or its rules and regulations, here the alleged violation of § 10(b) and Rule 10b-5. *Ross v. Abercrombie & Fitch Co.*, 501 F. Supp. 2d 1102, 1119 (S.D. Ohio 2007); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 599 (S.D. Tex. 2003) (citing 15 U.S.C. § 78t–1(a)). The control liability claims also require proof of, at minimum, "the practical ability to direct the actions of the people who committed the violation." *In re Nat'l Century Fin. Enters., Inc.*, 504 F. Supp. 2d 287, 300 (S.D. Ohio 2007) (internal quotation marks and citation omitted). The insider trading claims require a showing that the plaintiff purchased the securities contemporaneously with the insider defendant's sale. *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 599 (S.D. Tex. 2003).

Loss causation, scienter, and whether a statement or omission was material, misleading, or false are common questions to the class. *Amgen, Inc.*, 568 U.S. at 467–70, 475. Additionally, the § 20(a) control issue presents a common question. Individual proof may be needed to show a contemporaneous purchase under § 20A, but this can be accomplished through trading records— the same proof required to show class membership. Accordingly, this Court analyzes whether Plaintiffs and the proposed class are entitled to the fraud-on-the-market presumption for reliance and whether Plaintiffs' proposed damages methodology can calculate class-wide damages.

### *(1) Reliance*

Reliance is a common question when it turns on the fraud-on-the-market presumption. *Basic*, 485 U.S. at 241; *Amgen, Inc.*, 568 U.S. at 462–63. To invoke the presumption, a plaintiff must show: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock

between the time the misrepresentations were made and when the truth was revealed." *Halliburton II*, 573 U.S. at 268. The plaintiff need not prove materiality at the class-certification stage because materiality is a common question that can be resolved on a class-wide basis and is an essential element of a § 10-b claim. *Amgen, Inc.*, 568 U.S. at 459.

Defendants do not submit an argument as to reliance. This Court finds, and Defendants do not dispute, that the allegations were publicly known, and that Plaintiffs and the proposed class traded securities during the relevant time. This Court also finds that Upstart common stock and options traded in efficient markets. This Court looks to the following five-factor inquiry to determine market efficiency:

> (1) a large weekly trading volume; (2) the existence of a significant number of reports by securities analysts; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S–3 Registration Statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases.

*See Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990) (citing *Cammer*, 711 F. Supp. 1264, 1286–87 (D.N.J. 1989)). Upstart common stock and options had high trading volume, analyst coverage, and were listed on the NASDAQ and the Chicago Board Options Exchange. (Cain Rep., ECF 102-4, 13–23). Upstart became eligible to file an S-3 Registration Statement during the class period. (*Id.*). Finally, Plaintiffs' expert conducted an event study that demonstrated that the release of Upstart specific information caused changes in price. (*Id.* at 23–31). Accordingly, reliance is a common question because the fraud-on-the-market presumption hinges on materiality. *Amgen, Inc.*, 568 U.S. at 462–63, 467–70.

*(2) Damages*

Under *Comcast*, plaintiffs seeking certification of a damages class must show that "damages are capable of measurement on a class-wide basis" and provide a model that "measure[s]

only those damages attributable to [their] theory [of liability]." *Comcast*, 569 U.S. at 34–35. This holding, however, "breaks no new ground on the standard for certifying a class action." *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 860 (6th Cir. 2013). Further, *Comcast* does not apply "[w]here there is no chance of aggregated damages attributable to rejected liability theories[.]" *In re VHS of Mich., Inc.*, 601 F. App'x 342, 344 (6th Cir. 2015).

Plaintiffs' proposed methodology meets *Comcast*. Plaintiffs have a single theory of § 10(b) liability: that Defendants made material misrepresentations and omissions that artificially inflated the price of Upstart securities during the class period. (*See* Op. & Ord., ECF No. 68, 40). Plaintiffs propose the "out-of-pocket" methodology to calculate damages attributable to this theory of liability. (Cain Rep., ECF No. 102-4, 44). Under this formula, each individual plaintiff's damages equal the artificial inflation caused by the misrepresentations at the time of purchase minus the artificial inflation at the time of sale. Because the Upstart securities traded in efficient markets, artificial inflation at any given time can be calculated class-wide using event studies. (*Id*. at 47). The formula requires individual inputs only as to transaction data, such as dates and prices for purchases and sale. Accordingly, Plaintiffs' "proposed measure for damages is . . . directly linked with their underlying theory of classwide liability" and therefore meets *Comcast*. *Tivity Health, Inc.*, 334 F.R.D. at 137 (quoting *Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017)). The out-of-pocket damages model "is the standard measurement of damages in Section 10(b) securities cases . . . *Comcast* did not change this." *Id*. (internal citations omitted).

Defendants also argue that "constant percentage" or "constant dollar" inflation methods are inconsistent with Plaintiffs' theory of liability. But Plaintiffs' expert does not assume that the "constant percentage" or "constant dollar" methods will be appropriate. (Cain Rep., ECF No. 102-4, 46). Plaintiffs' expert notes that the evidence may show varied rates of artificial inflation and

that, if so, the variance can be incorporate into the damages model. (*Id*.). More is not required at the class certification stage. *Tivity Health, Inc.*, 334 F.R.D. at 138 (citing *Waggoner*, 875 F.3d at 106).

Defendants' other arguments go to loss causation rather than the predominance of common questions. *See Halliburton I*, 563 U.S. at 812–13 (holding that plaintiffs need not prove loss causation at the class certification stage). Defendants assert that the mismatch between the alleged misrepresentations and corrective disclosures means that the price drop following the latter cannot show artificial inflation due to the former. This argument raises a common question as to whether there is any mismatch between the statements and disclosures. Defendants also contend that Plaintiffs' model fails to account for changing macroeconomic and business conditions. But Plaintiffs' expert notes that the damages formula may require disaggregating confounding information. (Cain Rep., ECF No. 102-4, 45). At most, Defendants' argument raises a common question as to whether the alleged misstatements or macroeconomic and business conditions caused changes in price.

