**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ***In re*** **UPSTART HOLDINGS, INC. SECURITIES LITIGATION.** | : | **Case No. 2:22-cv-02935** |
| | : | **Judge Algenon L. Marbley** |
| | : | **Magistrate Judge S. Courter Shimeall** |

**OPINION & ORDER**

This matter comes before this Court on Defendants Daniel S. Loeb, Third Point LLC, Third Point Ventures LLC (all together "Third Point Defendants") and Defendant Robert Schwartz's Motion to Dismiss Plaintiffs' First Amended Consolidated Complaint ("FAC") (ECF No. 165). (ECF No. 170-1). This Court also considers Plaintiffs' Motion to Strike or, in the Alternative, for Leave to File a Sur-Reply. (ECF No. 177). For the reasons set forth below, Mr. Schwartz and the Third Point Defendants' Motion to Dismiss is **GRANTED in part and DENIED in part** and Plaintiffs' Motion to Strike or, in the Alternative, for Leave to File a Sur-Reply **is GRANTED in part and DENIED in part**.

## I. BACKGROUND

This case is a consolidated action for various securities cases regarding Upstart Holdings, Inc. Plaintiffs, Universal-Investment-Gesellschaft mbHaft, ("Universal" or "Lead Plaintiff"), Kevin Crain, and Kathy Brooks (all together "Plaintiffs") filed their First Amended Consolidated Class Action Complaint on September 30, 2025. (ECF No. 165). They bring this action on behalf of themselves individually and on behalf of all other persons and entities similarly situated who

purchased or acquired Upstart securities between December 16, 2020, and November 8, 2022 (the "Class Period"), and were damaged thereby. (*Id.* at 1).

**A. Consolidated Complaint and Procedural History**

This Court previously set out the facts of this case in detail in its September 29, 2023, and its September 29, 2025, Opinion & Orders. (ECF Nos. 68, 163). This Court restates and supplements the facts as relevant here.

In December 2020, Upstart Holdings, Inc. ("Upstart"), a consumer lending startup completed its initial public offering at $20.00 per share. (ECF No. 45 ¶ 83). Upstart touted its "cloud-based AI lending platform" which connects prospective borrowers seeking personal loans with Upstart's various bank partners. (*Id.* ¶ 22). The AI lending platform evaluates prospective borrowers, decides whether to issue a loan, and determines at what rate to issue the loan. (*Id.* ¶¶ 3, 58). Upstart's bank partners pay Upstart a referral fee to use the platform, are responsible for originating the loans, and then typically hold onto the originated loans, or exercise their option to sell undesired loans back to Upstart. (*See id.* ¶¶ 61–64, 66). In theory, this setup was thought to provide substantial value to everyone involved. Upstart claimed that its AI underwriting model would generate "better" loans for Upstart's bank partners than traditional FICO-based models—with "higher approval rates and lower interest rates at the same loss rate." (*Id.* ¶ 126). It would also insulate Upstart from the credit risk associated with the loans themselves, since Upstart would simply facilitate lending between borrowers and its banking partners, without holding any long-terms loans on its balance sheet. (*Id.* ¶¶ 3, 60, 63).

In less than a year following the IPO, Upstart's stock rose to a peak of $401.49; early investors-— including the investment firm, Third Point LLC ("Third Point")— executives, and shareholders reaped immense profits by selling high. (*Id.* ¶¶ 97, 275). But when increased interest rates

hampered demand for loans, Upstart's business flagged, and it faced a precipitous increase in loans retained on its balance sheet. (*See id.* ¶ 298). By November 2022, its stock had dropped to $19.04 per share, and investors who bought in during the fall of 2021 were left with massive losses. (*See id.* ¶¶ 307–08).

*1. Consolidated Complaint*

On December 5, 2022, Plaintiffs filed the Consolidated Complaint on behalf of themselves and all persons who purchased or otherwise acquired Upstart securities between December 16, 2020, and November 8, 2022. (ECF No. 45 ¶ 1). Plaintiffs alleged violations of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. §§ 77a–78pp, and the regulations promulgated thereunder, against Defendants Upstart; David J. Girouard, cofounder and chief executive officer ("CEO") of Upstart and chair of its board; Sanjay Datta, the chief financial officer ("CFO") of Upstart; Paul Gu, co-founder and Senior Vice President of Product and Data Science of Upstart and a member of its board of directors; Anna Counselman, co-founder and Senior Vice President of People and Operations at Upstart; Third Point; Third Point Ventures LLC, the Menlo Park-based venture capital arm of Third Point; Daniel S. Loeb, the CEO of Third Point; and Robert Schwartz, the Managing Partner of Third Point Ventures and a former member of the Upstart Board. The Complaint included three counts: (1) violations of § 10(b) of the Exchange Act and SEC Rule 10b-5 against all defendants; (2) violations of § 20(a) of the Exchange Act against Girouard, Gu, Counselman, Datta, Schwartz, Third Point, and Third Point Ventures; and (3) violations of § 20A of the Exchange Act against Girouard, Gu, Counselman, Third Point, Third Point Ventures, and Loeb. (ECF No. 45).

According to the Consolidated Complaint, the Upstart and Third Point Defendants made dozens of allegedly false and misleading statements during the Class Period that violated Section

10(b)/Rule 10b-5. Plaintiffs also alleged that the Defendants employed a fraudulent scheme based in part on their misleading statements, to defraud Upstart shareholders. The Complaint also provided that the Third Point Defendants were major investors in Upstart's early operations, wielding major influence over Upstart. (ECF No. 45 ¶¶ 6, 316). Additionally, Plaintiffs allege that the Third Point Defendants and Schwartz were deeply entangled with Upstart's day-to-day operations. (*Id.* ¶¶ 72, 316, 332). This included Upstart's involvement in "organizational development," "go-to-market strategies," "tech focus," staffing, "talent acquisition," "go-to-market strategies," and "capital markets strategy." (*Id.* ¶¶ 68–70, 316). Plaintiffs also alleged that the Third Point Defendants' structured credit team was "instrumental in evaluating Upstart's loan and securitization products" and were further involved in Upstart's business as a major funder of Upstart loans, providing well over $1 billion in funds from 2017 through 2021. (*Id.* ¶ 316).

Plaintiffs further asserted that Schwartz and Third Point Ventures were critical partners, who helped Upstart to transform from an early-stage startup to a market leader prepared for success at the next level. (*Id.* ¶¶ 68, 316). Most notably, however, were Plaintiffs allegations that Third Point wielded power over Upstart through Schwartz's position on the Upstart Board. (*Id.* ¶¶ 6, 67, 261). While Plaintiffs alleged that Schwartz made materially false and misleading statements in signing Upstart's IPO Form S-1, Upstart's SPO Form S-1, and Upstart's 2020 Form 10-K, the Consolidated Complaint contained no allegations that Third Point was the "maker" of such statements. (*Id.* ¶¶ 50, 124, 135, 141).

*2. Dismissal of Third Point Defendants*

On February 24, 2023, both the Upstart Defendants and the Third Point Defendants moved to dismiss the Consolidated Complaint. (ECF Nos. 58, 60). On September 29, 2023, this Court

granted the motion to dismiss as to the Third Point Defendants and granted in part and denied in part the motion to dismiss as to the Upstart Defendants. (ECF 68 at 56).

This Court found that, with respect to the Third Point Defendants' liability under § 10(b) of the Exchange Act and Rule 10b-5, Plaintiffs securities fraud and scheme liability claims failed. Specifically, this Court found that the Third Point Defendants could not be subject to liability for false or misleading statements, which is limited to the "maker" such statements. (*Id.* at 17-20). Because Plaintiffs' allegations against the Third Point Defendants relied on Schwartz's statements and thus, on Schwartz being classified as a Third Point Defendant, Third Point could not be held liable. (*Id.* at 18-19). Moreover, this Court noted that Schwartz's actions as a director of Upstart could not be conflated with his role as a Third Point employee—unless he was violating his fiduciary duties to Upstart and acting on behalf of Third Point while carrying out his Upstart director duties. (*Id.* at 19). The Complaint, however, lacked any allegations that Schwartz breached his fiduciary duties to Upstart. Accordingly, this Court categorized Schwartz as an Upstart Defendant and not as a Third Point Defendant. As such, this Court reasoned that none of the Third Point Defendants was adequately alleged to have "made" any of the challenged statements; thus, there was no basis for sustaining a misstatement claim against them. (*Id.* at 17-20).

As to scheme liability, this Court found that Plaintiffs' allegations suggested only that the Third Point Defendants aided and abetted the deceptive scheme, and not that their actions were themselves deceptive. (*Id.* at 51). Hence, this Court reasoned that Plaintiffs also failed to state a claim against Third Point under Rule 10b-5(a) and (c). (*Id.* at 52).

In addition, Plaintiffs brought claims under § 20(a) of the Exchange Act for control liability and a claim for contemporaneous trading liability pursuant to Section 20A of the Exchange Act against the Third Point Defendants. As for § 20(a) control liability, this Court explained that

Plaintiffs failed to plead allegations giving rise to a "reasonable inference" that the Third Point Defendants possessed "the power to direct or cause the direction of the management and policies of" the Upstart Defendants. (*Id.* at 54). As to Plaintiffs' Section 20A claim, this Court reasoned that without a predicate securities violation, Plaintiffs' Section 20A claim against the Third Point Defendants failed. (*Id.* at 54-56). This Court, thereafter, granted the Third Point Defendants' Motion to Dismiss (ECF No. 60), resulting in the dismissal of all claims asserted against them, however, Schwartz remained in this case as an Upstart Defendant.

Subsequently, on March 27, 2025, this Court certified the following class under subsection 23(b)(3) of the Federal Rules of Civil Procedure:

> All persons and entities who purchased or otherwise acquired Upstart Holdings, Inc. ("Upstart" or the "Company") common stock or exchange-traded Upstart call options, or who sold exchange-traded Upstart put options (together, the "Securities"), between December 16, 2020, and November 8, 2022, inclusive (the "Class Period"). Excluded from the Class are: (i) Defendants; (ii) the officers and directors of Upstart at all relevant times; and (iii) members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

(ECF No. 157 at 25).

*3. Motion For Leave to Amend*

On December 6, 2024, Plaintiffs filed a Motion for Leave to File a First Amended Complaint. (ECF No. 130). The First Amended Complaint renames the Third Point Defendants in this case and, characterizes Defendant Schwartz as a "Third Point Defendant" rather than an "Upstart Defendant." (*Id.*). Plaintiffs explained to this Court that on December 12, 2023, a non-party subpoena was issued by Plaintiffs to Third Point containing sixteen broad requests for documents and information. (ECF Nos. 147-3 at 6; 130-1 at 2–4). Plaintiffs also sent separate requests for production as to Defendant Schwartz. (*Id.*). Plaintiffs contended that the documents produced demonstrate that Schwartz routinely violated his fiduciary duties to Upstart by disclosing material nonpublic information ("MNPI") to the Third Point Defendants. Plaintiffs

therefore sought to amend its Consolidated Complaint to allege additional facts and prosecute their claims against the Third Point Defendants.

On September 29, 2025, this Court granted Plaintiffs' Motion to for Leave to File the First Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a)(2). (ECF No. 163). This Court reasoned that Plaintiffs "now go beyond their previously rejected theory… [and] allege, in detail, that Schwartz repeatedly violated Upstart's internal policies and his fiduciary obligations by transmitting material nonpublic information ("MNPI") to Third Point to facilitate its trading activity." (*Id.* at 14). Specifically, this Court found that the amendment contained new allegations for: "(i) insider trading claims under §10(b) of the 1934 Act (15 U.S.C. §78j(b)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5) against Third Point Defendants and Schwartz; (ii) liability pursuant to the doctrine of respondeat superior against Third Point Defendants based on Schwartz's violations of §10(b) of the 1934 Act and Rule 10b-5; (iii) control person claims against Third Point Defendants related to violations of the 1934 Act; (iv) insider trading claims under §20A of the 1934 Act (15 U.S.C. §78t-1) against Third Point Defendants and Schwartz; and (v) a supplement to the scheme liability claim against Third Point Defendants." (*Id.* at 13).

As such, this Court determined that such additional allegations taken as true, cure the previous deficiencies and support the reasonable inference that Schwartz acted on Third Point's behalf, in breach of his fiduciary duties to Upstart, to benefit Third Point's investment strategy. (*Id.* at 15–16). On September 20, 2025, Plaintiffs filed the First Amended Consolidated Complaint. (ECF No. 165). This Court summarizes the relevant factual allegations below.

### B. First Amended Consolidated Complaint

#### *1. The Relationship Between Upstart and Third Point*

Defendant Third Point LLC ("Third Point") is a New York based investment adviser to a variety of managed accounts and hedge funds. (*Id.* ¶ 42). Third Point Ventures LLC is the venture capital arm of Third Point LLC through which Third Point became an early investor in Upstart. (*Id.* ¶¶ 43, 45). In early 2015, Third Point led Upstart's Series C funding round. (*Id.* ¶ 71). Plaintiffs allege that as result of these early and foundational investments, Upstart offered Robert Schwartz, a Managing Partner of Third Point Ventures, a seat on Upstart's eight-person board.[1] (*Id.* ¶¶ 52, 71). At the time of Upstart's IPO, Schwartz was an Upstart director and signed the IPO Form S-1 filed on December 9, 2020, the Company's April 6, 2021, SPO Form S-1, and the 2020 Form 10-K, filed on March 18, 2021. (*Id.* ¶53). Plaintiffs contend that all three documents contained false and misleading statements. (*Id.*). As Plaintiffs allege, Schwartz was also involved in the timing of Upstart's IPO and communicated with Goldman Sachs to persuade earlier timing of the IPO. (*Id.*).