Finally, Defendants contend that the class should not be certified for options traders because Plaintiffs' expert has not explained how he would calculate expected volatility to determine the artificial inflation in options pricing. At most, this raises a common question as to whether Plaintiffs and the proposed class can prove damages from options trading with reasonable certainty.

### 2. Superiority

Plaintiffs argue that the superiority requirement is met because individual class members' interests in prosecuting separate actions are minimal, this is a consolidated case, and this Court is handling the related shareholder derivative suit. Additionally, while class members are

geographically dispersed, Upstart is co-headquartered in this District.  Defendants do not provide argument on this element.

This Court's consideration of superiority concerns whether a class action is the superior means of adjudication.  *Bentley v. Honeywell Int'l, Inc.*, 223 F.R.D. 471, 488 (S.D. Ohio 2004). The superiority requirement "aims to achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  *Martin v. Behr Dayton Thermal Prod. LLC*, 896 F.3d 405, 415 (6th Cir. 2018) (internal quotations omitted).  Rule 23(b)(3) lists four factors to be considered in determining the superiority of proceeding as a class action compared to other methods of adjudication: (1) the interests of the members of the class in individually controlling the prosecution of separate actions; (2) the extent and nature of other pending litigation about the controversy by members of the class; (3) the desirability of concentrating the litigation in a particular forum; and (4) the difficulties likely to be encountered in management of the class action.  Fed. R. Civ. P. 23(b)(3); *Myers*, 2018 WL 4932087, at *9.

This Court finds that a class action is the superior litigation method here.  This case is complex, and each individual class member's potential recovery is small.  Accordingly, class members have minimal interest in prosecuting separate actions.  *See Dougherty*, 2020 WL 3481322, at *9; *Pipefitters Loc. 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 654 F.3d 618, 631 (6th Cir. 2011) ("small awards weigh in favor of class suits").  Further, this proceeding is a consolidated case and the related shareholder derivative suit is before this Court.  Additionally, Upstart is co-headquartered in Columbus, Ohio.  This Court sees no particular difficulties in management of this litigation as a class action.  *See Ross*, 257 F.R.D. at 455 ("It is well-recognized

that class actions are a particularly appropriate means for resolving securities fraud actions"). Accordingly, the superiority requirement is met.

### 3. *Ascertainability*

The parties do not brief ascertainability.  The Sixth Circuit has held ascertainability to be an "implicit requirement" of class certification, at least for a Rule 23(b)(3) class.  *Cole*, 839 F.3d at 541–42.  To meet the ascertainability requirement, the class description must be "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member."  *Id*. at 541.  This determination "requires only the existence of objective criteria upon which class membership is based." *McNamee v. Nationstar Mortg., LLC*, No. 2:14-cv-1948, 2018 WL 1557244, at *4 (S.D. Ohio, Mar. 30, 2018) (citing *Young*, 693 F.3d at 538–39).

This Court finds that Plaintiffs' class description is sufficiently definite.  It is administratively feasible to determine objectively whether a potential class member purchased or otherwise acquired Upstart stock or exchange-traded call options, or sold exchange-traded put options during the proposed class period.  Therefore, the ascertainability requirement is met.

\*\*\*

For the foregoing reasons, Plaintiffs and the proposed class meet the requirements of Rule 23(a) and Rule 23(b)(3).

### C.  Appointing Class Counsel under Rule 23(g)

Plaintiffs request that this Court appoint Motley Rice LLC and Robbins Geller Rudman & Dowd LLP as Class Counsel.  Defendants do not contest Plaintiffs' request under Rule 23(g).  This Court considers Defendants' arguments under the adequacy element of Rule 23(a) as relevant here.

In appointing class counsel under Rule 23(g), the Court must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's relevant experience and knowledge of applicable law; and (iii) the resources that counsel will commit to representing the class. Fed R. Civ. P. 23(g)(1)(A).

This Court finds that proposed class counsel have demonstrated efforts prosecuting Plaintiffs' claims, shown in part through their work drafting the complaint and opposing Defendants' motion to dismiss.  For the reasons stated above in the adequacy analysis, proposed class counsel have the knowledge, experience and resources to litigate this matter effectively. Accordingly, this Court finds that proposed class counsel are qualified under Rule 23(g).  This Court hereby appoints Motley Rice LLC and Robbins Geller Rudman & Dowd LLP as Class Counsel.

## IV.  CONCLUSION

For the foregoing reasons, this Court **GRANTS** Plaintiffs' Motion for Class Certification. (ECF No. 100).  This Court **CERTIFIES** the following Class under subsection 23(b)(3) of the Federal Rules of Civil Procedure:

> All persons and entities who purchased or otherwise acquired Upstart Holdings, Inc. ("Upstart" or the "Company") common stock or exchange-traded Upstart call options, or who sold exchange-traded Upstart put options (together, the "Securities"), between December 16, 2020, and November 8, 2022, inclusive (the "Class Period").  Excluded from the Class are: (i) Defendants; (ii) the officers and directors of Upstart at all relevant times; and (iii) members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

In addition, this Court **APPOINTS** Lead Plaintiff Universal-Investment-Gesellschaft mbH and plaintiffs Kathy Brooks and Kevin Crain as Class Representatives and **APPOINTS** Motley Rice LLC and Robins Geller Rudman & Dowd LLP as Class Counsel.

**IT IS SO ORDERED.**

_____
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED:  March 27, 2025**