According to Plaintiffs', as part of Schwartz's role as a Third Point Managing Partner, it was expected that he be devoted to Third Point, and he was not to engage in any other business activity. Specifically, Schwartz's employee agreement noted that he was to "devote substantially all of [his] business time and attention to the business and affairs of Third Point, to use [his] best efforts to perform faithfully and efficiently such responsibilities, and not to engage in any other business activity." (*Id.* ¶55). Accordingly, Plaintiffs reason that Schwartz's presence on the Upstart Board activities was geared for the benefit of Third Point. (*Id.*). Such was evidenced by Schwartz winning August 2021, employee of the month, in relation to his work on the Upstart investment. In an emailing congratulating Schwartz, Loeb wrote: "Congratulations Robert Schwartz! Third

[1] Schwartz served as a member of Upstart's Board of Directors from approximately June 2015 until his resignation in November 2021. (ECF No. 165 ¶ 52).

Point Employee of the Month August 2021! . . . UPST up 89.7%." (*Id.*). Plaintiffs also contend that Schwartz's efforts did not only benefit Third Point, as Schwartz's own bonus was tied to the aggregate performance of Third Point's investment in Upstart. (*Id.* ¶ 56).

Additionally, Daniel S. Loeb, the CEO of Third Point, was named a reporting person on the Form 3 and Forms 4 filed with the SEC, disclosing the sales and holdings of Upstart common stock by Third Point Ventures and other Third Point related funds. (*Id.* ¶ 49). As such, Plaintiffs contend that Loeb may be deemed a "beneficial owner" of the securities beneficially owned by Third Point and its related funds. (*Id.*). Plaintiffs also allege that "Loeb also issued and signed quarterly letters to Third Point's clients which made clear that the investments in Upstart were Third Point's own." (*Id.* ¶ 50).

By the time of Upstart's IPO, entities affiliated with Third Point Ventures owned 19.3% of Upstart's common stock and purchased an additional $24 million in the December 2020 IPO, totaling over $66 million worth of Upstart stock combined. (*Id.* ¶¶ 46–47, 71, 74). By May 2021, Third Point held its largest position in Upstart, totaling around $1.2 billion. (*Id.* ¶ 74). In a May 6, 2021, letter, Loeb and Third Point reflected on Third Point's investments, noting that "We sat on their boards throughout their journey from start-ups to mature businesses, adding value in a variety of areas from talent acquisition to go-to-market strategies to navigating capital markets." (*Id.*).

*2. Schwartz Breached His Fiduciary Duties to Upstart*

According to Plaintiffs, Schwartz's position on the Upstart Board was strategically orchestrated and placed him and Third Point in a unique position to capitalize on material non-public information for gain of Third Point. (*Id.* ¶ 116). Schwartz on multiple occasions forwarded monthly updates from Upstart CEO David Girouard which included material, nonpublic information that Schwartz only had access to given his status as an Upstart Board Member. (*Id.* ¶

54). These updates gave Third Point an inside look at the data reflecting the soon to be detrimental growth in loans on Upstart's balance sheet before the public became privy to such information. (*Id.* ¶¶ 15, 130). As alleged, Schwartz repeatedly shared information from Upstart Board materials, and discussions with Upstart executives, to Third Point to build its valuation model and to aid its Upstart investment strategy. (*Id.* ¶ 54). Schwartz also informed Loeb that Third Point's valuation model was "more informed than any outsider could produce." (*Id.* ¶¶ 54, 130).

Schwartz was cognizant of and touted his unique positioning inside Upstart. In November 2021, Schwartz emailed Lobe stating, "I'm on the Board and responsible for this investment." (*Id.* ¶ 55). Similarly, in a May 2021 email, he remarked to a Third Point employee, "I own the position. I'm on the board. I'm trying to be as clear as I possibly can be here. You're not the analyst on this position which is the largest one in the firm. You're just supporting me with analyst work." (*Id.*).

Plaintiffs additionally note that all of Schwartz's conduct during the Class Period was in violation of the various Upstart company policies that applied to all board members.[2] (*Id.* ¶ 117). First, Upstart maintained a Code of Ethics, applying to "all directors, officers and employees (who, unless otherwise specified, will be referred to jointly as 'employees') of Upstart Holdings, Inc." which prohibited the use of "corporate property, information or position for personal gain," and stated in relevant, part:

> Employees must maintain the confidentiality of information about the Company and other companies entrusted to them by the Company, use the information only for permissible business purposes and in accordance with any restrictions imposed by the disclosing party, and limit dissemination of the confidential information, both inside and outside the Company, to

[2] The First Amended Complaint also includes allegations that Third Point violated §204A of the Investment Advisers Act by failing to establish and maintain a written code of ethics requiring its employees and officers to comply with applicable federal securities laws or did not enforce its Policy. (*Id.* ¶¶ 124–128). Plaintiffs reference a Third Point document titled "Detection and Prevention of Insider Trading," but note that there is no effective date on the Policy nor indication that Schwartz ever saw the Policy. (*Id.* ¶ 125). According to Plaintiffs', even if the Policy was in effect during the Class Period, Third Point violated these policies repeatedly as indicated by Third Point CEO, Loeb, stating in an email to the Third Point GC and COO that "[Schwartz] is on the board so we have proprietary information which you can and should use." (*Id.*).

> people who need to know the information for business purposes and who are bound by similar obligations of confidentiality, unless disclosure is authorized or legally mandated.

(*Id.* ¶118).

Second, Upstart maintained an Insider Trading Policy which provided in relevant part:

> If you are in possession of material nonpublic information about the Company, you are prohibited from:
>
> a. using it to transact in securities of the Company;
> b. disclosing it to other directors, officers, employees, consultants, contractors, agents or other service providers whose roles do not require them to have the information;
> c. disclosing it to anyone outside the Company including family, friends, business associates, investors or consulting firms, without prior written authorization from the Responsible Officer; or
> d. using it to express an opinion or make a recommendation about trading in the Company's securities.

(*Id.* ¶ 120).

The Policy also defines material information as "information that a reasonable investor would be substantially likely to consider important in deciding whether to buy, hold or sell securities of the Company or view as significantly altering the total mix of information available in the marketplace about the Company as an issuer of the securities." (*Id.* ¶121). The Policy provides examples of material information, including: "financial results, key metrics, financial condition, earnings pre-announcements, guidance, projections or forecasts, particularly if inconsistent with the Company's guidance or the expectations of the investment community;" "business plans or budgets;" "significant information relating to the Company's platform and AI models, such as new products or services, major modifications or performance issues or other announcements of a significant nature;" "major events involving the Company's securities, including calls of securities for redemption, adoption of stock repurchase programs, option repricings, stock splits, changes in dividend policies, public or private securities offerings, modifications to the right of security

holders or notice of delisting;" and "significant corporate events, such as a pending or proposed merger, joint venture or tender offer, a significant investment, the acquisition or disposition of a significant business or asset or a change in control of the Company." (*Id.*).

Additionally, Upstart adopted a Regulation FD Policy intended "to direct and inform how you as a director, officer, employee, consultant, contractor or agent (each an 'Insider') of the Company communicate with the media, investment community (including analysts and institutional and individual stockholders) and other third parties who are not bound by a duty of confidentiality to the Company." (*Id.* ¶ 123). Moreover, the Policy explains that the Policy is violated when an individual, who is unauthorized to speak on behalf of Upstart: (1) discloses MNPI to anyone outside the company; (2) provides selective guidance to third parties regarding Upstart's internal projections, transactions, or metrics; or (3) comments on whether people should buy or sell Upstart's stock. (*Id.*).

Plaintiffs allege that Schwartz repeatedly violated Upstart's policies and breached his fiduciary duties beginning prior to Upstart's IPO and did so throughout his entire tenure on the Upstart Board. (*Id.* ¶ 130). And did so knowingly based on his statements that Third Point's financial model, produced with MNPI gained by Schwartz, was "more informed than any outsider could produce." (*Id.*). Moreover, various emails by Schwartz to Third Point colleagues noted that the content he was sharing was "very confidential reference materials," "very, very sensitive of course," and one email specifically noted that it contained "mnpi." (*Id.*). In Plaintiff's view, such disclaimers represent knowledge, or at minimum, a reckless disregard by Schwartz and the Third Point Defendants that the information discussed was material, non-public information. (*Id.* at ¶¶ 389, 391, 409).

Plaintiffs first point to a January 6, 2021, email from Schwartz to two Third Point analysts attaching documents named "Board Meeting Materials – December 18, 2020" and "Analyst Day Deck (2020.10.16) vF," which stated, "Here are some very confidential reference materials that might help us to build a deck." (*Id.* at ¶ 131). From January 2021 to August 2021, Schwartz continued exchanging similar emails with his Third Point colleagues. In these emails, Schwartz funneled information that aided Third Point's financial model and investment strategy regarding Upstart. The First Amended Complaint provides the following additional examples:

- On January 19, 2021, Schwartz emailed Loeb and other Third Point that "We are discussing a potential strategic small acquisition in the auto segment on Monday evening. I'll let everyone know about that as soon as the Board meets to discuss." (*Id.* at ¶ 135).
- On January 21, 2021, Schwartz emailed Upstart CFO Sanjay Datta, inquiring "I have to build a model internal to TP. Do we have a best guess long range financial plan?" (*Id.* at ¶ 138).
- On January 22, 2021, Schwartz emailed two Third Point Analysts with the subject line "Upstart Confidential 3yr Plan" and wrote "Please see attached from company. This is as far out as they've provided. I suppose we could straight line project another year ourselves." (*Id.* at ¶ 136).
- On January 23, 2021, Schwartz sent an email to a Third Point analyst writing "Here is a Board book from mid-December (very, very sensitive of course) but it's chock full of useful info that will help." (*Id.* at ¶ 137).
- On February 1, 2021, Schwartz forwarded Third Point colleagues Upstart Board Meeting Materials from a January 25, 2021 Board meeting in which a not-yet public acquisition of Prodigy, a provider of cloud-based automotive retail software was discussed. The next day, Schwartz looped in Loeb and other Third Point employees noting: "Mosko (heavy lift on model) and I have been working on this and also vetted some model parameters with the company. Further, we attempted to incorporate the impact of a pending acquisition that Upstart is making (under LOI on Prodigy in the Auto segment)." (*Id.* at ¶ 139).
- On March 6, 2021, Loeb emailed Schwartz, Third Point GC and COO Josh Targoff, and two Third Point analysts emphasizing that "Rob [Schwartz] is on the board so we have proprietary information which you can and should use. I know that the q4 should be stronger than 'street' estimates and guidance should be higher. PLUS the pending Prodigy (name of auto lending business) should add a new vertical of sales beyond which is forecast. We need to be in the top 1% of people who know this company and we won't get there simply from Rob relaying anecdotes from the board . . . .I can't stress how important this project is." (*Id.* at ¶ 140).
- Schwartz responded to Loeb's March 6, 2021, email, noting "I pulled the models from inside Upstart to inform our changes to ou[r] model (board materials plus roadshow

materials). We then did a call with the Upstart CFO and head of finance with Janice [Zhang] and vetted our assumptions. Then I weighed in on the assumptions based on my knowledge of the company from the Board level. I would suggest that this modified model is the best information that is possible with the most rational assumptions that can be made at this early date  It's consistent with the best thinking of the Board and CFO of Upstart in these early days of their post IPO growth. I think it is more informed than any outsider could produce." (*Id.* at ¶ 141).

- On March 9, 2021, Schwartz forwarded Upstart's February 2021, financial results and monthly update email which contained the Upstart CEO's impressions and commentary regarding Upstart's financial results and additionally included details such as the amount of loans retained by banks and loan equity. (*Id.* at ¶142).
- On March 11, 2021, Schwartz emailed a Third Point analyst regarding Third Point's Upstart model stating "look at the new guidance I sent you. We need to up the model. Note that the new guidance has $0 for auto in 2021 (but it won't be $0)." (*Id.* at ¶144).
- On March 16, 2021, Schwartz emailed a Third Point analyst writing "See attached (guard this with your life) report from the audit committee of the Upstart board (I am not on that committee). Included are the proforma earnings press release and the draft 10-K. If you look carefully you can find a lot of the details you are looking for re 4Q2020. This will inform the model and be useful generally." (*Id.* at ¶146).
- On April 10, 2021, Schwartz again forwarded Upstart's monthly update email containing Upstart's internal commentary on the Company's March 2021 performance as well as details regarding the loans retained by banks and loan equity. (*Id.* at ¶147).
- On July 11, 2021, Schwartz emailed Third Point colleagues informing them ""By the way, not sure when we will put out the 2Q letter but Upstart (confidentially) is poised to blow away expected 2Q (June) numbers (won't announce until early August though)." (*Id.* at ¶149).
- On August 10, 2021, Schwartz emailed various Third Point executives stating "Note that I expect Upstart to float a $500M-$750M convert[ible bond offering] shortly. They are beefing up the balance sheet for opportunistic investments and M&A." (*Id.* at ¶150).

### 3. *Insider Trading*

Plaintiffs contend that after Schwartz received the August 10, 2021, Upstart monthly update email, reflecting a material increase in loans held on Upstart's balance sheet, Third Point began to sell its investment in Upstart. (*Id.* at ¶¶ 151–153). Specifically, Plaintiffs allege that armed with MNPI reflecting that loan equity at Upstart had grown from $89 million to $94 million in a month's time, Upstart began offloading Upstart stock before the public became privy to this adverse trend. (*Id.* at ¶ 152). As a result, on August 20, August 23, and August 24, 2021, Third Point sold 981,222 shares of Upstart stock, earning $198.2 million in proceeds. (*Id.* at ¶ 153).

Again, in September 2021, Schwartz provided his Third Point colleagues with the Upstart monthly update which documented continued growth in the amount of loans held on Upstart's balance sheet. (*Id.* at ¶ 154). Then on October 18, 2021, Loeb emailed multiple Third Point employees noting that "[w]e have to wait to get Rob off the board to have any flexibility." (*Id.* at ¶ 155). A few weeks later, on November 5, 202, Schwartz again emailed his Third Point colleagues the November Upstart monthly update revealing that Upstart had $228 million in loans on its balance sheet, whereas Upstart's public reporting at this time reflected only $130 million of loans on its balance sheet. (*Id.* at ¶156).

Plaintiffs allege that equipped with inside information that the loans were increasing, Third Point began its final exit strategy. On November 15, 2021, Schwartz resigned from the Upstart Board. That same day, Third Point sold 2,150,000 Upstart shares for proceeds of over $500 million. (*Id.* at ¶157). From that point on, Third Point continued selling its Upstart stock throughout the end of the year, and by December 2021, Third Point had sold a majority of its Upstart stock for over $1.7 billion in proceeds. (*Id.*).

*4. Respondeat Superior Liability*

The First Amended Complaint also includes new allegations of respondeat superior liability, contending that the Third Point Defendants, and Loeb, are vicariously liable as principles for their agent, Schwartz, related to his conduct on the Upstart Board. (*Id.* at ¶ 159). Plaintiffs specifically contend that Schwartz acted on Third Point's behalf while on the Upstart Board and was motivated, at least in part, by his own monetary interests tied to the performance of Third Point's investment in Upstart and his relationship incentive as a Managing Partner in Third Point Ventures. (*Id.* at ¶¶ 160–161; 390). The Complaint classifies Schwartz's conduct of signing registration statements, acting as a board member, and liaising with portfolio companies as within the scope of an agency

relationship between Schwartz and Third Point. (*Id.* at ¶ 162). Moreover, Plaintiffs add that Third Point and Loeb, as experienced investors, knew or had reason to know that Schwartz violated his fiduciary duties to Upstart and its shareholders by feeding material, nonpublic information about Upstart to Third Point. (*Id.* at ¶¶ 390–391). While in possession of this information, Plaintiffs allege that Loeb controlled and influenced Schwartz's provision of Upstart's MNPI and Third Point's transactions in Upstart stock. (*Id.* at ¶ 400).

### C. Post First Amended Complaint Procedural History

On November 14, 2026, the Third Point Defendants, Daniel Loeb, and Robert Schwartz moved to dismiss the First Amended Complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6). (ECF No. 170). That Motion is fully briefed (ECF Nos. 173; 174; 176). After Defendants filed their reply brief, Plaintiffs filed a Motion to Strike or, in the Alternative, for Leave to File a Sur-Reply, (ECF No. 177), which the Third Point Defendants oppose. (ECF No. 178).

These matters are fully briefed and are now ripe for this Court's review.

## II. STANDARD OF REVIEW

### A. Motion to Dismiss for Failure to State a Claim

A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A motion to dismiss pursuant to Rule 12(b)(6) evaluates the sufficiency of the complaint and permits dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Such a motion tests the complaint's cause of action and is "not a challenge to [its] factual allegations." *Golden v. City of Columbus*, 404 F.3d 950, 958–59 (6th Cir. 2005). Thus, in evaluating a Rule 12(b)(6) motion to dismiss, courts "construe the complaint in the light most favorable to the plaintiff, accept [all] allegations as true, and draw all reasonable inferences in [its] favor." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528

F.3d 426, 430 (6th Cir. 2008) (internal quotation marks and citation omitted). This favorable treatment of the complaint applies to well-pleaded factual allegations. Complaints cannot rest on legal conclusions, as "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" are insufficient; similarly, factual assertions cannot rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)). In sum, the facts alleged must be sufficient to "raise a right to relief above the speculative level," such that the complaint states a claim for relief that is "plausible on its face." *Twombly*, 550 U.S. at 555, 570; *Hensley Mfg., Inc. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009).

Beyond the complaint itself, courts may also consider exhibits attached to the complaint, "public records, items appearing in the record of the case and exhibits attached to the defendant's motion so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett*, 528 F.3d at 430.

### B. Pleading Standard for Section § 10(b) Securities Fraud Claims

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, prohibit "fraudulent, material misstatements or omissions in connection with the sale or purchase of a security." *La. Sch. Emp. Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 478 (6th Cir. 2010) (quoting *Frank v. Dana Corp.*, 547 F.3d 564, 569 (6th Cir. 2008)). Rule 10b-5 makes it "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange":

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. Thus, to state a claim for securities fraud in violation of Section 10(b) and Rule 10b-5, the complaint must allege: (1) in connection with the purchase or sale of securities; (2) the misstatement or omission of a material fact; (3) made with scienter; (4) upon which the plaintiff justifiably relied; and (5) which proximately caused the plaintiff's injury. *Newtyn Partners LP v. Alliance Data Sys. Corp.*, 2025 WL 872967, at *10 (S.D. Ohio Mar. 20, 2025) (citing *La. Sch.*, 622 F.3d at 478).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") sets out specific pleading standards for bringing such claims. Where a complaint alleges that a defendant "made an untrue statement of a material fact" or "omitted to state a material fact necessary" to render statements made "not misleading," a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"—i.e., scienter—where a particular state of mind is required. *Id.* § 78u-4(b)(2)(A). A "strong inference" of scienter means that scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

### C. Heightened Pleading Standard for Fraud

The PSLRA does not provide the only pleading standard applicable in securities fraud cases. In general, when a complaint sounds in fraud, it must satisfy a more stringent burden by

"stat[ing] with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This remains the case for securities fraud claims arising under Section 10(b), and the complaint must: (1) "specify the statements" that are allegedly fraudulent; (2) "identify the speaker"; (3) state where and when the statements were made"; and (4) "explain why the statements were fraudulent." *La. Sch.*, 622 F.3d at 478 (quoting *Frank*, 547 F.3d at 570); *Bennett v. MIS Corp.*, 607 F.3d 1076, 1100 (6th Cir. 2010) (noting that a complaint must allege the "time, place, and content of the alleged misrepresentation[s]" along with the "fraudulent scheme," the "fraudulent intent," and the injury).

In sum, the PSLRA and Rule 9 operate in tandem to "require a complaint to allege the 'who, what, where, when, and why' of the fraudulent statements. . . . If the complaint does not answer all of these questions, it fails to sufficiently plead securities fraud." *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, 29 F.4th 802, 810 (6th Cir. 2022) (citations omitted).

## III. LAW AND ANALYSIS

### A. Motion to Strike or, in the Alternative, for Leave to File a Sur-Reply

The Court first addresses the pending Motion to Strike or, in the Alternative, for Leave to File a Sur-Reply (ECF No. 177) before turning to the Motion to Dismiss.

Pursuant to S.D. Ohio Civ. R. 7.2 and the Court's inherent authority to control its docket, Plaintiffs move to strike: (1) the Third Point Defendants' allegations that Plaintiffs have abandoned allegations related to Third Point's illicit insider trading, have conceded that Upstart approved the challenged trades, and walked back allegations that Third Point's insider trading Policy was not effective during the Class Period; (2) Exhibits 2 and 3 attached to the Third Point Defendants' Reply Brief; and (3) the Third Point Defendants' loss causation arguments. (ECF No. 177). In the alternative, Plaintiffs request leave to file a sur-reply to address the Defendants' new arguments. (*Id.*). This Court addresses each request in turn below.

First, Plaintiffs take issue with the fact that the Third Point Defendants contend that in response to the Defendants' Rule 11 accusations, Plaintiffs have withdrawn certain allegations. (ECF No. 177 at 3–4). Accordingly, Plaintiffs request that this Court disregard or strike the Defendants' various assertions that Plaintiffs have shifted their arguments. The parties spend several pages arguing about mere threats of Rule 11 sanctions and whether Plaintiffs have withdrawn certain arguments. Notably, however, there is no motion for sanctions pending before this Court. Additionally, there have been no further amendments to Plaintiffs' allegations beyond what is alleged in the FAC. Therefore, such arguments by both parties are of no use and do nothing to aid this Court in evaluating the motion to dismiss *sub judice*. This Court is well equipped to evaluate the allegations asserted in the FAC and to discern the parties' briefing despite how either party construes such pleadings and briefings to their benefit. Moreover, gamesmanship and mischaracterization will not be rewarded in this Court. Accordingly, this Court finds Plaintiffs' request unnecessary where this Court does not need assistance from the parties to discern misleading arguments. Plaintiffs' request that this Court disregard or strike the Defendants' various assertions that Plaintiffs have shifted their arguments, therefore, **DENIED**.

Second, this Court addresses Plaintiffs' request to strike Exhibits 2 and 3 that the Defendants attached to their reply brief. (ECF No. 177 at 4–6). In the motion to dismiss *sub judice*, Defendants contend that Third Point's November 15, 2021, trade was not insider trading because "Third Point's trade was ***preapproved by Upstart***—as Plaintiffs know because that document was produced to them in discovery." (ECF No. 170-1 at 22) (emphasis added). Notably, the Third Point Defendants do not specify or attach the document that they contend proves that the trades at issue were preapproved. And Plaintiffs highlight this in their opposition motion. (*See* ECF No. 176 at 27) (" The Third Point Defendants' assertion that there was no breach because Third Point's trades

were purportedly "authorized by Upstart" in an "agreed-upon procedure for pre-clearing its trades" … fails for multiple reasons. First, even if this were a valid legal defense (it is not), ***the Third Point Defendants fail to provide any of the documents that supposedly exculpate them***. Thus, they give the Court no basis whatsoever to disregard the well-pleaded allegations in the Complaint.") (emphasis added). For the first time in the reply brief, however, the Defendants attach Exhibits 2 and 3 which contain an email and a letter documenting that Third Point requested to pledge all of its Upstart shares in August 2021 and as a result agreed to become subject to the Upstart Insider Trading Policy which prohibited it from trading while in possession of material, nonpublic information. (ECF No. 174, Exhibits 2 and 3). Third Point contends that these documents prove that the alleged insider trades were in fact authorized by Upstart and cannot serve as a basis for a Rule 10b-5 claim. (ECF Nos. 170-1 at 22–23; 174 at 22–24).

Plaintiffs argue, however, that because both documents were in the possession of the Third Point Defendants at the time of the motion to dismiss, the Defendants had an obligation to attach such exhibits to the initial Motion. (ECF no. 177 at 4). This court agrees. Pursuant to the Local Rules, Schwartz and Third Point had an obligation to attach evidence relied on in their Motion. *See* S.D. Ohio Civ. R 7.2(d). It is not this Court's obligation, nor is it Plaintiffs' obligation to scour the docket and guess the evidence to which the Defendants are referring. Defendants' conduct here makes this Court suspicious that its mentioning of such allegedly exculpatory documents without specifying the documents until the reply brief may have been an attempt impermissibly to get the last word without Plaintiffs' retort. Despite such, even if this Court were to consider the attached email and letter, documenting that Third Point agreed to Upstart's insider trading policy which required them to refrain from trading in possession of material, nonpublic information, such does

not prove that Third Point complied with the policy in reality or that Upstart approved the trades at issue in the FAC.

Additionally, at the motion to dismiss stage, courts generally consider only extrinsic documents referenced explicitly in the complaint *and* that are central to the pleadings. *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 591–92 (N.D. Ohio 2004); *Schmidt v. PennyMac Loan Servs., LLC*, 106 F. Supp. 3d 859, 865 (E.D. Mich. 2015) ("[T]he Court can examine documents [d]efendants have attached to their motions to dismiss if they are referred to in the plaintiff's complaint and are central to her claim.…Both conditions—reference in the complaint and centrality to the complaint—are necessary for the rule to apply.") (internal quotation marks and citations omitted). Here, Plaintiffs' FAC makes no mention of the exhibits in dispute, and accordingly, this Court need not determine whether the exhibits are integral to the FAC. Even if the exhibits satisfied both requirements of being mentioned in the FAC and integral to the FAC, the exhibits are still inadmissible where Third Point seeks to use the exhibits to decide a factual dispute. *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d at 592 ("Here, the Defendants urge the Court to accept the truth of the matters asserted in the exhibits to decide factual disputes in favor of the Defendants. Because this is an improper use of the documents, the Court strikes these exhibits."). Accordingly, this Court **GRANTS** Plaintiffs' Motion to Strike Exhibits 2 and 3.

Next, Plaintiffs request that this Court disregard or strike the Third Point Defendants' loss causation arguments. Specifically, Plaintiffs contend that besides listing "loss causation" as an element of the Section 10(b), the Defendants fail to raise any loss causation arguments until their reply brief. (ECF No. 177 at 6–7). This Court disagrees.

It is well-settled that a movant "cannot raise new issues in a reply brief; [s]he can only respond to arguments raised for the first time in [the nonmovant's] brief" or issues already

discussed in her opening brief. *United States v. Jerkins*, 871 F.2d 598, 602 n.3 (6th Cir. 1989) (citation omitted); *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d at 599 (same). This rule is not meant to prevent a movant from elaborating on her prior arguments, proposing new examples that illustrate her point, or parrying her opponent's thrusts in her reply brief. Rather, it bars only those arguments that are genuinely new. *See, e.g.*, *United States v. Campbell*, 279 F.3d 392, 401 (6th Cir. 2002) (disposing of an argument that the litigant "failed to raise, even perfunctorily . . . in his original brief").

Despite Plaintiffs' contentions, the Defendants' loss causation arguments are not "new." In their opening brief, the Defendants argue that Plaintiffs' Rule 10b-5 "Insider Trading" claim is not a viable theory because in *Fridrich v. Bradford*, the Sixth Circuit refused to adopt the disclose or abstain rule and reasoned that, to state a claim, a defendants' act of trading with third persons must be "causally connected with the claimed loss by plaintiffs who traded on the impersonal market." (ECF No. 170-1 at 17) (citing *Fridrich v. Bradford*, 542 F.2d 307 (6th Cir. 1976)). Thus, the Defendants' loss causation arguments in the reply brief are only elaborating on the argument already raised in their opening briefing. Accordingly, this Court reasons that the challenged argument was not improperly raised for the first time in a reply brief. Plaintiffs' request that this Court disregard or strike the Defendants' loss causation arguments is, therefore, **DENIED**.

Finally, Plaintiffs ask to submit a sur-reply if this Court finds that striking the Third Point Defendants' argument is unwarranted. (ECF No. 177 at 7). Generally, sur-replies are "highly disfavored, as they usually are a strategic effort by the nonmoving party to have the last word on a matter." *Liberty Legal Found. v. Nat'l Democratic Party of the USA, Inc.*, 875 F. Supp. 2d 791, 797 (W.D. Tenn. 2012) (citation omitted). Additionally, although the Federal Rules of Civil Procedure do not explicitly contemplate the filing of sur-replies, this Court's Local Rules permit

additional memoranda "upon leave of court for good cause shown." S.D. Ohio Civ. R. 7.2(a)(2). The Rules do not define good cause, but the Sixth Circuit has noted that additional filings "may be allowed in the appropriate circumstances, especially '[w]hen new submissions and/or arguments are included in a reply brief, and a non-movant's ability to respond to the new evidence has been vitiated.'" *Key v. Shelby Cnty.*, 551 F. App'x 262, 265 (6th Cir. 2014) (alteration in original) (quoting *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 481 (6th Cir. 2003)). But a party's desire to point out mischaracterizations or misrepresentations of caselaw, even if helpful, does not provide grounds for the filing of sur-replies. *See Little Hocking Water Ass'n, Inc. v. E.I. Du Pont de Nemours & Co.*, 2014 WL 12651139, at *2 (S.D. Ohio Oct. 31, 2014).

Because this Court concludes that the Third Point Defendants' alleged mischaracterizations of the law did not warrant striking and that the Defendants' alleged "new loss causation argument" was not an improper new argument, Plaintiffs have failed to demonstrate "good cause" justifying the filing of a sur-reply. Additionally, as discussed above, this Court is well equipped to analyze the parties' arguments and apply the law without the aid of further briefing. Allowing a sur-reply in this context would not be of service to this Court and would only allow Plaintiffs to get the last word. *See Spitzer Autoworld Akron, LLC v. FCA US LLC*, 2023 WL 4842669, at *1 (N.D. Ohio Feb. 8, 2023). Permission to file a sur-reply is not warranted under such circumstances. Accordingly, Plaintiffs' Motion for Leave to File Sur-Reply is hereby **DENIED**.

In summary, this Court **GRANTS** Plaintiffs' Motion to Strike Exhibits 2 and 3 for the reasons stated above. Plaintiffs' additional requests to strike and for leave to file a sur-reply are hereby **DENIED**.

**B. Securities Fraud (Count I)**

As a threshold matter, the Third Point Defendants and Schwartz contend that Plaintiffs have failed to state a cognizable 10b-5 misstatement liability claim against them, nor have they pleaded scheme liability successfully. (ECF No. 170 at 7–10). The Court first evaluates Plaintiffs' misstatement liability and scheme liability claims, before considering the scienter allegations.

***1. False and Misleading Statements Against Third Point and Schwartz***

As to Schwartz specifically, the Defendants argue that Plaintiffs allege only that Schwartz signed three Upstart SEC filings, none of which is sufficient to sustain a claim of misstatement liability against him. (ECF No. 170-1 at 8). First, the Defendants contend that Upstart's IPO Form S-1 filed on December 9, 2020, is not actionable because it was filed before the December 16, 2020, Class Period start date and did not contain Schwartz's signature. (*Id.*). As Plaintiffs highlight, however, Upstart CEO, Girouard, signed as power of attorney for Schwartz. (ECF No. 58-4). Additionally, statements made in the IPO prior to the Class Period are still actionable, where Plaintiffs have alleged sufficiently that those in the Class relied on statements made in the December 9, 2020, IPO and such statements "were not so 'stale' as to be immaterial and had not been superseded by later events and disclosures." *Zwick Partners, LP v. Quorum Health Corp.*, 2018 WL 2933406, at *7 (M.D. Tenn. Apr. 19, 2018).

Second, the Defendants contend that this Court held that the challenged statements in Upstart's 2020 Form 10-K, filed on March 18, 2021, are protected forwarded looking statements subject to the PSLRA safe harbor and therefore are not actionable. (ECF No. 170-1 at 8). This is not correct. This Court specifically referred to "statements about robust demand for Upstart-powered loans" when reasoning that Upstart's 10-K provided meaningful cautionary language that

made those specific challenged statements subject to the PSLRA safe harbor. (ECF No. 68 at 30–31). Notably, however, statements about robust demand for loans were not the only types of alleged misstatements referenced in the Form 10-K. The Consolidated Complaint and the First Amended Complaint both allege that:

> The Company continued to mislead investors regarding the capabilities of its AI platform. For example, the Form 10-K states, "[b]ecause ***our model changes in real time***, we are able to extend new offer loans to applicants who were previously not eligible or were previously quoted a higher rate." Additionally, regarding the "Constantly Improving AI Models," the Form 10-K states, "[b]eyond the advantages accrued by our constantly growing volume of training data, ***our machine learning team continues to update our modeling techniques regularly***."

(ECF Nos. 45 ¶136; 165 ¶187). This Court previously reasoned that affirmative statements by the Upstart Defendants about *the ability of the AI model to adapt quickly* are actionable material misstatements. (ECF No. 68 at 23–29). Thus, these statements in the Form 10-K claiming that the AI model "changes in real time" and "continues to update…regularly" are actionable statements in the Form 10-K which was signed by Schwartz. Accordingly, the Third Point Defendants' argument that the Form 10-K statements are not actionable is without merit.

Finally, Defendants argue that the April 6, 2021, SPO Form must be dismissed because it was signed more than seven months prior to November 9, 2021, the date of the first corrective disclosure. (ECF No. 170-1 at 8). As with both prior arguments asserted about the documents signed by Schwartz, the Third Point Defendants and Schwartz are barred from producing new arguments that they neglected to raise in the first motion to dismiss. *Novo Nordisk, Inc. v. DCA Pharmacy*, 745 F. Supp. 3d 626, 632 (M.D. Tenn. 2024) (citations omitted) ("Courts have held that '[t]he filing of an amended complaint' does not create an exception to Rule 12(g)(2) 'with respect to claims in the amended complaint that were in the original complaint—and thus were subject to being challenged, in the motion to dismiss the original complaint, via the same defenses

that the defendant seeks to bring for the first time in a motion to dismiss the amended complaint.'"). Accordingly, all three arguments regarding Schwartz's signatures on Upstart's SEC filings must fail.

Next, Third Point and Schwartz contend that this Court has already found that Third Point is "not subject to liability for false or misleading statements, which is limited to the 'maker' of the false or misleading statement." (ECF No. 68 at 19). The Defendants highlight that this Court reasoned that Schwartz's signatures on Upstart SEC filings does not render the Third Point Defendants "makers" of Upstart's statements where Schwartz acted in his capacity as an Upstart director. (*Id.* at 20). Defendants further contend that the First Amended Complaint fails to add any new Rule 10b-5(b) allegations, and therefore, this Court's conclusion as to Third Point's misstatement liability must remain unchanged and this claim dismissed. (ECF No. 170-1 at 7).

Third Point and Schwartz critically mischaracterize this Court's reasoning. This Court previously ruled that "Schwartz's actions as a director of Upstart cannot be conflated with his role as a Third Point Ventures employee—***unless*** he was violating his fiduciary duties to Upstart and acting on behalf of Third Point Ventures while carrying out his director duties." (ECF No. 68 at 19) (emphasis added). Because the Consolidated Complaint was devoid of any allegations that Schwartz violated his fiduciary duties, this Court deemed Schwartz an Upstart Defendant and dismissed all misstatement liability claims against Third Point. (*Id.*). That, however, is no longer the case. The First Amended Complaint is rife with allegations that Schwartz violated his fiduciary duties to Upstart and acted as an agent for Third Point. (ECF No. 165 ¶¶ 116–158).

Plaintiffs now allege that Schwartz "routinely abused his position on Upstart's Board and access to material, nonpublic information about Upstart" by forwarding "Board communications and other material, nonpublic information to Third Point executives and employees in order to

drive Third Point's Upstart investment strategy." (*Id.* ¶ 116). The First Amended Complaint details that Schwartz began sharing Upstart's material, non-public information with his Third Point colleagues prior to Upstart's IPO and continued to do so throughout his six-year tenure on the Upstart Board. (*Id.* ¶ 130). Specifically, Plaintiffs now contend that Schwartz shared "tips about future acquisitions and strategies, sensitive materials from Board meetings, and monthly updates on Upstart's performance that [Upstart's CEO] sent to the Board." (*Id.*). According to Plaintiffs, many of these monthly updates included nonpublic data about the soon to be detrimental increase in loans retained on Upstart's balance sheet that ultimately informed Third Point's investment strategy and allowed Third Point to dump its Upstart stock ahead of time. (*Id.*; ¶¶ 151–158). Such is evidenced by the numerous emails now provided by Plaintiffs documenting that Schwartz consistently forwarded emails including material, nonpublic information in the months leading up to Third Point selling a majority of its Upstart stock for proceeds of over $1.7 billion. (*Id.* ¶¶ 131–157).

Moreover, this Court has already rejected the Third Point Defendants' attempts to classify the First Amended Complaint as a recycled version of the Consolidated Complaint. In this Court's September 29, 2025, Opinion & Order granting Plaintiffs' Motion to Amend, this Court reasoned that:

> Plaintiffs, however, now go beyond their previously rejected theory. Plaintiffs now allege, in detail, that Schwartz repeatedly violated Upstart's internal policies and his fiduciary obligations by transmitting material nonpublic information ("MNPI") to Third Point to facilitate its trading activity. (ECF No. 130-4 ¶¶ 15, 54, 116-158, 391). The proposed amendment describes Upstart's internal policies on trading and ethics prohibiting the transmission of MNPI. (*Id.* ¶¶ 117-28). It then alleges specific instances of Schwartz disclosing such information to Third Point Defendants. (*Id.* ¶¶ 116-58)
> ….
>
> These allegations, taken as true, support the reasonable inference that Schwartz acted on Third Point's behalf, in breach of his fiduciary duties to Upstart, to benefit Third Point's

> investment strategy. They materially distinguish the proposed amendment from the original complaint and directly address the prior deficiencies identified by this Court.

(ECF No. 163 at 14–16). Accordingly, this Court finds no reason to depart from its ruling that the First Amended Complaint cures prior identified deficiencies regarding Schwartz's alleged violations of his fiduciary duties and his identity as a Third Point actor.

Thus, given this Court initially reasoned that Plaintiffs pleaded sufficiently that Schwartz, as an Upstart Defendant, made misleading statements in Upstart's IPO Form S-1, SPO Form S-1, and 2020 Form 10-K by signing Upstart's SEC filings, such findings remain true here where Plaintiffs have cured their pleading deficiencies to allege properly that Schwartz was a Third Point actor. Despite such, Plaintiffs' burden is not yet satisfied. To plead successfully that Schwartz's statements are attributable to Third Point, Plaintiffs still must establish that the Third Point Defendants are vicariously liable for Schwartz's actions.

***2. Third Point Misstatement Liability Under Respondeat Superior***

In response to this Court's Opinion & Order reasoning that Plaintiffs' Complaint was lacking allegations that Schwartz "was violating his fiduciary duties to Upstart and acting on behalf of Third Point Ventures while carrying out his director duties," Plaintiffs have supplemented the First Amended Complaint with various allegations supporting that Schwartz repeatedly violated his fiduciary duties and acted on the behalf of the Third Point Defendants. [3] Accordingly, Plaintiffs contend that the actionable misstatements made by Schwartz should be attributed to the Third Point Defendants under the doctrine of respondeat superior. (ECF No. 176 at 17–19). In the motion to

[3] In the reply brief, the Third Point Defendants contend that "Plaintiffs have added no allegations that any of the Third Point Defendants 'made' any of the challenged statements within the meaning of *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011)." (ECF No.174 at 3). This Court plainly ruled that the Consolidated Complaint was deficient in that it did not demonstrate that Schwartz violated his fiduciary duties to Upstart nor that he acted as a Third Point agent and therefore Schwartz's alleged misstatements could not be imputed to Third Point as the "maker" of such statements. (ECF No. 68 at 19–20). Plaintiffs have since cured those deficiencies as discussed herein, and neither the Defendants' continued ignorance of the new allegations nor will their mischaracterizations of this Court's prior holding salvage their arguments.

dismiss *sub judice*, however, the Third Point Defendants fail to contest Plaintiffs' respondeat superior allegations regarding Schwartz's misstatements entirely. The Third Point Defendants only contest these allegations in the reply brief, and therefore these arguments are waived. *Palazzo v. Harvey*, 380 F. Supp. 3d 723, 730 (M.D. Tenn. 2019) (quoting *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008)) (reasoning that arguments raised for the first time in the reply brief are waived). Even if Third Point had contested the respondeat superior allegations adequately, however, such arguments are without merit.

As a threshold matter, the Sixth Circuit has "long recognized that an entity may be vicariously liable for acts committed by its agents in violation of securities laws." *Cannon v. GunnAllen Fin., Inc.*, 2007 WL 2351313, at *9 (M.D. Tenn. Aug. 14, 2007) (citing *Holloway v. Howerdd,* 536 F.2d 690, 694-95 (6th Cir. 1976)). The doctrine of respondeat superior has also been applied successfully in securities cases in various other circuits. *See Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1577 n. 27 (9th Cir. 1990) (collecting cases in the First, Second, Fifth, Sixth, Eighth, and Tenth Circuits that have allowed respondeat superior claims to serve as a basis for vicarious liability in securities cases); *see also In re Musicmaker.com Sec. Litig.*, 2001 WL 34062431, at *12 (C.D. Cal. June 4, 2001) ("[I]f [signors] were acting within the course and scope of their employment with [Defendant One] while acting as directors of [Defendant Two], and when they signed the registration statement, it appears that [Defendant One] would be [a] proper defendant[ ] under § 11(a)(1) and (2) and the doctrine of respondeat superior.").

Additionally, despite the Third Point Defendants arguments that it is unclear whether Rule 10-b5 liability can be imputed under the doctrine of respondeat superior, the Supreme Court has not ruled as such. In *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, the Supreme Court held that civil liability under Section 10(b) does not extend secondarily to those

who aid or abet. 511 U.S. 164, 191 (1994). In his dissent, Justice Stevens noted that the majority's holding potentially implicated other forms of secondary liability. *Id.* at 200 n.12 (Stevens, J., dissenting). As such, the Third Point Defendants contend that this holding restricts Plaintiffs' ability to recover under respondeat superior liability. To date, however, the Supreme Court has not extended its rationale in *Central Bank* to the context of respondeat superior liability, and this Court does not find it prudent to do so on its own accord, especially where the Sixth Circuit has not opined on the issue. *See, e.g.*, *Wang v. Zymergen Inc.*, 744 F. Supp. 3d 995, 1014 (N.D. Cal. 2024) ("Justice Stevens' speculation notwithstanding, *Hollinger* remains good law and has not been explicitly overruled by the Supreme Court or the Ninth Circuit. Nor is *Hollinger*'s holding that respondeat superior liability is available for statutory securities claims clearly irreconcilable with *Central Bank*'s holding regarding aiding and abetting liability for Section 10(b) claims, as would be required for this Court to conclude that *Hollinger* has been effectively overruled."). Accordingly, this Court reasons that respondeat superior liability is available to Plaintiffs so long as it is plead sufficiently.

"Under the doctrine of respondeat superior, 'the principal who acts through the agent ... is secondarily liable' for the agent's violation, 'assuming the agent is acting within the scope of his agency.'" *Wang*, 744 F. Supp. 3d at 1014 (quoting *Hollinger v. Titan Capital Corp.*, 914 F.2d at 1578). When considering common law secondary doctrines of liability, state law applies, and therefore this court will apply the law of the forum state, Ohio. *Id.* "Under Ohio law, an employer ordinarily can be held liable for an intentional tort committed by an employee only if the employee's actions were 'calculated to facilitate or promote the business for which [he] was employed.'" *Blankenship v. Parke Care Centers, Inc.*, 913 F. Supp. 1045, 1052 (S.D. Ohio

1995), *aff'd,* 123 F.3d 868 (6th Cir. 1997) (quoting *Byrd v. Faber,* 57 Ohio St.3d 56, 58, 565 N.E.2d 584 (1991)).

The Third Point Defendants contend that Plaintiffs' own cited authority, *Wang v. Zymergen Inc.*, demonstrates they have failed to plead a respondeat superior claim against Third Point. (ECF No. 174 at 5). Specifically, the Third Point Defendants argue that the Plaintiffs have failed to allege that Schwartz's decisions while on the Upstart Board were *directed* by Third Point. (*Id.* at 6).

In *Wang*, the court analyzed whether plaintiffs adequately alleged respondeat superior liability to impute liability to three venture capital fund investors based on the actions of their investor-appointed board members. *Wang*, 744 F. Supp. 3d at 1013. Zymergen, the company at issue, was a materials manufacturing startup that went public in 2021. *Id.* at 1001. Zymergen had three early venture capital fund investors who together owned more than half of its outstanding shares at the time of its public offering: SoftBank; DCVC; and True Ventures. *Id.* at 1002. As a result of their investments, all three investors received the right to appoint a board member to the Zymergen board. *Id.* The relevant complaint alleged that Softbank and True Ventures both appointed employees to the Zymergen board who had to receive authorization from their respective venture fund employers before making major board decisions. *Id.* at 1003. Additionally, both the Softbank and True Ventures board members received a salary from their funds and carried interest resulting from their funds' investment in Zymergen. The Soft Bank and True Ventures appointed board members also served on the boards of other portfolio companies as part of their job descriptions with their respective venture capital fund employers. *Id.* at 1014. DCVC, on the other hand, appointed one of its co-owners to the Zymergen board. *Id.* at 1003. The relevant complaint alleged that DCVC's board member served as an agent to DCVC, and that he would receive financial incentives from DCVC if its Zymergen investment succeeded. *Id.*

Based on the allegations in the complaint, the *Wang* court found that the actions of the Soft Bank and True Ventures investor-appointed board members could be imputed to Soft Bank and True Ventures. The court specified that at the motion to dismiss stage, plaintiffs' pleadings that: (1) the scope of the board members' employment included serving on portfolio companies' boards; (2) both board members did actually serve on other boards; and (3) that both board members had to receive approval from SoftBank and True Ventures in making major decisions even in their capacity as board members, were sufficient to invoke respondeat superior. *Id.* at 1014.

As to the DCVC investor-appointed board member, however, the *Wang* court found that the plaintiffs failed to state a respondeat superior claim because the complaint contained only conclusory allegations that the employee was a DCVC agent. *Id.* at 1015. The court noted that the appointed board member was a co-owner of DCVC as opposed to an employee, and that there were no allegations that the DCVC board member had to receive approval from DCVC prior to making board decisions. *Id.* at 1014–15.

In the Third Point Defendants' view, Schwartz was more akin to the DCVC investor-appointed board member whose actions could not be imputed to DCVC because his actions were not adequately alleged to be directed by his employer. (ECF No. 174 at 6).

While Third Point is correct that Schwartz is more like the DCVC appointed board member than he is akin to the Soft Bank and True Ventures board members, such is not dispositive where the factual allegations in the complaints are not synonymous. In *Wang*, the plaintiffs merely alleged that the DCVC appointed board member, who was a co-owner of DCVC, acted as an agent while serving on the Zymergen board, without additional factual allegations to explain the agency relationship. This was deemed insufficient to allege agency, and ultimately respondeat superior liability.

Here, however, Plaintiffs set forth various allegations supporting that Schwartz acted in service to and for the promotion of Third Point during his tenure on the Upstart Board. Further, Plaintiffs' allegations evidence that Third Point exercised influence over Schwartz which directed his conduct while on the Upstart Board. For example, the First Amended Complaint contains allegations that Schwartz repeatedly touted the importance of his role on the Upstart Board for Third Point's benefit. In an email between Schwartz and Loeb, Schwartz noted that he was "on the Board and *responsible*" for the Upstart investment. (ECF No. 165 ¶ 55) (emphasis added). In another email to a Third Point colleague, Schwartz wrote "*I own the position. I'm on the board*. I'm trying to be as clear as I possibly can be here. *You're not the analyst on this position which is the largest one in the firm*. You're just supporting me with analyst work."(*Id.*) (emphasis added). Such allegations plausibly allege that Schwartz viewed his role on the Upstart Board as a position that he held on behalf of, and for the benefit of, Third Point. Indeed, Schwartz's role as he viewed it, was one that other Third Point employees worked to support.

Additionally, the First Amended Complaint provides an example of Schwartz funneling the information he received from the Upstart Board for the purposes of completing his duties at Third Point. He wrote in an email to Upstart CFO, Sanjay Datta, "I *have to build a model internal to TP*. Do we have a best guess long range financial plan?" (*Id.* ¶ 138) (emphasis added). This allegation additionally supports the assertion that Schwartz was acting on behalf of Third Point in his Board role. And notably, while there are no such allegations that Schwartz needed approval from Third Point prior to making Upstart Board decisions, the *Wang* court merely noted that such allegations *bolstered* the plaintiffs' respondeat superior allegations. The court *did not* contend that such allegations were *necessary* to demonstrate direction and an agency relationship.

Plaintiffs further allege that it was part of Schwartz's job description that he "devote substantially all of [his] business time and attention to the business and affairs of Third Point, to use [his] best efforts to perform faithfully and efficiently such responsibilities, and not to engage in any other business activity." (*Id.* ¶ 55). Accordingly, Plaintiffs contend that Schwartz's role on the Upstart Board by the nature of his employment agreement had to be in service to Third Point or else he would have been violating his duties to Third Point. Plaintiffs additionally contend that Schwartz's service on the boards of various other portfolio companies to protect and maximize the Third Point Defendants' investments further demonstrates the agency relationship and that Schwartz served on the Upstart Board as part of his role at Third Point. (*Id.* ¶ 162) ("Acting as a Board member, liaising with portfolio companies, and signing registration statements were acts within the scope of the agency relationship between Schwartz and Third Point…. For example, Schwartz has served on the board of SentinelOne, Next Silicon, Verbit, Sysdig, Kentik, Kumu Networks, Aryaka, R2 Semiconductor, YellowBrick Data, Ushur, and Trullion."). The *Wang* court similarly noted that allegations regarding service on other portfolio boards as part of the board member's job, militated in favor of a properly pleaded respondeat superior claim.

In sum, while Plaintiffs do not plead that Schwartz needed approval from Third Point prior to making any board decision, such is not dispositive where the Plaintiffs have alleged various other facts supporting that his actions on the Upstart Board were calculated to facilitate or promote Third Point's business. *Blankenship*, 913 F. Supp. at 1052; *see Tharp v. Acacia Commc'ns, Inc.*, 321 F. Supp. 3d 206, 219 (D. Mass. 2018) (finding plaintiffs had properly plead respondeat superior liability without requiring plaintiffs to plead that the board members had to seek employer approval prior to making board decisions). Accordingly, this Court finds that the First Amended Complaint plausibly alleges that Schwartz was acting in the scope of his Third Point employment

when he signed Upstart SEC filings, and therefore Plaintiffs have pleaded misstatement liability properly against the Third Point Defendants via respondeat superior.

### ***3. Scheme Liability***

A scheme liability claim requires the plaintiff to show: "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021) (citation omitted). The alleged "scheme" "may rest in part on the same statements or omissions that trigger misstatement liability, or it may embrace separate statements or conduct." *In re FirstEnergy*, 2022 WL 681320, at *7 (S.D. Ohio Mar. 7, 2022) (citing *Lorenzo v. SEC*, 587 U.S. 71, 72 (2019)).

The Third Point Defendants and Schwartz argue that Plaintiffs' scheme liability claim must be dismissed because this Court has already found that Plaintiffs failed to state a scheme liability claim against them and the First Amended Complaint fails to cure any of the previously identified deficiencies. (ECF No. 170-1 at 9). In this Court's prior Opinion & Order addressing the motion to dismiss the Consolidated Complaint, this Court reasoned that Plaintiffs merely alleged that the Third Point Defendants "disseminated misstatements" without sufficient detail of how the Defendants engaged in deceptive conduct themselves. (ECF No. 68 at 50–51). Specifically, the Court reasoned that Plaintiffs failed to allege that the Third Point Defendants made any of the challenged statements themselves nor were they alleged to have disseminated the misstatements. (*Id.*). Such was particularly relevant, given the Court highlighted that for the purposes of scheme liability "[a]ny deception lies in what statements are made in conjunction with the IPO…". (*Id.* at 51 n.15). Without such allegations this Court found that Plaintiffs merely alleged that the Third

Point Defendants aided and abetted the Upstart Defendants' conduct which is not a viable basis for private liability. (*Id.* at 51).

In the Third Point Defendants' view, the FAC cures none of the identified deficiencies. First, the Third Point Defendants and Schwartz argue that Plaintiffs new allegations that the Defendants violated the Investment Advisers Act does not provide Plaintiffs with any remedy. Specifically, the Defendants contend that the absence or lack of enforcement of an insider trading policy does not constitute a deceptive of manipulative act for the purposes of scheme liability. (ECF No. 170-1 at 10) (citing *In re Nat'l Century Fin. Enters., Inc. Fin. Inv. Litig.*, 553 F. Supp. 2d 902, 909 (S.D. Ohio 2008)).

The Third Point Defendants neglect to acknowledge, however, that the FAC also includes new insider trading allegations detailing that Schwartz disseminated MNPI to the Third Point Defendants to aid Third Point's financial model, giving Third Point an advantage in trading its Upstart stock. (ECF No. 165 ¶ 130). Such new allegations of insider trading constitute a "deceptive device" necessary to plead a scheme liability claim. *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 548 (S.D. Ohio 2000) (declaring that insider trading constitutes an actionable deceptive device for the purposes of Rule 10(b));[4] *United States v. O'Hagan*, 521 U.S. 642, 651–52 (1997) ("10(b) and Rule 10b–5 are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information. Trading on such information qualifies as a "deceptive device" under § 10(b), …because "a relationship of trust and confidence

[4] Schwartz and the Third Point Defendants contend that *In re SmarTalk Teleservices, Inc. Sec. Litig.*, demonstrates that Plaintiffs' pleaded scheme liability claim would be limited to a claim for insider trading as opposed to Plaintiffs' much broader misstatement scheme liability claim. (ECF No.174 at 8). This Cout disagrees. The plaintiffs in that case argued scheme liability based only on the deceptive act of insider trading. Differently here, Plaintiffs now allege that Schwartz disseminated and made the alleged misstatements on behalf of Third Point, that Third Point violated the Investment Advisers Act, and that the Defendants propped up the appearance of demand for Upstart loans, in addition to insider trading. Thus, the Plaintiffs in this case allege multiple "deceptive devices" to support their scheme liability claim as opposed to just insider trading.

[exists] between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation."). Additionally, because Plaintiffs pleaded that Schwartz and Third Point violated the Investment Advisers Act, such also serves as an allegation that the Defendants engaged in deceptive conduct by violating the law. *See In re Firstenergy Corp.*, 2022 WL 681320, at *14 (reasoning that plaintiffs pleaded deceptive acts with particularity where plaintiffs plead which laws the defendants violated).

Next, the Third Point Defendants and Schwartz contend that Plaintiffs scheme liability claim is not distinct from its misstatement liability claim. It is true that an actionable scheme liability claim requires plaintiffs to plead allegations that go beyond misstatements and omissions. *In re Gen. Motors Co. Sec. Litig.*, 773 F. Supp. 3d 429, 459 (E.D. Mich. 2025); *Newtyn Partners, LP v. All. Data Sys. Corp.*, 165 F.4th 947, 971 (6th Cir. 2026) (affirming dismissal of scheme liability claim where the scheme theory relied only on the same facts as the 10b-5(b) theory). Even so, "[s]cheme liability may rest ***in part*** on the same statements or omissions that trigger misstatement liability." *In re Firstenergy Corp.*, 2022 WL 681320, at *7 (emphasis added). That is exactly what Plaintiffs allege in the FAC.

As this Court previously noted, Plaintiffs' arguments that the Third Point Defendants participated on the Upstart Board, inflated loan purchases, and helped Upstart navigate the market, were not actually pleaded in the Consolidated Complaint as part of the scheme liability claim, and if even they were pleaded in that context, this would not have sustained a scheme liability claim where Third Point did not make or disseminate the statements. (ECF No. 68 at 50). Here, Plaintiffs go beyond the misstatement liability claim and now allege not only that Defendants ***made*** the misstatements themselves via their agent Schwartz,[5] but that Schwartz also repeatedly funneled

[5] The Third Point Defendants and Schwartz acknowledge themselves that "but for Upstart's supposedly misleading misstatements, the market would not have been misled…." (ECF No. 170-1 at 9). Notably, here, the FAC alleges

MNPI to Third Point for his own and Thid Point's financial gain, as evidenced by numerous emails. Such allegations go beyond mere awareness of the MNPI, and the FAC alleges that Schwartz and Third Point used this MNPI to strengthen their own financial models and gained a market advantage by trading Upstart stock at a high value before shareholders became aware of its loan retention issues. The FAC also now includes allegations that the Third Point Defendants materially increased Upstart's loan origination volumes and participated in various management functions at Upstart as part of the scheme. (ECF No. 165 ¶ 382). Thus, the FAC cures specifically what this Court reasoned was previously insufficient by detailing with particularity how Schwartz and the Third Point Defendants acted unlawfully in furtherance of the scheme.

***4.* Scienter**

Next, the Court turns to consider whether the Plaintiffs have adequately alleged a strong inference of scienter as to Schwartz and Third Point. Scienter is established by "either demonstrating a 'knowing and deliberate intent to manipulate, deceive, or defraud' or 'recklessness.'" *Astec Indus.*, 29 F.4th at 812 (quoting *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016)). Recklessness is "akin to conscious disregard"—it is "highly unreasonable conduct" that departs from the ordinary standards of care to an "extreme." *Id.* (citations and internal quotation marks omitted). Courts generally require "multiple, obvious red flags" of an "egregious refusal to see the obvious or investigate the doubtful" before drawing an inference of recklessness. *Id.* A strong inference is one that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Where "two equally compelling inferences can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, *Tellabs* instructs that

---

that Schwartz, acting as an agent of Third Point, made these misstatements, and thus Third Point is also liable for misleading the market.

the complaint should be permitted to move forward." *Frank*, 547 F.3d at 570 (citing *Tellabs*, 551 U.S. at 324 n.5).

Courts in the Sixth Circuit apply a three-part test to answer whether scienter is adequately alleged. *Astec Indus.*, 29 F.4th at 812. First, all factual allegations in the complaint are accepted as true. *Id.* (quoting *Tellabs*, 551 U.S. at 322). Second, the court reviews the allegations "holistically" in order to "determine 'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 979 (6th Cir. 2018) (quoting *Tellabs*, 551 U.S. at 322–23). As a part of this holistic review, courts in the Sixth Circuit typically employ the non-exhaustive list of factors set forth in *Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001). *Id.* Third, the court considers "'plausible opposing inferences'" and determines "whether 'a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Id.* (quoting *Tellabs*, 551 U.S. at 323–24).

Accepting Plaintiffs' factual allegations as true, the Court turns to a holistic review of the scienter allegations, considering the relevant *Helwig* factors, before weighing opposing inferences. The nine *Helwig* factors are:

(1) insider trading at a suspicious time or in an unusual amount;
(2) divergence between internal reports and external statements on the same subject;
(3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;
(4) evidence of bribery by a top company official;
(5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;
(6) disregard of the most current factual information before making statements;
(7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;
(8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and

(9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Helwig*, 251 F.3d at 552 (citing *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 196 (1st Cir. 1999)). "These factors merely assist the Court's scienter analysis; they are not a checklist of required showings." *FirstEnergy*, 2022 WL 681320, at *18; *see Dougherty*, 905 F.3d at 981 (inferring scienter with three *Helwig* factors shown).

a. Imputation of Schwartz's Scienter

As a threshold issue, the parties dispute whether Schwartz's scienter can be imputed to the Third Point Defendants. The Defendants contend that Schwartz signed the Upstart filings in his capacity as an Upstart director and therefore his scienter cannot be imputed to Third Point, a corporation that did not make misrepresentations. (ECF No. 174 at 10). Further, the Defendants argue that in Plaintiffs' cited authority, *In re Omnicare, Inc. Sec. Litig.*, the Sixth Circuit considered only whether an employee's scienter could be imputed to the corporation that made the misrepresentation, not to an outside venture capital investor who made no such statements. 769 F.3d 455 (6th Cir. 2014). As determined above, however, this Court finds that Plaintiffs have adequately pleaded that Schwartz, acting in his capacity as a Third Point agent, signed the two Upstart filings at issue, and therefore Third Point "made" the misstatements under respondeat superior. *See* Section III.B.2, *supra*. Accordingly, this Court is not persuaded by the Third Point Defendants arguments that Schwartz's liability cannot be imputed to Third Point. Thus, because this Court previously found that Plaintiffs properly pleaded scienter as to Schwartz, Schwartz's scienter may be imputed to Third Point. *Kirkland v. E.F. Hutton & Co.*, 564 F. Supp. 427, 447 (E.D. Mich. 1983) ("Respondeat superior does not do away with the requirement of scienter. Rather, the agent must be found to have acted with scienter, and the conduct of the agent is imputed to the principal party."). Even if this Court found that Schwartz's scienter could not be imputed to

the Third Point Defendants', Plaintiffs' allegations in the First Amended Complaint provide additional allegations to support that the Third Point Defendants acted with scienter.

b. The Third Point Defendants' Scienter

i. Access to Upstart's MNPI

First, the Third Point Defendants and Schwartz argue that Plaintiffs' allegations that the Defendants merely had access to MNPI, fails to plead scienter. (ECF No. 170-1 at 12). Additionally, the Defendants contend that Plaintiffs' new allegations, including various emails where Schwartz and the Third Point Defendants acknowledge the information in the emails as "confidential," do not prove that the Defendants acted with intent to deceive shareholders or knew privately that the information contradicted Upstart's public disclosures. (*Id.*). The Defendants are correct that purely possessing or having access to MNPI does not establish scienter. *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 688 (6th Cir. 2004); *In re Kindred Healthcare, Inc. Sec. Litig.*, 299 F. Supp. 2d 724, 740 (W.D. Ky. 2004). But that is not all that is alleged in the FAC. On the contrary, Plaintiffs allege that Schwartz and the Third Point Defendants not only possessed MNPI, but repeatedly acknowledged that the information was sensitive, not available to the public, and that they used this information for their own personal gain in furtherance of the scheme to defraud investors.

By way of example, Loeb writes in an email: "Rob [Schwartz] is on the board so we have proprietary information which you can and should use. . . . We need to be in the top 1% of people who know this company and we won't get there simply from Rob relaying anecdotes from the board. . . . I can't stress how important this project is." (ECF No. 165 ¶ 140). Schwartz's emails also indicate awareness that he was in a unique position of knowledge. In one email, he noted, "I cannot explain reasons why we are super bullish because I know things the street does not (because

I am on the Board).” Additionally, he wrote in various other emails that the information he was sharing was “MNPI,” “very confidential,” “very, very sensitive,” and instructed that his Third Point colleagues guard the information with their lives. (*Id.* ¶¶ 326–328). Plaintiffs also plead that Schwartz touted that the Third Point financial model, built using Upstart Board materials, was “more informed than any outsider could produce.” (*Id.* ¶¶ 141, 389). Such evidence does not merely plead access to MNPI but goes beyond and demonstrates awareness of wrongdoing and a motive for personal gain.

Additionally, the authorities relied upon by the Third Point Defendants are inapposite. (*See* ECF No. 170-1 at 12) (collecting cases). For example, in *Konkol v. Diebold*, the Sixth Circuit opined that the plaintiffs failed to plead scienter where the complaint alleged access to financial information but lacked “sufficiently detailed facts regarding the financial reports, how they were used, and their connection to the [d]efendants.” 590 F.3d 390, 397 (6th Cir. 2009). The Sixth Circuit further reasoned that:

> “In the absence of greater particularity, we have no way of distinguishing the plaintiffs' allegations from the countless fishing expeditions which the PSLRA was designed to deter.” *Fischer v. Vantive Corp. (In re Vantive Corp. Secs. Litig.)*, 283 F.3d 1079, 1087 (9th Cir.2002) (alterations, citation, and internal quotation marks omitted). Generalized facts alleging that the Defendants had access to Diebold's financial information, in short, do not support a strong inference that the Defendants knew of or recklessly disregarded the falsity of Diebold's earnings statements and SEC certifications. *See PR Diamonds*, 364 F.3d at 688 (citing *In re Peritus Software Servs., Inc. Secs. Litig.*, 52 F.Supp.2d 211, 228 (D.Mass.1999) (holding that general allegations that a defendant, through his executive position, had access to internal corporate information and therefore had actual knowledge of misstatements or reckless disregard for the truth were insufficient to support a strong inference of scienter)).
>
> The standard from Tellabs requires specific facts that those reports were known to Defendants and reflected the revenue-recognition scheme in such a way that it would have been obvious that Diebold was improperly inflating its revenue. *See In re Peritus Software Servs.*, 52 F.Supp.2d at 228 (rejecting an allegation of scienter because it did not “achieve the level of specificity” required by the PSLRA).

*Id.* at 397–398. In summary, the Sixth Circuit ruled that general allegations of access to records with nothing more do not establish scienter. Similarly, *Loc. 295/Loc. 851 IBT Emp. Grp. Pension Tr. & Welfare Fund v. Fifth Third Bancorp.*, a court in the Southern District of Ohio found that the plaintiff's allegations failed to support a strong inference of scienter where the complaint contained no factual allegations "that [d]efendants actually read or reviewed information available." 731 F. Supp. 2d 689, 726 (S.D. Ohio 2010). Here, Plaintiffs do not merely allege access to Upstart financial information; rather, the FAC alleges access, use, and awareness. Specifically, the FAC details that the Third Point Defendants, through Schwartz, repeatedly received non-public board insights that indicated a steady increase in the loans retained on Upstart's balance sheet before this information was available to the public. Such indicates that the Third Point Defendants privately knew of facts that contradicted Upstart's disclosures to the public. *Helwig*, 251 F.3d at 552. Further, the FAC details how Third Point used this information to shape their investment strategy while repeatedly acknowledging that the information was sensitive and not publicly available. Accordingly, Third Point's cited authority fails to undercut Plaintiffs' scienter allegations. Thus, this factor militates in favor of Plaintiffs.

ii. Schwartz's Departure from the Upstart Board and Financial Incentives

Next, the Third Point Defendants contend that Plaintiffs' allegations regarding Schwartz's quick departure from the Upstart Board and the Third Point Defendants' exit from its investment in Upstart fail to plead a strong inference of scienter. (ECF No. 170-1 at 13). Specifically, Third Point argues that Plaintiffs' allegations regarding Schwartz's departure, "which occurred three months after Third Point's August sales and one month before Third Point finished liquidating its Upstart investment," fails to demonstrate that the Third Point Defendants recklessly or knowingly deceived Upstart investors. (*Id.*). Third Point further contends that without more, these allegations

merely demonstrate that Schwartz left his position during the Class Period, which does not support an inference of scienter. In Third Point's view, the non-fraudulent inference, however, that Schwartz left the Board because Third Point was exiting its investment—is far more compelling. (*Id.* at 13–14).

In opposition, Plaintiffs contend that Schwartz's exit from the Upstart Board supports its allegations that the Third Point Defendants engaged in a scheme and needed Schwartz off the Board to allow more flexibility to liquidate its Upstart position. (*Id.* at 23–24).

While other jurisdictions abide by Third Point's contention that without specific allegations connecting an individual defendant's departure to fraud, an inference of scienter is not supported, the Sixth Circuit has not adopted this rule. *See Plagens v. Deckard*, 2023 WL 2711263, at *28-29 (N.D. Ohio Mar. 30, 2023) (collecting cases in other jurisdictions). Accordingly, this Court declines to do so and will analyze Plaintiffs' arguments holistically. *Id.* at *29 ("The Court declines to adopt such a bright line rule where the Sixth Circuit has not done so and will consider whether [plaintiff's] departure supports an inference of scienter viewing the facts alleged in the consolidated amended complaint holistically.").

Here, Plaintiffs' allege that Schwartz's exit coupled with emails from Loeb documenting that Third Point had to "wait to get [Schwartz] off the board to have any flexibility" is demonstrative of the overall scheme and scienter of the Third Point Defendants. Specifically, Plaintiffs argue that Third Point was aware that, with Schwartz free, it could more easily dump its stock and exit its investment without restraint in light of its not yet public knowledge that Upstart was quickly taking on more loans on its balance sheet. While Third Point contends that the more likely inference is that Schwartz, who was affiliated with Third Point, simply left the board because Third Point was exiting its investment, this theory is not dispositive where Plaintiffs' inference is

equally compelling. Loeb's statement about needing Schwartz off the Upstart Board for flexibility begs the question: flexibility to do what? This email came in response to an analyst's "double downgrade of Upstart." (ECF No. 165 ¶ 155). Surely, Third Point is correct that a valid inference is that Upstart had merely decided to leave its investment. But there is critical context lacking from Third Point's assertion where the FAC provides various examples of Loeb and the Third Point Defendants discussing how they should use Schwartz's position to their advantage. (*Id.* ¶ 140) ("Rob [Schwartz] is on the board so we have proprietary information which you can and should use.").

Further, Third Point and Schwartz made these moves equipped with the knowledge that Upstart was quickly taking on more loans despite public statements that its AI model was superior and able to adapt quickly. Thus, it is an equally compelling inference that Schwartz's exit and Third Point's divestment was part of its scheme to sell the entirety of its Upstart stock at a profit while in possession of MNPI indicating the company's impending decline. *See Plagens*, 2023 WL 2711263, at *29 (finding an inference of scienter where the resigning officer knew of the alleged fraud but the company's announcement of the departure did not tie the officer's departure to fraud); *cf. Knurr v. Orbital ATK Inc.*, 272 F. Supp. 3d 784, 807 (E.D. Va. 2017) (finding no inference of scienter where plaintiffs merely alleged the timing of a director's departure inferred scienter without alleging that the departure was related to the losses the company was suffering because of a long term contract). Accordingly, this Court finds that the timing of Schwartz's exit favors Plaintiffs.

Additionally, the Third Point Defendants argue that Plaintiffs' allegation that Mr. Schwartz personally "profited" from Third Point's sales does not support a strong inference of scienter. (ECF No. 170-1 at 14). The Third Point Defendants are correct that while "an executive's desire to

protect his position within a company or increase his compensation" does not count as a specific motive for fraud, *PR Diamonds, Inc. v. Chandler*, 364 F.3d at 690, compensation incentives tied directly to share price like performance-based pay do count. *See In re Cardinal Health Inc. Sec. Litigations*, 426 F. Supp. 2d 688, 737–38 (S.D. Ohio 2006); *In re Firstenergy Corp.*, 2022 WL 681320, at *21. Here, Plaintiffs allege that Schwartz personally benefited from the sale of Upstart's stock and was "'entitled to a cash bonus' based upon a percentage 'of the aggregate performance and/or incentive-based compensation actually received by Third Point and/or its affiliates in such year as general partner, investment advisor and/or investment manager of the Venture Fund and related ***only*** to investments in the fintech, gaming, enterprise software, cybersecurity and related information technology sectors…,'" of which Upstart was included. (ECF No. 165 ¶ 56). These allegations go beyond a "generalized motive" and demonstrate incentives tied to share price. This factor also favors Plaintiffs' inference of scienter.[6]

iii. Third Point Stock Sales

Finally, Third Point Defendants' stock sales also support an inference of scienter. Plaintiffs allege that in August 2021, Third Point sold $198.2 million worth of stocks while in possession of MNPI prior to any Upstart corrective disclosures. (ECF No. 165 ¶ 153). After August, Plaintiffs allege that Schwartz continued funneling nonpublic information to Third Point that depicted the ongoing negative trend of increased loans on the Upstart balance sheet. (*Id.* ¶¶ 154–56). According to Plaintiffs, this resulted in Third Point selling 2,150,000 Upstart shares for proceeds of over $500 million on November 15, 2021, the same day that Schwartz resigned. (*Id.* at ¶ 157).

[6] Third Point additionally argues that Plaintiffs fail to allege any details as to Third Point, Third Point Ventures, or Mr. Loeb's compensation arrangements. Such is irrelevant however, where the scienter of Schwartz can be imputed to the Company.

In opposition, the Third Point Defendants contend that this conduct is not indicative of scienter where the vast majority of sales (92%) "occurred after an alleged corrective disclosure and substantial drop in Upstart's stock price." (ECF No. 170-1 at 14). Additionally, the Third Point Defendants argue that Upstart's additional May 9, 2022, July 7, 2022, and November 8, 2022, disclosures are too temporally distant from the December 2021 stock sales, thereby negating scienter. (*Id.*at 15). Further, Third Point highlights that it is not unusual for a venture capital firm to sell large volumes of stock at once or to entirely exit an investment, which is the far more compelling inference in Third Point's view. ( *Id.*; ECF No. 174 at 13).

This Court has held that "[t]here is no bright line test… as to the amount or percentage of stock that must be sold to constitute a "suspicious amount"—nor should there be, for, in the end, the determination of whether insider sales were "suspicious" is highly context-specific and depends on the other allegations offered in the Complaint." *In re Cardinal Health*, 426 F. Supp. 2d at 728. As for timing, the important issue is "the proximity of the sales to the false statements…[,]" not the proximity to the sales and the company's corrective disclosures. *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. at 542 n.3.

Here, Plaintiffs allege that the Third Point Defendants sold 2.4 million shares for $573 million prior to Upstart's first public disclosure on November 9, 2021, and five days later, on November 15, 2021, Third Point sold 8.5 million shares for gains of $1.5 billion. (ECF No. 165 ¶ 317). While the Defendants are correct, that Third Point did not sell stock at the most opportune times for the largest gains, such is not dispositive where there is no requirement that insider trading be perfectly optimized, and it is not uncommon for investors to attempt to obscure trades. *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 801 (Del. Ch. 2009) ("But it is not a defense that [insiders] could have committed an even larger breach of their fiduciary duties."); *S.E.C. v. Life Partners*

*Holdings, Inc.*, 41 F. Supp. 3d 550, 561 (W.D. Tex. 2013) ("As for Defendants' suggestion that the fact that Mr. Peden did not sell at the very peak of the market, this would hardly be remarkable in an insider trading case.… [I]t would stand to reason that a reasonably smart fellow like Mr. Peden would want to sell at an opportune, but perhaps not the most opportune, time, if only to avoid more suspicion than his behavior was already bound to attract.").

Further, Third Point's argument that its largest stock sales occurred after Upstart's first corrective disclosure needs context. It is true that Upstart disclosed in its November 9, 2021, financial report it had retained $130 million in loans on its balance sheet. (ECF No. 165 ¶ 156). By this time, however, Plaintiffs allege that the Third Point Defendants knew that the problem had already gotten far worse than what was disclosed to the public on November 9, 2021. As of November 5, 2021, equipped with MNPI from Schwartz, the Third Point Defendants knew that the amount of loans on Upstart's balance sheet "had climbed to $228 million as of the end of October 2021, more than a 70% increase beyond the figure publicly disclosed with Upstart's 3Q21 results on November 9, 2021." (*Id.* ¶ 15). Accordingly, this Court finds that Plaintiffs' alleged inference of scienter based on Third Point's stock sales is at least equally as compelling as the Third Point Defendant's asserted inference that these stock sales were the typical sales of a venture capital firm.

In sum, viewing Plaintiffs' allegations collectively, this Court finds that a "reasonable person" would "deem the inference of scienter at least as strong as any opposing inference." *Tellabs*, 551 U.S. at 326. Plaintiffs have pleaded sufficiently that Schwartz violated his fiduciary duties and acted as an agent of Third Point while serving on the Upstart Board. Additionally, Plaintiffs have alleged that Schwartz possessed the requisite scienter to impute to Third Point. Plaintiffs have also supplemented Schwartz's scienter and have a established a strong inference

that the Third Point Defendants themselves possessed scienter with independent allegations regarding Third Point's access to Upstart MNPI, Schwartz and Third Point's suspicious departure from involvement with Third Point, and Third Point's insider sales.

Accordingly, Third Point and Schwartz's Motion to Dismiss the Plaintiffs' securities fraud claims are **DENIED**.

### C. Rule 10b-5 Insider Trading (Count II)

Schwartz and the Third Point Defendants also contend that Plaintiffs have failed to state a cognizable Rule 10b-5 claim. Specifically, the Defendants argue that: (1) Plaintiffs Rule 10b-5 insider trading claim is not a viable theory; (2) even if the claim insider trading claim was viable, Plaintiffs cannot establish class-wide standing[7]; and (3) Plaintiffs' insider trading claim fails on its terms. (ECF 170-1 at 16–23). This Court disagrees.

Despite the Defendants' contentions, it is not a novel concept that a cause of action under Rule 10b-5 liability for insider trading exists. The Supreme Court has ruled that "[u]nder the 'traditional' or 'classical theory' of insider trading liability, § 10(b) and Rule 10b–5 are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information." *United States v. O'Hagan*, 521 U.S. at 651–52. The Supreme Court further specified that in order for liability to attach, there must be a violation of a fiduciary duty, or misappropriation of material, nonpublic information received from an insider. *Dirks v. S.E.C.,* 463 U.S. 646, 655-660 (1983); Federal Securities Law (4th ed. 2022) ("The Supreme Court held that in the absence of some breach of fiduciary duty, or "misappropriation," there is no violation

[7] This Court is not persuaded by Third Point's standing arguments. This Court has already established that the named Plaintiffs have standing for their claims against Defendants and therefore the standing of absent class members is not pertinent . (ECF No. 157 at 12) (citing *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998)) ("Brooks and Crain have individual standing vis-a-vis Defendants because they allege a redressable injury-in-fact, traceable to each defendants' conduct.…Thus, whether Brooks and Crain can represent the class 'depends solely on whether [they are] able to meet the additional criteria encompassed in Rule 23.'").

of Rule 10b-5. The Court in *Dirks* also suggested that for liability to attach, there must be 'personal gain' by the wrongdoer.").

Moreover, there is no bar on the ability of a securities class to recover under Rule 10b-5 for insider trading. In *In re SmarTalk*, for example, the court allowed plaintiffs' claims to procced where it was alleged that the investor defendants had a duty to disclose their material, nonpublic information, or abstain from trading, yet failed to do so. 124 F. Supp. 2d. at 549 ("As alleged in the Complaint, Alfi, as the inside tipper and part owner of SmarTalk Partners, personally benefitted either directly or indirectly from the disclosure because the profit from the sale of SmarTalk Partners' stockholdings worked to his personal financial benefit. Thus, the Court concludes that the Plaintiffs have sufficiently pleaded a 10(b) claim against the Investor Defendants, albeit a claim that is limited to the allegations of insider trading."). The court also allowed the plaintiffs § 20(a) claims to proceed alongside the Rule 10b–5 insider trading claims. *Id.* Similarly, in *Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, the court allowed plaintiffs' claims that the defendants violated § 10(b) by improperly using material non-public information for their benefit to proceed alongside § 20A(a) claims. 940 F. Supp. 1101, 1129 (W.D. Mich. 1996). Accordingly, not only are such claims viable, but Section 20A does not prohibit plaintiffs from bringing Rule 10b–5 insider trading claims.[8] Now that this Court has determined that such

---

[8] Schwartz and Third Point rely on *Fridrich v. Bradford*, 42 F.2d 307, 318–19 (6th Cir. 1976), which held that a Rule 10b-5 claim cannot be based on the fraud on the market theory, to support its arguments that "a securities class is not entitled to recover under Rule 10b-5 for defendants' trading while in possession of material nonpublic information ("MNPI") on the grounds that such conduct is manipulative or deceptive within the meaning of Section 10(b) or Rule 10b-5." (ECF No. 170-1 at 17). Moreover, the Defendants contend there would have been no need for codification of § 20A if insider trading were already prohibited under Rule 10b-5. (*Id.)*. Notably, however, various courts have declined to follow *Fridrich*, noting that it is no longer authoritative. *Backman v. Polaroid Corp.*, 540 F. Supp. 667, 669 (D. Mass. 1982) ("The Sixth Circuit's interpretation in Fridrich of the causation-in-fact requirement is too restrictive."); *In re Nord Res. Corp. Sec. Litig.*, , 1992 WL 1258516, at *4 (S.D. Ohio Dec. 16, 1992) ("However, the ruling in Fridrich is no longer authoritative. The legislative history of ITSFEA indicates that Congress adopted a more expansive notion of the necessary quantum of causation in insider trading cases. Accordingly, the ruling in Fridrich no longer defines the causation necessary to state a claim for insider trading."); *Shupe v. Rocket Companies, Inc.*, 348 F.R.D. 431, 443 (E.D. Mich. 2024) ("This Court joins the Southern District of Ohio in concluding that Fridrich, nearly 50 years later, is non-binding and unpersuasive.").

claims are viable, this Court must analyze whether Plaintiffs' have adequately pleaded a Rule 10b-5 insider trading claim.

In order to state a Rule 10b-5 insider trading claim, Plaintiffs must allege : "(1) a breach of a duty to disclose information or abstain from trading; (2) this information was material and nonpublic; and (3) the insider defendants acted with scienter." *Picard Chem. Inc. Profit Sharing Plan*, 940 F. Supp. at 1128. Typically, such a duty to disclose or abstain arises from a corporate insider's position within the corporation. *Id.* at 1129. Notably, however, one who does not have a formal position within the corporation may acquire a duty when he receives information from a corporate insider. This is referred to as tippee liability. *Dirks v. S.E.C.*, 463 U.S. 646, 660 (1983) ("[A] tippee assumes a fiduciary duty to the shareholders of a corporation not to trade on material nonpublic information only when the insider has breached his fiduciary duty to the shareholders by disclosing the information to the tippee and the tippee knows or should know that there has been a breach."). Accordingly, Plaintiffs may also plead Rule 10b-5 insider trading claim by demonstrating that a tippee, received material, nonpublic information from a corporate insider (the tipper) who breached his fiduciary duty and disclosed such information to receive a personal benefit. *Dirks*, 463 U.S. at 662 ("the test is whether the insider personally will benefit, directly or indirectly, from his disclosure. Absent some personal gain, there has been no breach of duty to stockholders. And absent a breach by the insider, there is no derivative breach."). Plaintiffs must also demonstrate that the tippee knew or should have known that the information upon which they relied was confidential or came from a corporate insider. *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d at 548.

Here, Plaintiffs have pleaded adequately that Schwartz is liable under Rule 10b-5 as a tipper. As discussed thoroughly above, Plaintiffs have detailed that Schwartz, as a member of the Upstart

Board, had a fiduciary duty to Upstart and its shareholders that he repeatedly breached by forwarding confidential board materials to his Third Point colleagues. Plaintiffs further allege that Schwartz did so for his own personal benefit, as his own compensation incentives were tied to Third Point's investment in Upstart, and for the benefit of Third Point of whom he was an agent and partner. Plaintiffs provide various emails indicating that Schwartz and Third Point were using Upstart material, nonpublic information to build their financial models to guide their investment in Upstart with information that was more informed than that to which the public had access. Additionally, Plaintiffs allege Schwartz shared this information knowing that the information was confidential, and aware that he had unique access by way of his position that gave Third Point an advantage.

In their motion to dismiss, however, Schwartz and the Third Defendants contend that the "record of documents that the Court may consider on this motion" overwhelmingly demonstrates that Schwartz did not breach any fiduciary duty; and accordingly, Plaintiffs claims must fail. (ECF No. 174 at 22). Tellingly, the Defendants do not specify which documents support their arguments. Only in their reply brief do the Defendants pinpoint two emails that they argue demonstrate that: (1) Upstart was aware Schwartz was sharing Upstart MNPI with Third Point; (2) Third Point agreed to be bound by Upstart's insider trading policies; and (3) therefore, the trades made by Third Point were authorized and not capable of being insider trades. (ECF No. 174 at 22 n.25). This Court is not persuaded.

As discussed above, however, Exhibits 2 and 3, are not properly before this Court and will not be considered at this stage. *See* Section III.A, *supra*. Even if this Court were to consider the attached emails, documenting that Third Point agreed to abide by Upstart's insider trading policy, such does not prove Third Point complied or that Upstart approved the trades at issue in the FAC.

This argument is without merit and viewing the evidence in the light most favorable to the Plaintiffs at this stage, this Court finds that Plaintiffs have adequately pleaded Schwartz's liability as a tipper.

Plaintiffs have also alleged adequately that the Third Point Defendants are liable under Rule 10b-5 as tippees. Where this Court has already determined that Plaintiffs sufficiently pleaded that Schwartz breached his fiduciary duties to Upstart and gained a personal benefit, such supports a finding that Plaintiffs have also pleaded that the Third Point Defendants who received such material, nonpublic information, and were aware of Schwartz's insider position, are also liable as tippees. *See In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d at 549 ("The Plaintiffs allege SmarTalk Partners and Youness sold stock held by SmarTalk Partners on the basis of the inside information they learned from Alfi. Given the Court's findings above, this would include information that pertained to SmarTalk's true financial status. As alleged in the Complaint, Alfi, as the inside tipper and part owner of SmarTalk Partners, personally benefitted either directly or indirectly from the disclosure because the profit from the sale of SmarTalk Partners' stockholdings worked to his personal financial benefit. Thus, the Court concludes that the Plaintiffs have sufficiently pleaded a 10(b) claim against the Investor Defendants…."). Additionally, Plaintiffs repeatedly allege that Schwartz emailed his Third Point colleagues about the sensitivity and confidential nature of the material nonpublic information he distributed to them. Hence, Plaintiffs

have alleged sufficient knowledge on behalf of Third Point. At this stage, the allegations are sufficient to state an insider trading claim.[9]

**D. §20(a) Control Person (Count III)**

Section 20(a) of the Exchange Act allows plaintiffs to hold liable "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder." 15 U.S.C. § 78t(a). A plaintiff asserting a claim pursuant to Section 20(a) must show that the controlled individual committed "an underlying violation of the securities laws or the rules and regulations promulgated thereunder" and that "the 'controlling person' defendant . . . directly or indirectly controlled the person liable for the securities law violation." *PR Diamonds, Inc.*, 364 F.3d at 696 (citation omitted). "Control" is defined by regulation as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. Courts have read this provision as requiring plaintiffs to plead that the defendant had "the practical ability to direct the actions of the people who committed the violation." *In re Nat'l Century Fin. Enters., Inc.*, 504 F. Supp. 2d 287, 300 (S.D. Ohio 2007) (internal quotation marks and citation omitted). Some courts further require that plaintiffs prove the actual exercise of control; the Sixth Circuit has not spoken on whether this is required. *See also In re FirstEnergy*, 2022 WL 681320, at *30.

Schwartz and the Third Point Defendants contend that Plaintiffs have failed to establish a predicate violation of Section 10(b), and have failed to allege sufficiently that Schwartz, Loeb, or

---

[9] The Third Point Defendants also argue that Plaintiffs claims must fail because there are no allegations that the Defendants actually traded based on MNPI. (ECF No. 170-1 at 21–23). This argument is without merit. Plaintiffs are not required to demonstrate that the Defendants "actually traded" based on MNPI, but rather Plaintiffs must allege that Defendants were at minimum in possession of the MNPI at the time of the trades. *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 370 (2d Cir. 2014) ("To establish an insider trading claim, it is not necessary to show that corporate insiders used the nonpublic information; it is sufficient to prove that they traded their corporation's securities 'while knowingly in possession of the material nonpublic information.'").

Third Point controlled a primary violator of the federal securities laws. (ECF Nos. 170-1 at 24–25; 174 at 25–27).

As an initial matter, this Court has already determined that Plaintiffs have alleged adequately that Schwartz and Third Point violated Section 10(b) which establishes a predicate violation for Section 20(a). Thus, this Court must now consider whether Plaintiffs have pleaded control sufficiently as to any of the Defendants over a primary violator. First, Schwartz and the Third Point Defendants argue that this Court already rejected Plaintiffs' allegations that Schwartz or Third Point controlled Upstart and the FAC does not cure the identified deficiencies. (ECF No. 170-1 at 24). This Court agrees. Plaintiffs reallege that Schwartz and the Third Point Defendants: (1) influenced and controlled the decision-making of Upstart and had supervisory involvement in the day-to-day operations of Upstart by virtue of their high-level positions with the company (i.e. Schwartz's Board seat); (2) had the power and authority to cause Upstart to engage in the alleged misconduct by virtue of its ownership of Upstart common stock; and (3) had the power to direct Upstart's management policies and operations (i.e. the timing of Upstart's IPO). This Court already reasoned, however, that minority stock ownership (20%) and the presence of a single member on the Upstart Board[10] was insufficient to demonstrate control. (ECF No. 68 at 53–54). Plaintiffs add a new allegation that "Loeb had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Schwartz, Third Point, and Third Point Ventures, including Schwartz's provision of material, nonpublic information and Third Point's

---

[10] Contrary to Plaintiffs' contention, the fact that the FAC now alleges that the Third Point controlled Schwartz, such does not equate to Plaintiffs sufficiently pleading that the Defendants controlled Upstart, where Schwartz is still only one member of the Board. (See ECF No. 68 at 54) (citing *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 458–59 (S.D.N.Y. 2005) (no control liability against defendant who appointed three of nine board members).

and Third Point Ventures' (and/or other funds managed or advised by Third Point's) transactions in Upstart stock." (ECF No. 165 ¶ 400).

Despite those allegations, the FAC does not provide any allegations that Schwartz needed authorization from the Third Point Defendants when he signed Upstart SEC filings, or that Schwartz needed to consult the Third Point Defendants prior to making any Upstart Board decisions. Those vague allegations do not suffice to evidence that Schwartz was "controlled" by Third Point.[11] Moreover, without claims of direct oversight, Plaintiffs fail to allege functional intertwinement of the Third Point Defendants in Upstart's operations. *Cf. In re Nat'l Century Fin. Enters., Inc.*, 504 F. Supp. 2d 287, 301 (S.D. Ohio 2007) (finding control where the outside directors held two out of three company board seats, one director chaired the auditor committee, and the directors were employed by a group that held a 20% interest in the company). As such, Plaintiffs' FAC does not remedy the prior deficiencies by demonstrating direct oversight or involvement in day-to-day Upstart operations by any of the Defendants. Defendants' Motion to Dismiss the control person liability claim as to Schwartz and the Third Point Defendants over Upstart is **GRANTED**.

Next, Schwartz and the Third Point Defendants argue that Loeb and Schwartz cannot be liable as control persons of Third Point where Third Point was not the "maker" of the statements at issue or otherwise responsible for the securities law violations. (ECF No. 170-1 at 25). Specifically, the Third Point Defendants argue that without a primary violation by Third Point, there can be no Section 20(a) liability. As discussed above, however, this Court has found that

[11] This Court notes that though Plaintiffs have pleaded that Schwartz worked on behalf of Third Point, such is not synonymous with pleading control. As discussed above, under respondeat superior liability, Plaintiffs have pleaded that Schwartz as an agent of Third Point while on the Upstart Board and acted in a way to promote Third Point's business. But such does not mean that Schwartz was under the direct control of Third Point. Thus, Plaintiffs pleadings that Schwartz worked for the benefit of Third Point does not equate to control.

Plaintiffs have pleaded a predicate Section 10(b) violation as to the Third Point Defendants via respondeat superior liability. *See* Section III.B.2, *supra*. Accordingly, given that the Third Point Defendants fail to make any argument regarding Loeb's or Schwartz's control over Third Point, this Court finds Plaintiffs have pleaded a control person claim as to Loeb and Schwartz with regard to Third Point. *See In re Scotts Miracle-Gro Co. Sec. Litig.*, 831 F. Supp. 3d 602, 647 (S.D. Ohio 2026) (finding plaintiffs stated a Section 20(a) control person claim where there was an underlying violation and the defendants did not argue a lack of control). Defendants' Motion to Dismiss the control person liability claim as to Schwartz and Loeb over Third Point is **DENIED**.

### E. §20A Insider Trading Claim (Count IV)

Finally, this Court turns to Plaintiffs' claim for insider trading liability under Section 20A. Pursuant to Section 20A of the Exchange Act, there is "a private right of action to buyers of securities who buy 'contemporaneously' with anyone who purchases or sells a security while in possession of material, nonpublic information." *Beach v. Healthways, Inc.*, 2009 WL 650408, at *5 (M.D. Tenn. Mar. 9, 2009) (citing 15 U.S.C. § 78t-1(a)). To sustain a § 20A claim Plaintiffs must: "(1) allege a requisite independent, predicate violation of the Exchange Act (or its rules and regulations), e.g., § 10(b), and (2) show that he has standing to sue under § 20A because he 'contemporaneously with the purchase or sale of securities that is the subject of such violation has purchased . . . or sold . . . securities of the same class' as the insider defendant." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 599 (S.D. Tex. 2003) (quoting 15 U.S.C. § 78t–1(a)). What is considered a "contemporaneous" trade has been the subject of vigorous debate; the term is not defined by statute. *See id.* at 599 (noting the lack of "clear agreement"). "Different courts have found that 'contemporaneity' requires the insider and the investor/plaintiff to have

traded anywhere from on the same day, to less than a week, to within a month, to 'the entire period while relevant and nonpublic information remained undisclosed.'" *Id.* at 600–01 (collecting cases).

The Third Point Defendants argue that Plaintiffs Section 20A claim must be dismissed because Plaintiffs fail to allege: (1) a predicate violation by any Defendant; (2) that any Defendant traded while in possession of material, nonpublic information; and (3) contemporaneous trading as to every sale. (ECF No. 170-1 at 26–30). This Court has determined that Plaintiffs adequately alleged that Schwartz and Third Point violated Section 10(b), which establishes a predicate violation for Section 20 A. *See* Section III.B.2, *supra*. Additionally, this Court already found that Plaintiffs have adequately alleged that Schwartz and the Third Point Defendants possessed material, nonpublic information prior to the alleged insider trades. *Id.* This is evidenced by the numerous emails Schwartz forwarded to Loeb and other Third Point colleagues containing Upstart's confidential Board material. It is not necessary that Plaintiffs allege that the Defendants "actually traded" based on MNPI; rather, Plaintiffs merely must allege that Defendants were in possession of MNPI at the time of the trades. *Steginsky*, 741 F.3d at 370. Thus, all that is left for this Court to evaluate is whether Plaintiffs have established standing through pleading contemporaneous trading with the Defendants.

The Third Point Defendants argue that Plaintiffs lack standing because their allegations fail to allege contemporaneous trading as to every Third Point sale of Upstart stock. (ECF No. 170-1 at 28). This Court knows of no authority, however, requiring contemporaneous trading for every trade, and the Third Point Defendants point to none. Instead, Plaintiffs must demonstrate that a member of the class traded contemporaneously with the Defendants. *Simon v. Am. Power Conversion Corp.*, 945 F. Supp. 416, 436 n.28 (D.R.I. 1996) ("Because the named plaintiffs traded on the same day as Machala and Davis, the 'contemporaneous' requirement of section 20A is

clearly satisfied. As such, the Court need not at this time determine whether a "contemporaneous" trader under this section includes someone who traded in the days or weeks after the alleged insider trade."); *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 255–56 (S.D.N.Y. 2007) ("the Complaint alleges that members of the putative class traded Openwave stock contemporaneously with the defendants named in the Section 20A cause of action, and has specified the dates of the defendants' trades. Such averments are sufficient to state a cause of action under Section 20A."); *see also Shupe v. Rocket Companies, Inc.*, 752 F. Supp. 3d 735, 788–90, 97 (E.D. Mich. 2024) (noting that the named plaintiff, who traded the day after the defendant, had standing and reasoning that "[t]he claims of all putative Subclass members will necessarily succeed or fail together. If [the defendant's] March 29, 2021 trade was an insider trade in violation of Section 10 of the Exchange Act, the entire Subclass, despite its ascertainability concerns, would be entitled to relief under Section 20A of the Exchange Act as "contemporaneous" traders."). Plaintiffs have satisfied these requirements.

Specifically, Plaintiffs have alleged multiple Plaintiff purchases on the same day that Third Point traded Upstart stock (August 23, August 24, November 19, December 12) and multiple other Plaintiff purchases within a few days of Third Point sales. (ECF No. 165 ¶ 412). These allegations are sufficient to establish a Section 20(A) violation. Additionally, Defendants' contentions that to establish contemporaneous trading, Plaintiffs purchases must have been at a price above the challenged sale price is without merit. Defendants point to no in circuit authority requiring this element and this Court declines to require such. Even so, Plaintiffs have alleged multiple contemporaneous, same day sales in which a plaintiff purchased Upstart stock at a price between the range of which Third Point sold stock. (*Id.*). Thus, even if this Court were to follow the Third Point Defendants' out of circuit authorities requiring contemporaneous trades for the same price

(*see Patel v. Edwards Lifesciences Corp.*, 2025 WL 2724388, at *15 (C.D. Cal. Sept. 19, 2025)), reliance on *Patel* would not be detrimental to Plaintiffs' Section 20(A) claims. Accordingly, the Third Point Defendants' Motion to Dismiss Plaintiffs' Section 20A insider trading claims is **DENIED**.

## IV. CONCLUSION

For the reasons set forth herein, this Court **GRANTS in part and DENIES in part** Plaintiffs' Motion to Strike or, in the Alternative, for Leave to File a Sur-Reply. (ECF No. 177). Exhibits 2 and 3 are therefore **STRICKEN**. This Court **GRANTS in part and DENIES in part** Schwartz and the Third Point Defendants' Motion to Dismiss. (ECF No. 170-1). Defendants' Motion to Dismiss the Section 20(a) control person liability claim as to Schwartz and the Third Point Defendants over Upstart is **GRANTED**. This Court **DENIES** the Motion as to all other claims. Plaintiffs' Section 20(a) claims alleging that the Third Point Defendants and Schwartz controlled Upstart are **DISMISSED**.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: September 30, 2026**